UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RHIAN TAYLOR,

                  Plaintiff,

  -against-

THE CITY OF NEW YORK and JOSEPH BEY,
Individually and as a Member of the New York
City Police Department,

                 Defendants.

**COMPLAINT**

Index No. 18-cv-5500

**JURY TRIAL DEMANDED**

Plaintiff RHIAN TAYLOR ("Plaintiff" or "Taylor"), by his attorneys, the LAW

OFFICES OF JOEL B. RUDIN, P.C., respectfully alleges, upon information and belief, as

follows:

## NATURE OF ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary

damages for Plaintiff, RHIAN TAYLOR, arising from his unconstitutionally-obtained conviction

for murder in Queens, New York.

2.      Plaintiff was convicted due to the unlawful withholding by police and prosecutors

of evidence favorable to his defense, in violation of his constitutional right to due process and a

fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

3.      Plaintiff's conviction ultimately was reversed, and he was acquitted after a second

trial, but not before he spent more than six years behind bars due to his unlawfully-obtained

conviction.

4.      The City of New York is liable because Plaintiff's constitutional injuries resulted

from the policies, customs and practices of the New York City Police Department ("NYPD") and

the Queens County District Attorney's Office ("QDAO") that were deliberately indifferent to the fair trial and due process rights of criminal defendants.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5.      This action arises under 42 U.S.C. §§ 1983 and 1988.

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8.      This action has been commenced within the applicable period for each claim.

9.      Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

10.     Plaintiff, RHIAN TAYLOR, is a citizen and resident of the State of New York and the United States.  He resides within the Eastern District of New York.

11.     Defendant JOSEPH BEY ("Bey"), was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law.  He is named here in his individual and official capacities.

12.     Defendant THE CITY OF NEW YORK ("City"), of which the County of Queens is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.  The QDAO and the NYPD are agencies of the City.  The District Attorney ("D.A."), assistants district attorney ("ADAs"), and detective-investigators ("D.I.s") employed by the QDAO, and police officers employed by the NYPD, are agents and employees of Defendant City, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

<u>**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**</u>

<u>**The Murder**</u>

13.     On August 10, 2007, Darion Brown was hanging out with his friends, including Seprel Turner and Anthony Hilton, drinking alcohol and/or smoking marijuana, in Jamaica, Queens.

14.     An altercation occurred involving Brown and members of a local youth gang called "I.G.M." ("I Got Money"), and Brown was visibly nervous.

15.     Brown, Turner, Hilton, another friend named Wayne Peacock, and two girls then drove to the location of a house party they had heard about, at 221st Street and 133rd Avenue, in Laurelton, Queens.

16.     When they arrived, the house party had ended and numerous young people were still hanging out in the street.

17.     Shots rang out and Brown, seated in the driver's seat of his vehicle, was fatally wounded.  He tried to drive away but lost consciousness and his car collided with a utility pole and came to a stop.

18.     Among the individuals who heard the shots were Rhian Taylor and several of his friends.

19.     They lived in the area and had attended the house party, which was a going-away celebration for one of their friends who was leaving for college.

20.     Plaintiff had been searched, like all the partygoers, upon his arrival at the party, and he was found to have no weapon.

21.     Upon hearing the shots fired, Taylor, his friends, and most of the other individuals in the area, including the additional occupants of Darion Brown's vehicle, fled to safety.

22.    Defendant Joseph Bey, a Queens homicide detective, was assigned the case.

23.    Police under Bey's direction gathered forensic evidence from the victim's car and the street, including shell casings, fingerprints, DNA, and other items, and they canvassed for witnesses.

24.    Plaintiff emerged as a suspect.

25.    Bey picked up for interrogation, and conducted identification procedures with, Turner and Hilton.

26.    Each of them identified Plaintiff as the shooter.

27.    Bey then arranged with Plaintiff to report to the 105th Precinct, where, on August 14, 2007, Bey arrested him for the murder.

28.    On April 18, 2008, Taylor was indicted by a grand jury sitting in the Supreme Court, Queens County, for second degree murder and possession of the murder weapon.

**The Trial Proceedings**

29.    Plaintiff's jury trial commenced on March 11, 2010, in the Supreme Court, Queens County.

30.    The prosecutor was Assistant District Attorney Karen Ross.

31.    She had been in the Office since 1998 and was highly experienced in handling murder and other serious prosecutions.

32.     The only evidence that Ms. Ross presented at trial that connected Plaintiff to the crime consisted of two witnesses—Turner and Hilton—and one piece of forensic evidence:  a cigarette butt recovered by police near the shooting which contained Plaintiff's DNA.

33.     Since Plaintiff was present for the party, the cigarette butt was of little significance, and the trial turned on the reliability of Turner's and Hilton's identifications and the credibility of their testimony.

**Testimony of Anthony Hilton**

34.     Hilton was a high school dropout and drug user.

35.     Hilton admitted he regularly smoked marijuana for the three years before the incident, and did not remember whether he smoked that night.

36.     He had been convicted, as a youthful offender, for criminal possession of a weapon and for menacing another person with a gun, and as an adult for disorderly conduct and criminal possession of stolen property.

37.     Hilton claimed that the shooting occurred as his friend Brown, seated in the driver's seat of his car, was flirting with and trying to pick up a girl hanging out in the street named Simone.

38.     Hilton testified he knew the girl and they were friends.

39.     Hilton testified he got out of the rear seat of the car, near where the girl was standing, and was admonishing Brown to stop flirting with the girl because she was like a cousin to Hilton.

40.     As Hilton directed Brown to stop speaking with the girl, Brown made fun of him as the girl's "kissing cousin" and continued to flirt with her.

41.     Hilton testified that Brown's "kissing cousins" comment caused tension in the nearby crowd.

42.     According to Hilton, he walked to the sidewalk, away from the car, to see if someone standing there whom he knew could help defuse the situation.

5

43.     As he was walking to the sidewalk, Hilton testified, he saw a heavyset, dark-skinned man suddenly fire four or five shots towards Brown from a distance of a few feet.

44.     Hilton identified Plaintiff, whom he observed in the courtroom, as the shooter.

45.     He claimed the shooter, like Plaintiff, was wearing glasses.

46.     Hilton testified that he fled, ran to Turner's house, and discussed with Turner what had happened.

47.     He testified that, minutes later, he returned to the scene, and saw Brown's car crashed into a utility pole down the block from the shooting.

48.     Although police were present, Hilton testified, he did not come forward, but instead went to the hospital to try to visit Brown.

49.     Not until one week later, after learning the police were looking for him, did Hilton come forward to speak with police and identify Plaintiff as the shooter.

50.     The prosecution argued that Hilton neither expected, received, nor was promised any benefit for his cooperation with the authorities in connection with Plaintiff's prosecution.

51.     Plaintiff's defense counsel, in his cross-examination of Hilton, brought out that Hilton had never previously mentioned that the shooter wore glasses.

52.     He tried to show Hilton had a motive to falsely accuse Plaintiff.

53.     He suggested that Hilton might have been the shooter himself.

54.     Hilton's DNA had been found in two specks of blood found by police on the side of the car where the shooting occurred, and neither Hilton nor the prosecution offered any explanation for the presence of his blood on the vehicle.

55.     Aside from counsel's suggestion, the only evidence he could point to of Hilton's motive to lie was a single instance, shortly before trial, in which ADA Ross appeared with Hilton at a proceeding to violate his probation on his gun conviction.

56.     ADA Ross asked the probation violation hearing judge not to require any bail so that Hilton would be at liberty and able to appear to testify at Plaintiff's trial.

57.     ADA Ross represented, in argument to Plaintiff's trial judge and to the jury at the end of the trial, that her request had no impact on Hilton and had provided him no benefit.

58.     She represented that the judge made an independent decision to fully restore Hilton to probation, so that her request to release him on no bail was of no consequence and did not affect his testimony.

59.     Plaintiff's counsel also tried to impeach Hilton's character by questioning him on his gun possession conviction.

60.     Hilton had been convicted at a trial before a judge of gun possession based upon a complaint and an indictment alleging that he had admitted to a detective that he had accidentally shot himself in the foot with it.

61.     However, when cross-examined by Plaintiff's attorney, Hilton testified he had been falsely convicted.

62.     He denied that he had possessed any gun.

63.     He denied that he had ever admitted to the police that he had shot himself with it.

**Testimony of Seprel Turner**

64.     The prosecution's second witness inculpating Plaintiff was Seprel Turner.

65.     Like Hilton, Turner admitted he was a drug user who had been smoking marijuana two to three times a day for the past three to four years, smoked on the day of the shooting, and smoked several times on the day before he testified at trial.

66.     He acknowledged that, six months after the murder, he was arrested in Queens for possessing a loaded semi-automatic handgun and, following his release on that charge, was arrested again, in Manhattan, for possessing a gravity knife and stolen property.

67.     Facing up to 15 years in prison for the gun possession, Turner testified, he entered into a cooperation agreement with the Queens County District Attorney.

68.     Under this agreement, in exchange for his trial testimony against Plaintiff, felony charges would be dismissed and Turner's sole conviction would be for a misdemeanor, with a sentence of three years of probation.

69.     Turner testified that, just before the shooting, Hilton spoke with the girl Simone.

70.     Brown asked if they were "kissing cousins."

71.     Unlike Hilton, who did not testify to any argument involving the shooter, Turner claimed that a dark-skinned, chubby man walked over to their car and began arguing with Hilton and Brown.

72.     Turner testified Hilton got out of the car, and then the shooting occurred.

73.     Like Hilton, Turner described the shooter as wearing glasses.

74.     Detective Bey testified that Turner had not mentioned glasses in the description of the shooter he initially gave to the detective.

75.     Turner admitted he fled from the scene after the shooting, met up with Hilton, then returned, but did not come forward to tell police he had seen the shooting.

76.     He claimed that he was ready to come forward at the request of Brown's family, but police got to him first and brought him in for questioning.

77.     Turner testified that he identified Plaintiff at a lineup conducted several days after the shooting, and he identified him again in the courtroom.

78.     Plaintiff's counsel brought out through the testimony of Detective Bey that Turner identified Plaintiff at the lineup where Plaintiff was the only individual who had previously been displayed to Turner in a photo array.

79.     Plaintiff's counsel contended that Plaintiff stood out as the most heavyset individual depicted in the photo array and as the only individual Turner was likely to recognize as having been present in the area when the shooting occurred.

### Summations and Verdict

80.      During his summation, defense counsel argued that both Hilton and Turner, when they testified at trial, had a motive—the assistance they had received from the D.A.'s Office with respect to their pending cases—to falsely accuse Taylor.

81.     Counsel knew about, and referred only, to Turner's written cooperation agreement and Hilton's release after ADA Ross had requested that no bail be set.

82.     Defense counsel had no evidence from which to argue Hilton or Turner had any additional motive to lie, either at the time they initially were interviewed by police and first identified Plaintiff as the shooter or at the trial.

83.     Meanwhile, the prosecutor, ADA Ross, contended that Hilton had received no benefit at all, and had no reason to lie.

84.     She argued that both witnesses had testified against Plaintiff solely "to get the right person" in order to obtain justice for their deceased friend and they had "nothing to gain by pinning this on somebody who didn't do it."

85.     During deliberations, the jury asked to see the benefits received by both witnesses.

86.     However, the judge gave them only Turner's written cooperation agreement, but none of the *testimony* about benefits Turner and Hilton had received.

87.     He erroneously informed the jury this was the only evidence of benefits.

88.     On March 29, 2010, after one week of deliberations, Plaintiff was convicted of all charges against him.

89.     Plaintiff was sentenced to serve 20 years to life in prison.

90.     Plaintiff was sent upstate to serve his sentence.

91.     On October 27, 2015, the New York State Court of Appeals reversed Plaintiff's conviction for violation of his right to a fair trial.

92.     The Court did so because of the judge's misleading response to the jury's inquiry about benefits which omitted Hilton's testimony about ADA Ross's appearance on his behalf at the probation violation proceeding.

93.     On December 21, 2016, as he was awaiting retrial, Plaintiff was released on bail.

94.     Previously, ADA Ross contended that his conviction at the first trial demonstrated the likelihood he would be convicted again and opposed his bail release.

95.     On January 31, 2017, following a second trial, Plaintiff was fully acquitted.

96.     In all, Plaintiff spent six years and nine months in custody following his trial conviction.

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments by Defendant Bey)

97.     Plaintiff repeats and realleges each allegation contained in ¶¶ 1 through 96 of this Complaint.

98.     At the time of his first trial, Plaintiff had a clearly-established right, pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, *Brady v. Maryland,* 363 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972), and other clearly established case law, to timely disclosure of all information that tended to show his innocence and/or impeached the credibility of the prosecution's witnesses against him.

99.     While the defense, at trial, knew that Hilton and Turner had not previously mentioned that the shooter wore glasses, it did not know that both Hilton and Turner had affirmatively told Defendant Bey, during their initial interviews shortly after the shooting, that the shooter was *not* wearing glasses.

100.     In addition, they had told Bey the shooter was clean shaven.

101.     When Bey arrested Taylor three days after the shooting, he learned that Taylor regularly wore corrective glasses and observed that he had a mustache and a goatee.

102.     Nevertheless, Bey omitted from his paperwork the descriptions he obtained from Hilton and Turner that the shooter did not wear glasses and was clean shaven.

103.     Bey never told ADA Ross that he had received descriptions of the shooter from Hilton and Turner that differed from Plaintiff's appearance.

104.    As a result, this information, which suggested Plaintiff's innocence and directly impeached Hilton's and Turner's trial testimony, was never disclosed to the defense.

105.    The information that Bey withheld from the prosecution, and thus from the defense, was favorable to the defense.

106.    The information that Bey withheld was material to the outcome of the trial in that there is a reasonable probability that it affected the verdict.

107.    In withholding the aforementioned information favorable to Plaintiff, Bey acted deliberately, intentionally, willfully, recklessly and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

108.    Bey's actions in withholding the favorable information was a foreseeable, substantial, and proximate cause of Plaintiff's conviction.

109.    Defendant Bey is therefore liable to Plaintiff, under 42 U.S.C. §§ 1983 and 1988, for his conviction and imprisonment, all other consequential damages, and his reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

**(42 U.S.C. § 1983/*Monell*; Claim Against Defendant THE CITY OF NEW YORK for Actions of the New York City Police Department)**

110.    Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 106 and 108 of this Complaint.

111.    The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

12

112.    Prior to Plaintiff's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*"Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence as well as evidence affecting the credibility of prosecution witnesses, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

113.    Specifically, the NYPD provided no minimally adequate training or supervision to police officers concerning their obligation to make a record of and/or to disclose to the prosecution information favorable to a criminal suspect or defendant, either because it is suggestive of innocence or is impeaching of potential witnesses for the prosecution.[1]

114.    As a result, many detectives were unaware they had any obligation to make a record of or to otherwise inform prosecutors of such information.

115.    In addition, the New York City Police Commissioner, as well as his delegates, did not discipline police officers found to have been responsible for the violation of criminal suspects' or defendants' right to disclosure of *Brady* material.

---

[1]Undersigned counsel for Plaintiff has obtained deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits establishing, prior to and during the time period of Plaintiff's arrest and prosecution, that the NYPD provided no *Brady*-related training and had no policies requiring disclosure of *Brady* material.

13

116. As a result, detectives understood that there would be no adverse consequence to them if they withheld such information from prosecutors and the defense.

117. At the same time, the NYPD put substantial pressure on detectives to close cases by developing probable cause and making arrests.

118. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant THE CITY OF NEW YORK, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

      a)   to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

      b)   that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

      c)   that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

119. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

      a)   credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence;

      b)   civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had withheld material evidence;

      c)   numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals,

and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady*;

d)   judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

e)   formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

f)   the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on and incentive of officers to close cases by making arrests that result in indictment and convictions.

120.   Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

121.   The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

122.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

123.    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by Defendant Bey of Plaintiff's rights under the Constitution and laws of the United States.

124.    Defendant Bey failed to make a record of evidence he knew was favorable to Plaintiff, and otherwise intentionally failed to disclose such information to the District Attorney's Office, either because he was acting willfully and in bad faith to suppress such information knowing there would be no adverse consequence to him if his misconduct was ever discovered or because, due to his lack of training, he was unaware he had any obligation to record and disclose such information.

125.    By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

### THIRD CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant THE CITY
OF NEW YORK For Actions of the Queens D.A.'s Office)**

126.    Plaintiff repeats and realleges each allegation contained in ¶¶ 1 through 96 as if fully set forth herein.

127.    Prior to and during the first trial of Plaintiff, ADA Ross knew that Plaintiff's defense lawyer was interested in challenging the reliability and the credibility of the trial testimony of the prosecution's two main witnesses, Hilton and Turner, and in trying to show that Hilton may have been the real killer.

128.    Ross knew as well that, in a criminal trial, the defendant is entitled to an acquittal if, due to evidence of innocence or the impeachment of the prosecution's witnesses, the jury is left with a reasonable doubt of guilt.

129.    Ross knew about numerous pieces of evidence that undercut the reliability and the credibility of Hilton and Turner, or which pointed to Hilton as the possible shooter, but failed to disclose such information to Plaintiff or his attorney.

130.    As to Turner, Ross knew but did not disclose that, when Bey first picked him up and interrogated him, Turner had a criminal history which provided him reason to be in fear of and to try to ingratiate himself with the police by assisting them in making an arrest.

131.    Ross knew but did not disclose that, when police were unable to locate or gain the cooperation of Hilton, Turner found Hilton and brought him to meet with Det. Bey.

132.    While presenting Turner as a fully cooperating witness, Ross did not disclose that, after initially ingratiating himself with police who had brought him in for questioning, Turner did not appear in response to a subpoena to testify before the grand jury.

133.    Ross did not disclose that, due to Turner's failure to comply with the subpoena or cooperate, she obtained an arrest warrant for him.

134.    Although the warrant application detailed Turner's pattern of failure to cooperate, Ross did not disclose it to the defense.

135.   Knowing that Turner had entered into a formal, written cooperation agreement under which he would avoid up to 15 years in prison but only if he cooperated with the District Attorney, Ross did not disclose that Turner violated the agreement by failing to voluntarily appear at her Office to prepare his trial testimony and she had to apply for and to obtain still another arrest warrant.

136.   Ross discussed with Bey, but failed to disclose to the defense, information she had received from the NYPD that Turner was a leader of a notorious street gang, known as the "Snow Gang," which operated in the same general neighborhood where the shooting occurred and which was involved in murders, drug dealing and prostitution.

137.   As for Hilton, Ross argued at trial that he had received no benefits related to his testimony and was motivated solely to obtain justice for his deceased friend.

138.   However, she knew, but did not disclose, that, at the time he finally met with Bey and identified Taylor as the shooter, Hilton had an open felony case in Queens County, being prosecuted by a colleague of ADA Ross, for possession of a stolen automobile.

139.   Ross did not disclose her knowledge that, when he testified for her, and against Plaintiff, at the grand jury, Hilton not only had the open felony case but also had failed to appear in court at least twice, bench warrants had been issued against him, and he could be prosecuted for bail jumping.

140.   Further, Ross did not disclose that, when Hilton failed to answer a grand jury subpoena to appear to testify, she obtained a material witness warrant, caused him to be arrested and brought before a judge, and when he still refused to testify, had him jailed.  Only then did he "agree" to testify.

18

141.   Ross did not disclose that, after Hilton testified before the grand jury, his felony case was dismissed by her Office and he was never prosecuted for bail jumping.

142.   Ross failed to disclose sworn grand jury and trial testimony by a detective, police reports, and statements by other prosecutors in her Office, proving that Hilton lied at Plaintiff's trial when he denied ever saying he had shot himself in the foot or possessed the gun used in that shooting.

143.   She failed to disclose police documents in her Office's possession showing that, when Hilton was arrested by police on January 8, 2008, for the gun possession, the person he called to assist him was Turner.

144.   She failed to disclose that, with nothing in it for him, Hilton refused to cooperate with the police in the latter's investigation of Hilton's own shooting.

145.   Ross failed to disclose that, before shooting himself in the foot with his own gun, Hilton previously had been shot in the foot and was wearing a protective boot.

146.   Ross failed to disclose that, in October 2009, Hilton was involved in still a third shooting.

147.   Hilton's involvement in three shootings, two unknown to Plaintiff's counsel, suggested access to guns, possible involvement in gang-related violence, and a violent proclivity that Plaintiff's attorney, suspecting that Hilton was the real shooter in Plaintiff's case, would have investigated and made use of at trial.

148.   On February 25, 2010, shortly before Plaintiff's trial, Ross appeared at Hilton's probation violation hearing on his gun case.  Contrary to her false representation at Plaintiff's trial denying any role in helping Hilton avoid imprisonment for violating his probation, Ross, solely because of Hilton's role as a prosecution witness, spoke with the court and the probation

department and caused the court to restore Hilton to probation even though he had repeatedly violated the conditions of his release on probation.

149.    Indeed, before restoring Hilton to probation, the court asked Ross if such a result would be okay with her and she agreed to that disposition.

150.    Ross also failed to disclose that, on that same day, she appeared in court with Hilton on still another case, and assisted him in avoiding a jail sentence for failing to perform court-ordered community service, causing the judge to resentence him to time served.

151.    Ross failed to disclose that, during Plaintiff's trial, Hilton got in trouble with the Probation Department for failing to report for supervision and again faced jail, but Ross had an investigator with her office intercede with the Probation Department to assist him in avoiding another violation proceeding.

152.    Ross failed to disclose that, on March 23, 2010, while Plaintiff's jury was deliberating, Ross, having argued Hilton was receiving no benefits in exchange for his testimony, appeared in court after he was arrested for yet another series of probation violations and interceded on his behalf.

153.    As a result, the judge restored Hilton to probation and released him from custody, acting against the recommendation of the Department of Probation, which requested that Hilton be remanded and resentenced.

154.    On April 22, 2010, Hilton appeared in court once more on his probation violations and, owing to ADA Ross's intervention on Hilton's behalf, the court resentenced Hilton to time served and terminated his probation.

155.    Prior to Plaintiff's retrial, and consistent with the policy, custom or practice of her Office, Ross continued to deliberately conceal exculpatory and impeachment evidence that she

was required by law to timely disclose and/or to consciously avoid obtaining possession or actual knowledge of such evidence.

156.    The aforementioned conduct of ADA Ross in failing to disclose information favorable to the defense prior to or during Plaintiff's trial, and in making false and misleading arguments during the trial to the court and the jury, violated Plaintiff's constitutional rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

157.    The foregoing violations of Plaintiff's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant THE CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the Queens County District Attorney's Office, namely:

    a.    The institution and implementation by the District Attorney of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

      i.    The duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

      ii.    The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred; and

      iii.    The continuing obligation to timely and fully disclose material favorable to the defense as set forth in *Brady v. Maryland,* 373

U.S. 83 (1963); *Giglio v. United States*, 450 U.S. 150 (1972), and their progeny; and

b. The District Attorney's deliberate indifference to the need, and his failure, to adequately instruct, train, supervise, and/or discipline his employees with respect to such matters.

158. The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the District Attorney of Queens County and his delegates, who knew:

a. To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b. That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

c. That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and

d. That employees of the QDAO had a history of making wrong choices in such matters.

159. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

a.     Numerous credible allegations, many substantiated by judicial decisions
       (some of which are listed in Exhibit A hereto and incorporated by
       reference) that Queens County ADAs had:

    i.     Participated in the manufacturing of false testimony or evidence,
       including identification evidence;

    ii.    Presented or failed to correct false or misleading testimony and
       argument;

    iii.   Failed to disclose information favorable to the defense that was
       required to be disclosed by the Constitutions and the laws of the
       United States and of the State of New York;

    iv.    Made arguments at trial that were so false, misleading, or
       otherwise improper that they deprived the defendant of due process
       and a fair trial; and

b.     The inherent obviousness of the need to train, supervise and discipline
       ADAs in their aforementioned constitutional obligations to counteract the
       pressure that the Queens County District Attorney applied to prosecutors
       to obtain convictions.

160.    At the time of Plaintiff's trial, the Queens County District Attorney's indifference
to the aforementioned types of prosecutorial misconduct was evidenced by his failure to conduct
internal disciplinary investigations, or to discipline, the prosecutors who were known to engage
in it, including the prosecutors responsible for the misconduct found in the judicial decisions
listed in Exhibit A, or to refer such individuals for possible discipline by the Appellate Division's
Disciplinary or Grievance Committees.

161.    Instead of disciplining such prosecutors, the District Attorney's policy, custom or practice was to give them raises, promotions and commendations, based in part on their record of winning at trial and extracting guilty pleas even in weak cases.

162.    Thus, prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning, but would suffer no negative consequence in the unlikely event their misconduct was exposed.

163.    Further encouraging prosecutors to win at any cost was their knowledge that the QDAO had no employee handbook or other published procedure for disciplining prosecutors who violated rules of behavior for criminal prosecutions.

164.    In addition to turning a blind eye to known violations of *Brady* and other fair trial obligations, the Queens County District Attorney followed a policy of encouraging prosecutors to consciously avoid obtaining personal possession or actual knowledge of *Brady* material, including evidence of innocence and impeachment material, so that they could avoid disclosing it and, if later discovered, could defend themselves against potential disciplinary sanctions by denying actual knowledge of such material.

165.    The Office itself termed this its "Chinese Wall" policy.

166.    It continued to pursue this policy, even after it was condemned by the New York State courts in the early 1990s, in flagrant disregard of law.

167.    Further, under District Attorney Brown, the Office followed a practice of using material witness warrants to arrest and detain prospective witnesses, sometimes in violation of the terms of the warrants, until they agreed to give testimony favoring the prosecution, and then concealed from the defense the existence and the contents of the warrant applications and orders

as well as the fact that the witnesses had been uncooperative or recalcitrant and were testifying under compulsion.

168.    Evidence of the Queens County District Attorney's deliberate indifference to prosecutorial misconduct violative of a criminal defendant's rights, including false or misleading argument to the jury and *Brady* violations, was uncovered during the civil rights litigation in *Su v. City of New York*, 06 Civ. 687 (EDNY) (RJD)(CLP), a case involving the wrongful conviction of a young man due to the prosecution's knowing use of false evidence and argument and *Brady* violations.

169.    During that litigation, discovery of personnel records, together with deposition testimony, showed that in dozens of cases where courts had found serious prosecutorial misconduct, including the use of and failure to correct false or misleading testimony and *Brady* violations, the prosecutors were never disciplined, the Office had no formal or meaningful disciplinary policy, procedure, training, or practice, and the Office trained prosecutors in the aforementioned "Chinese Wall" policy to prevent disclosure of impeachment evidence under *Brady*.[1]

170.    As established by the testimony of executives at the Queens D.A.'s Office, District Attorney Richard Brown made the decision in each instance where misconduct was alleged or found whether to initiate an investigation of the ADA involved or to impose discipline.

---

[1] The discovery obtained in that lawsuit is summarized in Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 559-566 (2011), a copy of which is attached as Exhibit B and is incorporated herein by reference.

171.    However, the testimony and evidence further showed and shows that, with deliberate indifference to the violations of criminal defendants' constitutional rights, Mr. Brown rarely if ever imposed discipline or authorized disciplinary inquiries.

172.    The *Su* case settled on or about October 15, 2008, for $3.5 million.

173.    Notwithstanding that settlement, the District Attorney's deliberately indifferent policies, customs or practices continued through and including the prosecution of Plaintiff and until the present.

174.    The District Attorney's policy, custom and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of ADA Ross's violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

175.    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

176.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense,

26

and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial and trial proceedings.

177.    The Queens County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

178.    The District Attorney of Queens County, at all relevant times, was and is an elected officer of Queens County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

179.    The District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); New York has provided by statute (N.Y. County Law §§ 53, 941) that Defendant City's constituent counties (including Queens County), and hence Defendant City itself, has liability for torts committed by County officers and employees, such as the District Attorney and his assistants, and THE CITY OF NEW YORK represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

180.    The District Attorney of Queens County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

181.    During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their

subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

182.    By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.    For compensatory damages of not less than $15 million;

b.    For punitive damages of not less than $7.5 million;

c.    For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

d.    For pre-judgment interest as allowed by law; and

e.    For such other and further relief as this Court may deem just and proper.

LAW OFFICES OF JOEL B. RUDIN, P.C.

_____/s/_____
By:   JOEL B. RUDIN
        HARAN TAE
Law Offices of Joel B. Rudin, P.C.
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600

*Attorneys for the plaintiff*

Dated: New York, New York
          October 1, 2018