# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RHIAN TAYLOR,<br><br>                  Plaintiff,<br><br>    -against-<br><br>THE CITY OF NEW YORK and JOSEPH BEY,<br>Individually and as a Member of the New York<br>City Police Department,<br><br>               Defendants. | **AMENDED COMPLAINT**<br><br>Index No. 18-cv-5500<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff RHIAN TAYLOR ("Plaintiff" or "Taylor"), by his attorneys, the LAW OFFICES OF JOEL B. RUDIN, P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary damages for Plaintiff, RHIAN TAYLOR, arising from his unconstitutionally obtained conviction for murder in Queens, New York.

2.      Plaintiff was deprived of his liberty before trial, and convicted, due to the unlawful withholding by police and prosecutors of exculpatory and impeachment evidence favorable to his defense, and their reliance on false or misleading evidence and argument, in violation of his constitutional right to liberty, due process, and a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

3.      Plaintiff's conviction ultimately was reversed, and he was acquitted after a second trial, but not before he spent nearly nine years in jail or prison due to the police and prosecutorial misconduct alleged in this complaint.

4.    The City of New York is liable because Plaintiff's constitutional injuries resulted from the policies, customs and practices of the New York City Police Department ("NYPD") and the Queens County District Attorney's Office ("QDAO") that were deliberately indifferent to the liberty, fair trial and due process rights of criminal defendants.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5.    This action arises under 42 U.S.C. §§ 1983 and 1988.

6.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8.    This action has been commenced within the applicable period for each claim.

9.    Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

10.    Plaintiff, RHIAN TAYLOR, is a citizen and resident of the State of New York and the United States. He resides within the Eastern District of New York.

11.    Defendant JOSEPH BEY ("Bey"), was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual and official capacities.

12.    Defendant THE CITY OF NEW YORK ("City"), of which the County of Queens is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York. The QDAO and the NYPD are agencies of the City. The District Attorney ("D.A."), assistant district attorneys ("ADAs"), and detective-investigators ("D.I.s") employed by the QDAO, and police officers employed by the NYPD, are agents and employees

of Defendant City, which is legally responsible for torts they commit within the scope of their

employment and/or under color of law.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**The Murder**

13.     On August 10, 2007, Darion Brown was hanging out with his friends, including

Seprel Turner and Anthony Hilton, drinking alcohol and/or smoking marijuana, in Jamaica,

Queens.

14.     An altercation occurred involving Brown and members of a local youth gang

called "I.G.M." ("I Got Money"), and Brown was visibly nervous.

15.     Brown, Turner, Hilton, another friend named Wayne Peacock, and two girls then

drove to the location of a house party they had heard about, at 221st Street and 133rd Avenue, in

Laurelton, Queens.

16.     When they arrived, the house party had ended and numerous young people were

still hanging out in the street.

17.     Shots rang out and Brown, seated in the driver's seat of his vehicle, was fatally

wounded. He tried to drive away but lost consciousness and his car collided with a utility pole

and came to a stop.

18.     Among the individuals who heard the shots were Rhian Taylor and several of his

friends.

19.     They lived in the area and had attended the house party, which was a going-away

celebration for one of their friends who was leaving for college.

20.     Plaintiff had been searched, like all the partygoers, upon his arrival at the party,

and he was found to have no weapon.

21.     Upon hearing the shots fired, Taylor, his friends, and most of the other individuals in the area, including the additional occupants of Darion Brown's vehicle, fled to safety.

22.     Defendant Joseph Bey, a Queens homicide detective, was assigned the case.

23.     Police under Bey's direction gathered forensic evidence from the victim's car and the street, including shell casings, fingerprints, DNA, and other items, and they canvassed for witnesses.

24.     Plaintiff emerged as a suspect.

25.     Bey picked up for interrogation, and conducted identification procedures with, Turner and Hilton.

26.     Each of them identified Plaintiff as the shooter.

27.     Bey then arranged with Plaintiff to report to the 105th Precinct, where, on August 14, 2007, Bey arrested him for the murder.

28.     On April 18, 2008, Plaintiff was indicted by a grand jury sitting in the Supreme Court, Queens County, for second degree murder and possession of the murder weapon.

**The Trial Proceedings**

29.     Plaintiff's jury trial commenced on March 11, 2010, in the Supreme Court, Queens County.

30.     The prosecutor was Assistant District Attorney Karen Ross.

31.     She had been in the Office since 1998 and was highly experienced in handling murder and other serious prosecutions.

32.     The only evidence that Ms. Ross presented at trial that connected Plaintiff to the crime consisted of two witnesses—Turner and Hilton—and one piece of forensic evidence: a cigarette butt recovered by police near the shooting which contained Plaintiff's DNA.

4

33.     Since Plaintiff was present for the party, the cigarette butt was of little

significance, and the trial turned on the reliability of Turner's and Hilton's identifications and the

credibility of their testimony.

**Testimony of Anthony Hilton**

34.     Under direct examination by ADA Ross, Hilton testified he was a high school

dropout and drug user.

35.     Hilton claimed that the shooting occurred as his friend Brown, seated in the

driver's seat of his car, was flirting with and trying to pick up a girl hanging out in the street

named Simone.

36.     Hilton testified he knew the girl and they were friends.

37.     Hilton testified he got out of the rear seat of the car, near where the girl was

standing, and was admonishing Brown to stop flirting with the girl because she was like a cousin

to Hilton.

38.     As Hilton directed Brown to stop speaking with the girl, Brown made fun of him

as the girl's "kissing cousin" and continued to flirt with her.

39.     Hilton testified that Brown's "kissing cousins" comment caused tension in the

nearby crowd.

40.     According to Hilton, he walked to the sidewalk, away from the car, to see if

someone standing there whom he knew could help defuse the situation.

41.     As he was walking to the sidewalk, Hilton testified, he saw a heavyset, dark-

skinned man suddenly fire four or five shots towards Brown from a distance of a few feet.

42.     Hilton identified Plaintiff, whom he observed in the courtroom, as the shooter.

43.     He claimed the shooter, like Plaintiff, was wearing glasses.

44.     Hilton testified that he fled, ran to Turner's house, and discussed with Turner what had happened.

45.     He testified that, minutes later, he returned to the scene, and saw Brown's car crashed into a utility pole down the block from the shooting.

46.     Although police were present, Hilton testified, he did not come forward then, or for the next week, because he did not want "police contact."

47.     Only after learning the police were looking for him did Hilton come forward to speak with police and identify Plaintiff as the shooter.

48.     Hilton acknowledged he had been convicted, as a youthful offender, of criminal possession of a weapon and had received a sentence of five years of probation.

49.     He further testified he had been convicted, as a youthful offender, for menacing another person with a gun and, as an adult, for disorderly conduct and criminal possession of stolen property.

50.     Hilton testified that, a week and a half before trial, he was in court for violating his probation on the gun possession matter.

51.     He testified that the only "promise" he received was that the District Attorney would ask the judge to leave him out on bail, but then the judge accepted his guilty plea and restored him to probation; he received no other "promise."

52.     Hilton testified that he had no other cases, and no other probation violation proceeding, pending.

53.     ADA Ross disclosed to the defense no additional impeachment information regarding Hilton.

54.     Plaintiff's defense counsel, in his cross-examination of Hilton, brought out that Hilton had never previously mentioned that the shooter wore glasses.

55.     He suggested that Hilton might have been the shooter himself.

56.     Hilton's DNA had been found in two specks of blood found by police on the side of the car where the shooting occurred.

57.     Neither Hilton nor the prosecution offered any explanation for the presence of his blood on the vehicle.

58.     Counsel elicited Hilton's admission that, after the shooting and before he came forward to talk with the police, he had gone over with Turner what had occurred.

59.     Hilton denied in his testimony that he had been drinking that night.

60.     He testified that he doubted that Turner had been drinking, although he claimed not to remember for certain about Turner.

61.     Counsel, through his questioning, tried to show that Hilton had received benefits that provided him a motive to falsely accuse Plaintiff.

62.     However, the only possible "benefit" Hilton acknowledged was the D.A.'s promise to ask the court for bail on Hilton's probation violation.

63.     Indeed, during argument to Plaintiff's trial judge and to the jury at the end of the trial, ADA Ross represented that her request had no impact on Hilton and had provided him no benefit.

64.     The reason, she contended, was that, following Hilton's plea, the judge restored him to probation anyway, so the issue of bail release became moot.

65.     Plaintiff's counsel also tried to impeach Hilton's character by questioning him on his gun possession and menacing convictions.

66.     However, Hilton now insisted he had been falsely convicted in both cases.

67.     He denied that he had possessed any gun when he was arrested for gun possession.

68.     He denied that in connection with that arrest he had admitted to the police that he had shot himself with it.

69.     As for his menacing with a gun conviction, he denied, contrary to his guilty plea, that he really had a gun, insisting he had merely "been talking with his hands."

**Testimony of Seprel Turner**

70.     The prosecution's second witness accusing Plaintiff was Seprel Turner.

71.     ADA Ross presented him as wholesomely as she could, eliciting his testimony that he was a hip-hop artist who had a contract with a record producer.

72.     She also had Turner explain that an apparent teardrop tattoo under his eye, potentially symbolic of violent and criminal activity, was really a music note, and that the other, numerous tattoos he had were related to music or religion.

73.     Turner admitted he was a drug user who had been smoking marijuana two to three times a day for the past three to four years, smoked earlier on the day of the shooting, and smoked several times on the day before he testified at trial.

74.     He acknowledged that, in 2009, he was arrested in Queens for possessing a loaded semi-automatic handgun.

75.     He also admitted that, following his release on that charge, he was arrested again, in Manhattan, for possessing a gravity knife and stolen property.

76.     Facing up to 15 years in prison for the gun possession, Turner testified, he entered into a cooperation agreement with the Queens County District Attorney.

77.     Under this agreement, Turner testified, in exchange for his trial testimony against Plaintiff, his felony charges would be dismissed and his sole conviction would be for a misdemeanor, with a sentence of three years of probation.

78.     ADA Ross made no other disclosure, either directly to defense counsel or through Turner's testimony, of any potentially impeaching information.

79.     Regarding the shooting, Turner testified that, just before it occurred, Hilton spoke with the girl Simone.

80.     When Hilton said they were like cousins, Brown asked if they were "kissing cousins."

81.     Unlike Hilton, who did not testify to any argument involving the shooter, Turner claimed that a dark-skinned, chubby man then walked to their car and began arguing with Hilton and Brown.

82.     Turner testified Hilton got out of the car, and then the shooting occurred.

83.     Like Hilton, Turner described the shooter as wearing glasses, a description that Detective Bey testified Turner had not mentioned in their initial interview.

84.     Turner admitted he fled from the scene after the shooting, met up with Hilton, then returned, but did not come forward to tell police he had seen the shooting because he did not want to be considered a "snitch."

85.     However, he claimed that, three days later, after speaking with Brown's family, he decided to voluntarily accompany the police to the precinct and do the right thing by telling them what he knew.

86.     Turner testified that he identified Plaintiff at a lineup conducted several days after the shooting, and he identified him again in the courtroom.

87.     During his cross-examination of Turner, Plaintiff's counsel contended that the lineup, and a photo array that preceded it, were suggestive.

88.     He tried to impeach Turner's credibility in a number of ways.

89.     First, he asked whether Turner had been drinking alcohol prior to his claimed observation of the shooting, but Turner flatly denied it.

90.     Second, he suggested that Turner was not really cooperative with police and the prosecution following the shooting.

91.     However, Turner denied this.

92.     Turner specifically denied any knowledge of unsuccessful efforts by police and prosecutors to gain his cooperation during grand jury proceedings.

93.     Third, counsel questioned Turner to elicit admissions of criminal activity undermining his general character, but Turner essentially admitted only his criminal convictions.

94.     Fourth, counsel questioned Turner about his motive to lie owing to his cooperation agreement, under which he was going to receive misdemeanor probation, instead of the maximum of 15 years in prison, for possessing a loaded firearm.

95.     Under that agreement, if Turner gave any untruthful testimony, failed to fully cooperate at all times, or committed any additional crime, the agreement could be voided and he would face a greater conviction and sentence.

**Summations and Verdict**

96.     During his summation, defense counsel argued that both Hilton and Turner, when they testified at trial, had a motive—the assistance they had received from the D.A.'s Office with respect to their pending cases—to falsely accuse Taylor.

10

97.     Counsel knew about, and referred only, to Turner's written cooperation agreement and Hilton's release after ADA Ross had requested that no bail be set.

98.     Defense counsel had no evidence from which to argue Hilton or Turner had any additional motive to lie, either at the time they initially were interviewed by police and first identified Plaintiff as the shooter, or at the trial.

99.     In response, with regard to Turner, ADA Ross argued, among other things, that the cooperation agreement provided him no motive to lie because Turner had cooperated with police well before his arrest and agreement.

100.    As for Hilton, ADA Ross argued he had received no benefit at all because the judge had independently decided to restore him to probation, and thus he had no reason to lie.

101.    She argued that both witnesses had testified against Plaintiff solely "to get the right person" and obtain justice for their deceased friend.

102.    She contended they had "nothing to gain by pinning this on somebody who didn't do it."

103.    During deliberations, the jury asked to see the benefits received by both witnesses.

104.    However, the judge gave them only Turner's written cooperation agreement.

105.    The judge informed the jury that Turner's written cooperation agreement was the only evidence of benefits.

106.    On March 29, 2010, after one week of deliberations, Plaintiff was convicted of all charges against him.

107.    Plaintiff was sentenced to serve 20 years to life in prison and was sent upstate to serve his sentence.

108.     On October 27, 2015, the New York State Court of Appeals reversed Plaintiff's murder conviction and his sentence for violation of his right to a fair trial.

109.     The Court concluded that the judge had provided the jury a misleading response to the jury's inquiry about benefits because it omitted Hilton's testimony about ADA Ross's appearance on his behalf at the probation violation proceeding.

110.     The Court reasoned that this omission prejudiced Plaintiff's defense because it undercut his counsel's argument that Hilton had a motive to lie.

111.     After he was returned to New York City to face retrial, Taylor was remanded to Rikers Island in lieu of bail.

112.     ADA Ross contended that his conviction at the first trial demonstrated the likelihood he would be convicted again and opposed his bail release.

113.     In or about December 2016, Plaintiff moved for his bail to be reduced.

114.     ADA Ross opposed this.

115.     The court then heard argument about the various factors, listed in the Criminal Procedure Law, relevant to determining bail.

116.     One of those factors was the strength or weakness of the prosecution's evidence.

117.     The court then fixed a bail condition under which Plaintiff would be released upon his deposit of $75,000 cash bail.

118.     On or about December 21, 2016, Plaintiff was released after family members and friends posted the bail.

119.     At Plaintiff's second trial, Turner was the only witness to testify in court that Plaintiff had committed the murder.

120.     Hilton had been murdered after the first trial and his testimony from that trial was read to the jury at the second trial.

121.     On January 31, 2017, Plaintiff was fully acquitted.

122.     In all, Plaintiff spent more than two years in custody on the murder charge before his first trial, five years and nine months in prison on his conviction, and approximately one year in jail awaiting his second trial.

## **Damages and Injuries**

123.     Plaintiff's injuries and damages include, but are not limited to, his:

   a.   His wrongful conviction for murder and possession of the murder weapon;

   b.   Nearly nine years in jail or prison;

   c.   Loss of the services, society, companionship, and consortium of his family and friends;

   d.   Past and future mental and emotional suffering; and

   e.   Legal fees and expenses paid and/or owed to private attorneys for his first trial, direct appeal, and retrial, of approximately $200,000.

## **FIRST CAUSE OF ACTION**

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth and Fourteenth Amendments by Defendant Bey)**

124.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 123 of this Complaint.

125.     At all relevant times, Plaintiff had a clearly-established right, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, *Brady v. Maryland*, 363 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), to timely disclosure of all

material information that tended to show his innocence or that impeached the credibility of the prosecution's witnesses against him.

126.    While the defense, at trial, knew that Hilton and Turner had not previously mentioned that the shooter wore glasses, it did not know that both Hilton and Turner had affirmatively told Defendant Bey, during their initial interviews shortly after the shooting, that the shooter was *not* wearing glasses.

127.    In addition, they had told Bey the shooter was clean shaven.

128.    When Bey arrested Taylor three days after the shooting, he learned that Taylor regularly wore corrective glasses and observed that he had a mustache and a goatee.

129.    Bey thus knew that Hilton and Turner had provided descriptions of the shooter that were inconsistent with Plaintiff's appearance and their identifications of him as the shooter and thus were exculpatory of him.

130.    Nevertheless, Bey omitted these descriptions and their inconsistency with Plaintiff's appearance from his reports and other paperwork.

131.    Additionally, he failed to ever inform the D.A.'s Office of the information.

132.    As a result of Bey's failure to disclose the exculpatory information about the shooter's appearance in his sole possession, the information was never disclosed to the defense at any time prior to or during Plaintiff's trial (and his retrial).

133.    Bey also omitted from his reports, and failed to disclose to ADA Ross, his knowledge that Turner had lied to him when he denied to Bey that he could get in contact with Hilton.

134.    Further, Bey, knowing that Darion Brown had been involved in a gang dispute and was nervous about it on the night of his shooting, was aware that Turner was reputedly a

leader of a violent youth gang, but failed to find out the information about Turner's gang-related activities that was known to the NYPD and to disclose such information to the D.A.'s Office.

135.     Such information supported a potential defense that the shooting of Brown was the result of gang-related activity unconnected to Plaintiff and would have further impeached Turner's trial testimony.

136.     The information that Bey withheld from the prosecution, and thus from the defense, was favorable to the defense.

137.     It was material to the outcome of the trial at which Plaintiff was convicted.

138.     Accordingly, Bey had a constitutional obligation to promptly disclose such information to the prosecutor.

139.     In withholding the aforementioned information favorable to Plaintiff, Bey acted deliberately, intentionally, willfully, recklessly, negligently and/or with deliberate indifference to Plaintiff's constitutional right to due process and a fair trial or to the effect of such misconduct upon Plaintiff's constitutional rights.

140.     But for Bey's withholding of information favorable to Plaintiff, there is a reasonable likelihood that Plaintiff would have been acquitted at his first trial and released from custody on the murder charge.

141.     Bey's actions in withholding the favorable information was a foreseeable, substantial, and proximate cause of Plaintiff's conviction and subsequent deprivation of liberty.

142.     By virtue of the foregoing, Bey is liable to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

## SECOND CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Liberty, Due Process, and a Fair Trial Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments by Defendant Bey Through His Manufacturing of False or Misleading 'Evidence' and Suppression of Exculpatory Evidence)**

143.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 141 of this Complaint.

144.   An individual has a constitutional right, pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution, not to be deprived of his liberty based upon the deliberate preparation by a police officer and handing to a prosecutor of false or misleading evidence that would be reasonably likely to convince a jury of the individual's guilt, where such actions actually result in the individual's deprivation of liberty.

145.   In addition, a criminal defendant has an analogous right, arising from the same provisions of the Constitution, to prompt disclosure by a police officer or detective, to the prosecutor, of exculpatory or other information that so undercuts the basis for the defendant's prosecution that it is likely to, or may, result in his release from custody.

146.   Such information must be disclosed, among other reasons, because it would correct the false or misleading impression from other evidence that the police have provided to the prosecutor, or which the prosecutor has provided to the grand jury or to the court, regarding the strength of the prosecution's case.

147.   The strength of the prosecution's case is not only material to a determination whether to initiate and continue a defendant's prosecution, but also to a grand jury's discretionary determination whether to approve an indictment and to a court's determination

16

pursuant to the Eighth and Fourteenth Amendments and state law whether to release the defendant from custody, pending trial, on a reasonable bail.

148.    In Plaintiff's case, the assigned case detective, Defendant Bey prepared police reports that he knew, or should have known, were false or misleading with respect to Plaintiff's alleged responsibility for the murder of Darion Brown because they omitted information, known to Bey, tending to show that Plaintiff was innocent and/or that his accusers were unworthy of belief.

149.    More specifically, Bey prepared reports documenting his interviews of Turner and Hilton, and the identification proceedings he had conducted at which Turner and Hilton identified Plaintiff as the shooter, without including that Turner and Hilton had provided a detailed description of the shooter that ruled out Plaintiff as the guilty party.

150.    Further, Bey omitted from his reports that, rather than having independently accused and identified Plaintiff as the shooter, Turner and Hilton had discussed with each other what had occurred and Turner, after falsely denying he knew where to find Hilton, had then brought Hilton to Bey to be interviewed.

151.    Bey handed his documentation of his investigation to prosecutors knowing and intending that such documentation would be relied upon by prosecutors in deciding whether to initiate and continue a prosecution of Plaintiff for the murder, by a grand jury considering whether to indict Plaintiff, and by a court in deciding whether to release Plaintiff on bail.

152.    Bey knew that the documentation he handed to prosecutors was likely to convince reasonable jurors to convict Plaintiff of the murder.

153.    While handing to prosecutors false or misleading documentation of his investigation, Bey at the same time failed to disclose to them his knowledge of evidence tending to show Plaintiff was innocent and that his accusers were unreliable and not credible.

154.    Bey did so even though he knew that the decision the District Attorney's Office had to make whether to proceed with an indictment was a difficult one.

155.    Specifically, Bey knew the decision was difficult because (a) Hilton and Turner had refused to respond to grand jury subpoenas and Hilton only testified under the compulsion of a material witness proceeding; (b) Hilton had told the court during the material witness proceeding that he had been intoxicated and had not seen the shooting; (c) Hilton and Turner had criminal histories; and (d) three friends of Plaintiff had told the prosecutor during interviews that, at the time of the incident, Plaintiff was with them and had not been involved in the shooting.

156.    Especially in light of the weakness in the case against Plaintiff and the evidence the District Attorney already knew about supportive of his innocence, Bey's preparation of false or misleading reports and other documentation, as well as his knowledge of exculpatory and impeachment evidence that was unknown to the prosecutor, was highly significant to the prosecutor's decision whether to prosecute, the grand jury's decision whether to indict, and to the court's decisions, prior to each trial, whether to grant Taylor pretrial release on a reasonable bail.

157.    Bey's aforementioned actions and inactions were a substantial cause of Plaintiff's prosecution, detention without bail before Plaintiff's first trial, indictment by a grand jury, conviction, state imprisonment, and detention without bail before his second trial.

158.    In engaging in the aforementioned actions, Bey acted deliberately, intentionally, willfully, recklessly, and/or with deliberate indifference to the effect of his actions upon Plaintiff's constitutional rights.

159.    By virtue of the foregoing, Bey is liable to Plaintiff, pursuant to 42 U.S.C. §§

1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in

bringing this action.

### THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983/*Monell*; Claim Against Defendant THE
CITY OF NEW YORK for the Deliberate Indifference of the
New York City Police Department to the Constitutional Rights
of Criminal Defendants Under the Fourth, Fifth, Sixth, Eighth
and Fourteenth Amendments)**

160.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 138, 140 through 142, and 144 through 157 of this Complaint.

161.    The foregoing violations of Plaintiff's federal constitutional rights and injuries

were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable

to Defendant City, amounting to deliberate indifference to the constitutional rights of persons,

including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities by

the New York City Police Department.

162.    Prior to Plaintiff's arrest, policymaking officials at the NYPD implemented no or

plainly inadequate policies, procedures, regulations, practices, customs, training, supervision,

and discipline concerning the continuing duty of police officers and investigators to preserve and

to make timely disclosure to the District Attorney's Office, during criminal investigations and

prosecutions, of all material evidence or information ("*Brady* material") favorable to a person

suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of

innocence as well as evidence affecting the credibility of prosecution witnesses, and to refrain from making reports that, because they omitted such information, were false or misleading.[1]

163.    As a result, many detectives were unaware they had any obligation to make a record of or to otherwise inform prosecutors of information that was favorable to the criminal suspect or defendant.

164.    In addition, the New York City Police Commissioner, as well as his delegates, did not discipline police officers found to have been responsible for the violation of criminal suspects' or defendants' right to disclosure of favorable evidence and not to be prosecuted based upon false or misleading evidence.

165.    Police officers thus understood that there would be no adverse consequence to them if they withheld such information from prosecutors.

166.    At the same time, the NYPD put substantial pressure on detectives to close cases by developing probable cause and making arrests.

167.    As a result, prosecutors would not be informed of evidence favorable to a suspect or defendant that was known to police and thus would be unable to comply with their own constitutional obligation to disclose such material to the defense in time to be used at bail hearings, in the grand jury, and at trial.

---

[1] Undersigned counsel for Plaintiff has obtained deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, establishing that, prior to and during the time period of Plaintiff's arrest and prosecution, the NYPD provided no or plainly inadequate *Brady*-related training, no or plainly inadequate training concerning making a record of information that was favorable to a criminal suspect or defendant, had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material, and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

168.     They also would be misled into relying on evidence provided to them by police that was false or misleading.

169.     The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for Defendant THE CITY OF NEW YORK, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

    a.     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.     that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

    c.     that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

170.     The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

    a.     credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence;

    b.     civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had withheld material evidence;

    c.     numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady*;

    d.     judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt

adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

e.   formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

f.   the inherent obviousness of the need to train, supervise and discipline police officers regarding such obligations to counteract the pressure on and incentive of officers to close cases by making arrests and winning convictions.

171.   Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation and continuation of criminal prosecutions, the documentation of information obtained during investigations, and the disclosure to prosecutors of *Brady* material.

172.   The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

173.   During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices,

training and discipline sufficient to prevent or deter conduct by his subordinates violating the

aforementioned constitutional rights of criminal suspects or defendants and of other members of

the public.

174.   The aforesaid policies, procedures, regulations, practices and/or customs of

Defendant City and the NYPD were collectively and individually a substantial factor in causing

Defendant Bey to prepare and hand to prosecutors false or misleading documentation of his

investigation, to withhold information favorable to Plaintiff from the prosecutors, and to thereby

cause Plaintiff to be deprived of his liberty.

175.   By virtue of the foregoing, the City is liable, to Plaintiff, pursuant to 42 U.S.C.

§§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses

in bringing this action.

## FOURTH CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant THE CITY
OF NEW YORK for Queens District Attorney's Policy of
Deliberate Indifference to Fair Trial Violations)**

176.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through

123 as if fully set forth herein.

177.   At all times relevant to this Amended Complaint, Plaintiff had a federal

constitutional right, pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth and

Fourteenth Amendments, to disclosure by the District Attorney's Office of all exculpatory and

impeachment evidence and information which, considered in its totality, was likely to influence

whether Plaintiff would be convicted at trial and thereafter deprived of his liberty.

178.   Under this requirement, known as the *Brady* rule, the assigned prosecutor of

Plaintiff had an absolute responsibility to obtain and to disclose to the defense all such

information and evidence in the possession, custody, control or knowledge of the NYPD and of the District Attorney's Office and to disclose it to Plaintiff's attorney sufficiently in advance of trial so that he could adequately investigate it and utilize it at trial in his client's defense.

179.    There was a mountain of exculpatory and impeachment evidence, known to or in the custody, possession or control of the Queens D.A.'s Office or the NYPD, that ADA Ross and the D.A.'s Office failed to disclose to Plaintiff or his attorney for use at his first trial.

180.    Constitutional provisions guaranteeing Plaintiff due process and a fair trial also prohibited from knowingly introducing, or failing to correct, false testimony, and from making factual argument to the jury that she knew, or should have known, was false or misleading.

181.    ADA Ross violated these provisions as well.

182.    To begin with, ADA Ross had an absolute obligation to find out whatever exculpatory or impeachment evidence was in the possession of detectives involved in the investigation of the homicide in this case, including most clearly the assigned homicide detective, Defendant Bey, and to disclose the same to the defense.

183.     However, due to her deliberate indifference to this obligation, Ross failed to closely question Bey about and to find out the information favorable to the defense summarized in paragraphs 126 to 129 and 133 to 134, *supra,* and failed to disclose such evidence to the defense.

### Ross Fails to Disclose Additional *Brady* Material Regarding Turner

184.    Ross also failed to disclose that, when Bey first picked up Turner and interrogated him, Turner had a criminal history which provided him reason to be in fear of the police and to provide information that would help them identify and arrest a suspect regardless of whether such information was true.

185.     While falsely presenting Turner as a fully cooperating witness who wanted to obtain justice for his deceased friend and his family, Ross did not disclose that, after his initial interrogation by police, and assistance to them in finding Hilton, Turner refused to cooperate any further.

186.     She failed to disclose that Detective Bey made approximately 15 trips to Turner's home to subpoena him to the grand jury and left word for Turner with his family.

187.     She failed to disclose that Turner's mother had spoken with her son and then told Bey that her son would not cooperate.

188.     Ross knew this evidence contradicted Turner's false testimony at trial denying any knowledge of efforts by the prosecution to find him so that he could testify in the grand jury, yet she failed to either correct Turner's false testimony or disclose the evidence that disproved it.

189.     The evidence Ross withheld also contradicted Ross's false argument to the jury that he cooperated throughout the prosecution to avenge the murder of his supposed friend.

190.     Ross also did not disclose that, due to Turner's failure to comply with subpoenas or otherwise cooperate, she had to obtain a material witness warrant authorizing Turner's arrest so that he would be compelled to testify in the grand jury.

191.     She failed to disclose that, because Turner continued to refuse to respond to Bey's efforts to find him, he did not testify in the grand jury.

192.     The material witness warrant application detailed Turner's pattern of failure to cooperate and contradicted his trial testimony that he cooperated with the authorities to obtain justice for his friend.

193.     Nevertheless, Ross did not disclose to Plaintiff the warrant or the application for the warrant.

194.    Ross also did not disclose that, following Plaintiff's grand jury indictment, Turner continued to fail to cooperate with her.

195.    Ross failed to disclose that Turner refused to comply with a trial subpoena, which caused her to obtain still another material witness warrant dated November 24, 2009.

196.    This warrant application quoted Turner's mother as saying that her son would not cooperate and recounted the full history of Turner's failure to respond to subpoenas and other efforts to obtain his cooperation.

197.    Ross did not disclose that it was only following Turner's arrest for felony gun possession, and his refusal to testify unless the charges were reduced to a misdemeanor and he escaped a prison sentence, that Turner became willing for the first time to testify against Plaintiff.

198.    Ross did not disclose her knowledge, obtained from the NYPD, that Turner headed a notorious street gang, known as the "Snow Gang," and a predecessor gang, which operated in the same general neighborhood where the shooting occurred and which was involved in murders, drug dealing and prostitution.

199.    The evidence of Turner's gang involvement would have permitted the defense to investigate, and to present evidence, that the Brown shooting was gang-related and had nothing to do with Plaintiff.

200.    Turner's leadership of a violent, drug-dealing youth gang also would have been relevant to his general credibility and, because of his vulnerability to prosecution, would have given him a motive to testify in favor of the District Attorney to insulate himself from investigation or prosecution.

201.     Furthermore, since Turner's cooperation agreement required him to disclose all his involvement in criminal activity and not to commit any future crimes, disclosure of his ongoing involvement in gang-related criminal activities would have opened him up to cross-examination concerning whether he had been fully forthcoming with the District Attorney and whether the Office had knowingly overlooked his criminal activity, another benefit.

202.     Rather than investigate Turner's gang involvement, which Ross had learned about from the NYPD, Ross, by her own admission, did nothing more than ask Turner whether the gang allegation was true and, predictably, he denied it.

203.     This denial, since it was false, was a violation of Turner's cooperation agreement, but Ross did nothing to enforce the agreement against Turner.

204.     Finally, Ross failed to disclose Hilton's statement, before Plaintiff was indicted, that he and his friends (including Turner) were intoxicated at the time of the shooting, which contradicted Turner's false denial at trial that he had any alcohol to drink that night.

**Ross Fails to Disclose *Brady* Material Regarding Hilton**

205.     As for Hilton, Ross falsely argued at trial that he had received no benefits related to his testimony and, like Turner, was motivated solely to obtain justice for his deceased friend.

206.     However, Ross did not disclose that, at the time he finally met with Bey and identified Taylor as the shooter, Hilton was being prosecuted by the Queens D.A.'s Office for possession of a stolen automobile.

207.     This provided Hilton with an interest in ingratiating himself with law enforcement authorities when they initially were looking for him.

208.     Ross failed to disclose that, contrary to her argument at trial and Hilton's testimony that he cooperated with the authorities to bring the killer of his friend to justice, Hilton, following his initial meeting with police, refused to cooperate with them any further.

209.     He failed to appear in court in his own case, bench warrants for his arrest were issued, and he faced prosecution for bail jumping.

210.     When served personally with a subpoena by Bey, he rejected the subpoena and told Bey he would not cooperate with the NYPD or the D.A.'s Office in connection with the shooting with which Plaintiff was charged.

211.     As with Turner, Ross secretly applied for, and obtained, a warrant for Hilton's arrest as a material witness.

212.     The warrant application outlined his failure to comply with compulsory subpoenas for his testimony.

213.     Ross secretly arranged for the assigned homicide case detective, Defendant Bey, to arrest Hilton and bring him before a Supreme Court justice to be arraigned on the material witness warrant.

214.     Ross did not ever disclose to the defense Hilton's refusal to cooperate, the bench warrants, the material witness application and order, Bey's arrest of Hilton, and the extraordinary events that then occurred in court on the material witness warrant.

215.     In front of the justice presiding at the material witness proceeding, Hilton stated, on the record, that he and his friends, presumably including Seprel Turner, had been "intoxicated" at the time of the shooting.

216.     This statement directly contradicted his later testimony at trial, and Turner's, that they had not been drinking before the shooting.

217.     Hilton also stated at the material witness hearing that he had only "heard" what happened.

218.     This contradicted his statements to Bey, as well as his grand jury and later trial testimony, that he had *seen* the shooting and that Plaintiff had committed it.

219.     Hilton then told the judge that, in defiance of the material witness warrant and of the court itself, he would not testify.

220.     The judge then ordered him to be detained in jail on $25,000 bail.

221.     Hilton changed his mind and, to avoid being incarcerated at Rikers Island, agreed to go into the District Attorney's "custody" and testify before the grand jury.

222.     This meant that, when he testified later the same day, he did so as a *prisoner* of the D.A.'s Office.

223.     This circumstance obviously affected the voluntariness, and the reliability, of his testimony accusing Plaintiff, and his motive to lie to win his own freedom.

224.     Even after telling the judge that he would cooperate, Hilton stated, again on the record, that he still had "doubts in [his] head."

225.     Both ADA Ross and another ADA who worked on Plaintiff's prosecution, Robert Ciesla, were present for and personally witnessed Hilton's statements and behavior during the material witness proceeding.

226.     However, Ross chose not to order the transcript of the proceeding and never disclosed any of the above events to the defense.

227.     Not only did Ross never disclose to the defense that Hilton had a grand larceny case pending at the time he first spoke with police and at the time he testified before the grand

jury, and that he had jumped bail on that case, but also never disclosed that, after Hilton finally testified, her Office dismissed his larceny case and never prosecuted him for bail jumping.

228.    As noted above, Hilton, under cross-examination at Plaintiff's trial, denied that he had possessed a gun prior to his arrest on January 8, 2008, denied that he had admitted possession to a detective, and denied that he had possessed a gun during a second arrest, where he was charged with menacing a store owner with such a weapon.

229.    All this testimony was false and Ross knew it or should have known it.

230.    Ross had a duty to correct such false testimony, but she unlawfully failed to do so.

231.    Regarding the gun possession case, the arresting officer's sworn grand jury and trial testimony, police reports, and statements by other prosecutors in Ross's Office disproved Hilton's trial testimony.

232.    This undisclosed evidence proved that Hilton had possessed a gun, shot himself in the foot with it, lied to police that some stranger had shot him, and then admitted to a police detective and to a friend that he had shot himself by accident.

233.    These aforementioned documents were in the case file of the D.A.'s Office.

234.    Ross was required by binding decisions of the United States Supreme Court to know about and to disclose such impeachment information to the defense.

235.    Yet, according to her own testimony, she never reviewed her Office's case file on Hilton, and thus did not obtain or disclose the evidence contradicting Hilton's false testimony and did not correct that false testimony.

236.    The Hilton gun possession case file also contained police documents showing that, when Hilton was arrested by police for the gun possession, the person he called to assist him was Turner.

237.    This was further evidence showing the closeness of their relationship and mutual trust in matters of criminal behavior, but Ross failed to disclose it to Plaintiff or his attorney.

238.    Ross also failed to disclose additional information in her Office's Hilton gun possession file showing that Hilton refused to cooperate with the police in the latter's investigation of Hilton's own shooting.

239.    Ross failed to disclose that, according to documents in the Office's case file, before shooting himself in the foot with his own gun, Hilton was wearing a protective boot because he previously had been shot in the foot.

240.    Regarding the menacing case, Hilton testified falsely at Plaintiff's trial that he had not possessed and menaced anyone with a gun, but that he merely "talk[ed] with [his] hands" and the person who called the police "assumed I had a gun."

241.    However, the District Attorney's own case file for that case noted that store surveillance video showed that Hilton had approached the complainant and pulled out a silver handgun.

242.    The case file was available to Ross but she did not  review its contents and did not disclose this evidence, contradicting Hilton's false testimony, to Plaintiff, or correct Hilton's false testimony.

243.    Ross further failed to disclose her knowledge that, in October 2009, Hilton was involved in still a third shooting.

244.    Hilton's involvement in three shootings, two unknown to Plaintiff's counsel, suggested access to guns, possible involvement in gang-related violence, and a violent proclivity that Plaintiff's attorney, suspecting that Hilton was the real shooter in Plaintiff's case, would have investigated and made use of at trial.

245.    While falsely portraying Hilton as a cooperative witness, Ross further failed to reveal to Plaintiff that, on February 18, 2010, a little more than one week before Plaintiff's trial began, Ross applied for and obtained still another material witness warrant that authorized Hilton's arrest.

246.    The warrant application, which Ross did not disclose, stated that Hilton *fled* from his probation officer when he learned that a detective from the D.A.'s Office was present to secure his cooperation and testimony.

247.    Thereafter, Hilton's probation officer sought Hilton's arrest for violating his probation.

248.    He apparently had been asked to do so by the D.A.'s Office because it needed Hilton as a witness in Plaintiff's upcoming trial but Hilton had been evading it.

249.    Ross did not disclose this either.

250.    On February 25, 2010, shortly before Plaintiff's trial, after being picked up on his probation violation, Hilton finally met with Ross.

251.    After he agreed to appear in court and testify, Ross had a detective-investigator from her Office contact the probation department to request that Hilton be released on his probation violation so that he would be available to appear in court and testify.

252.    Ross never disclosed this action to the defense.

253.    Ross personally appeared at Hilton's probation violation hearing later that day, spoke with the court and the probation department, and caused the court to restore Hilton to probation even though he had repeatedly violated the conditions of his release on probation.

254.    Before restoring Hilton to probation, the court asked Ross if such a result would be okay with her and she *agreed* to that disposition.

255.     Instead of disclosing all these events to the defense in Plaintiff's case, Ross falsely denied at Plaintiff's trial that she had any role in helping Hilton avoid incarceration for violating his probation.

256.     She made no disclosure of his history of defying subpoenas and other efforts to obtain his cooperation with her Office and in-court testimony.

257.     Ross also failed to disclose that, on that same day that she appeared in court with him on his probation violation, she appeared in court with him and assisted him on still another case.

258.     Hilton had failed to perform court-ordered community service, which was part of his sentence in this case.

259.     However, after he agreed to testify for Ross at Plaintiff's trial, she appeared in court and caused the judge to resentence him to time served.

260.     Ross also failed to disclose that, during Plaintiff's trial, Hilton got in trouble with the probation department for providing an invalid address and failing to report for supervision.

261.     She failed to disclose that she had an investigator with her office contact the probation department on Hilton's behalf to resolve this problem.

262.     This event also contradicted, or rendered misleading, Hilton's testimony, which Ross did not correct, that he had no case or probation violation pending at the time he testified at the trial.

263.     Ross failed to disclose that, on March 23, 2010, while Plaintiff's jury was deliberating, Ross, having falsely argued Hilton was receiving no benefits in exchange for his testimony and having elicited his testimony he had no probation violation pending, appeared at

still another of his probation violation hearings and informed the judge that Hilton had been

having trouble reporting to probation and that she had taken steps to help him.

264.    As a result, the judge restored Hilton to probation and released him from custody,

acting against the recommendation of the Department of Probation, which requested that Hilton

be remanded and resentenced.

265.    On April 22, 2010, Hilton appeared in court once more on additional probation

violations and, owing to ADA Ross's intervention on Hilton's behalf, the court resentenced

Hilton to time served and terminated his probation.

266.    ADA Ross's conduct in the murder prosecution of Nathaniel Newson and several

co-defendants, during the same approximate period that Plaintiff was prosecuted by her, shows

that her failure to obtain and/or to disclose evidence under *Brady* in Plaintiff's case was no

accident..

267.    Nathaniel Newson, Trevor Bowen, Lance Hamilton, and William Trotty were

arrested and indicted in August 2010, for the murder of Damian Champbell.

268.    These defendants told the authorities that another individual, Shamiek Corbett,

committed this murder.

269.    Unbeknownst to these defendants, a ballistics analysis of shell casings recovered

from the crime scene matched shell casings recovered from two other homicides for which

Corbett was being prosecuted, one of which had occurred a mere two days prior to the

Champbell murder.

270.    Ross was the prosecutor assigned to try the Newson case and knew of the defense

position that Corbett had committed the murder.

271.     She also was assigned the Corbett prosecution and thus was responsible for obtaining all the police reports and documentation in connection with that matter.

272.     Thus, she knew, or should have known, about the ballistics analysis linking Corbett to the weapon used to kill Champbell and directly supporting the defense in the Newson case that Corbett was the shooter.

273.     Ross's failure to disclose the ballistics analysis until after jury selection had started, nearly five years after the report had been prepared, caused the court to declare a mistrial due to this *Brady* violation.

274.     Thereafter, during Fall 2015, when the Newson defendants' retrial was being conducted, Ross did not disclose until the retrial was underway a police property voucher indicating that police officers had found in Corbett's possession, a mere nine hours after Champbell's homicide, a cellphone belonging to Champbell.

275.     This document, also nearly five years old, even more strongly linked Corbett to the Champbell homicide that Newson and his co-defendants were accused of.

276.     Ross also did not disclose until the trial was underway a surveillance video from the night of the shooting showing that the sole alleged eyewitness, who had testified that she had observed the shooting from the location depicted in the video, was not at that location until *after* the shooting had already occurred.

277.     On or about December 10, 2015, Newson and his co-defendants were acquitted.

278.     As a result of Ross's failure to make timely disclosure of the above, extraordinarily powerful exculpatory evidence, the acquittal did not occur until these defendants had spent more than five years at Rikers Island awaiting trial.

279.    The aforementioned conduct of ADA Ross in failing to timely disclose information favorable to the defense prior to or during Plaintiff's trial, in introducing and failing to correct false or misleading testimony by her witnesses, and in making false and misleading arguments during the trial to the court and the jury, violated Plaintiff's constitutional rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

280.    The foregoing violations of Plaintiff's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant THE CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the Queens County District Attorney's Office, namely:

a.    The institution and implementation by the District Attorney of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

   i.    The duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

   ii.    The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

   iii.    The continuing obligation to timely and fully disclose material, in the possession, custody or control of the District Attorney's Office or of the police, that is favorable to the defense within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 450 U.S. 150 (1972), and their progeny; and

b.    The District Attorney's deliberate indifference to the need, and his failure, to adequately instruct, train, supervise, and/or discipline his employees with respect to such matters.

281.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise and/or discipline

36

employees with regard thereto, were implemented or tolerated by policymaking officials for

Defendant City, including, but not limited to, the District Attorney of Queens County and his

delegates, who knew:

    a.    To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.    That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

    c.    That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and

    d.    That employees of the QDAO had a history of making wrong choices in such matters.

282.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

    a.    Numerous credible allegations, many substantiated by judicial decisions (some of which are listed in Exhibit A hereto and incorporated by reference) that Queens County ADAs had:

        i.    Participated in the manufacturing of false testimony or evidence, including identification evidence;

        ii.    Presented or failed to correct false or misleading testimony and argument;

        iii.    Failed to disclose at all, or on a timely basis, information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York;

        iv.    Made arguments at trial that were so false, misleading, inflammatory, or otherwise improper that they deprived the defendant of due process and a fair trial; and

    b.    The inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the

37

pressure that the Queens County District Attorney applied to prosecutors to obtain convictions.

283.    At the time of Plaintiff's trial, the Queens County District Attorney's indifference to the aforementioned types of prosecutorial misconduct was evidenced by his failure to conduct internal disciplinary investigations, or to discipline, the prosecutors who were known to engage in it, including but not limited to the prosecutors responsible for the misconduct found in the judicial decisions listed in Exhibit A, or to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees.

284.    Instead of disciplining such prosecutors, the District Attorney's policy, custom or practice was to give them raises, promotions, positive evaluations, and commendations, based in part on their record of winning at trial and their productivity in trying a lot of cases and extracting guilty pleas even in weak cases.

285.    The Office used evaluation forms, approved by the District Attorney or his Chief Assistant, with which bureau chiefs and other supervisors rated prosecutors in numerous categories of performance, but which nowhere asked for comment on their respect for or compliance with the due process or fair trial rights of criminal defendants.

286.    Every one of these evaluation forms were reviewed by John Ryan, the chief assistant to District Attorney Brown, and usually by Division chiefs, for purposes of determining raises, bonuses, and promotions.

287.    The district attorney delegated to Ryan and division chiefs the task of reviewing evaluations and recommending raises, bonuses, and promotions and almost always approved their recommendations.

288.     The evaluations were shown to the prosecutors who were evaluated in part for the purpose of communicating to them how successful they were being in implementing the goals of the Office and the types of behavior the Office approved of and wished to encourage.

289.     The completed evaluation forms would not reference court findings of misconduct or complaints by criminal defendants or their attorneys, no matter how egregious the misconduct.

290.     Thus, the message to the prosecutors was that the Office only cared about how aggressive and successful they were in processing and winning cases, not whether, in doing so, they violated the constitutional rights of the individuals they were prosecuting.

291.     The Office kept no records of negative court decisions or of complaints against individual prosecutors so that it could identify prosecutors who repeatedly were the subject of such decisions or complaints and who required greater training, supervision or discipline.

292.     Thus, when a court found that a prosecutor had committed misconduct, it had no data base or records from which to determine whether the same prosecutor had a history of engaging in similar or other misconduct.

293.     The Office kept no record of, and did not investigate, the failure of bureau chiefs and other supervisors to properly supervise staff attorneys to ensure that they complied with the due process and fair trial rights of criminal defendants.

294.     Although supervisors were supposed to monitor members of their bureau closely enough to ensure that constitutional violations did not occur, executives in the office would not follow up with supervisors to find out why *Brady* violations, summation, or other misconduct found by a court had been allowed or able to occur.

295.     Prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning but would suffer no negative consequence in the unlikely event their misconduct was exposed.

296.     Further encouraging prosecutors to win at any cost was their knowledge that the QDAO had no employee handbook or other published procedure for disciplining prosecutors who violated rules of behavior for criminal prosecutions, even though they had handbooks setting forth rules and disciplinary procedures in other areas, such as use of computers and equal employment opportunity rights.

297.     Policymakers at the Office failed to discipline misconduct affecting defendants' rights, no matter how egregious, despite being aware of and agreeing with the principle that the failure to discipline even one instance of unethical behavior can poison the atmosphere in the while office.

298.     In addition to turning a blind eye to known violations of *Brady* and other fair trial obligations, the Queens County District Attorney followed a policy, custom or practice of encouraging prosecutors to consciously avoid, or be deliberately indifferent to, obtaining personal possession or actual knowledge of *Brady* material, including evidence of innocence, witness benefits, prior inconsistent statements by witnesses, prior criminal or dishonest activities by witnesses, evidence of such witnesses' motives to lie, and other impeachment material, and was deliberately indifferent to whether prosecutors discovered and disclosed such information.

299.     The Office had no policy under which prosecutors were required to make a record of evidence that potentially favored the defense under *Brady*, such as threats, coercion, or promises of benefits to cause witnesses to provide testimony, and affirmatively discouraged

40

prosecutors from taking notes of interviews with witnesses, thereby making no record of potentially inconsistent statements.

300.    Policymakers were aware that, in a majority of serious felony cases, the trial prosecutor was a different individual than the prosecutors who initially "rode" the case at the police precinct, conducted intake, presented the case to the grand jury, or handled pretrial hearings and other matters.

301.    They were aware that trials often did not occur until several years after the initial arrest or indictment.

302.    The Office had no policy, practice or protocol under which trial prosecutors were required to thoroughly interview previous prosecutors and detectives involved in the case, and to review other records of the Office, to find out whether exculpatory or impeachment information existed.

303.    The Office had no policy, practice or protocol requiring trial prosecutors to review case files of the Office likely to contain incriminatory information concerning its trial witnesses whom the office had prosecuted or was prosecuting, including prior statements of witnesses and evidence of the witnesses' criminal or dishonest conduct, even though such information, being in the Office's possession, had to be disclosed to the defense.

304.    The Office had no information management system under which exculpatory or impeachment information relating to its witnesses would be saved and made accessible to trial prosecutors using such witnesses.

305.    Policymakers knew or should have known that, in the absence of note-taking and other records, any information management system, any requirement that trial prosecutors interview all personnel who handled the case previously, and any requirement that they review

case files of witnesses, there was a high likelihood that exculpatory or impeachment information would not be disclosed under *Brady*.

306.    The Office trained prosecutors that in most cases they could get away with disclosing *Brady* material at the last minute, even during trial, because courts were loath to declare mistrials or overturn convictions due to late disclosure.

307.    The Office had no written or clear policy concerning disclosure of *Brady* material at arraignment, during the grand jury process, or for consideration by the court during bail hearings.

308.    Indeed, the Office had no *Brady* manual or handbook setting forth any policy or guidance in this complicated area for prosecutors to consult; its policy was simply to "follow the law."

309.    Indifferent to prosecutors' compliance with their obligation to timely disclose evidence favorable to the defense, the District Attorney did not participate in making policy to effectuate *Brady* compliance, but completely delegated authority to determine the policy of the Office to mid-level executives involved with training.

310.    When *Brady* violations were discovered, the Office almost always made procedural and various other strained and often misleading arguments in the hope that the court would do nothing, thereby communicating to line prosecutors that *Brady* violations did not matter to it and would have no consequence.

311.    The Office had no written policy for correcting false testimony by its witnesses and would argue, contrary to law, that it had no obligation to do so.

312.    The Office followed a practice of using material witness warrants to arrest and detain prospective witnesses, not only when they failed to comply with proper subpoenas

commanding their appearance in court, but also when they simply did not voluntarily cooperate with the D.A.'s Office, which was an unlawful misuse of the material witness statute.

313.    Prosecutors would then conceal from the defense the existence and the contents of the warrant applications and orders as well as the fact that the witnesses had been uncooperative or recalcitrant and were testifying or "cooperating" under compulsion.

314.    Evidence of the Queens County District Attorney's deliberate indifference to prosecutorial misconduct violative of a criminal defendant's rights, including false or misleading argument to the jury and *Brady* violations, was uncovered during the civil rights litigation in *Su v. City of New York*, 06 Civ. 687 (E.D.N.Y.) (RJD)(CLP), a case involving the wrongful conviction of a young man due to the prosecution's knowing use of false evidence and argument and *Brady* violations.

315.    During that litigation, discovery of personnel records, together with deposition testimony, showed that in dozens of cases where courts had found serious prosecutorial misconduct, including the use of and failure to correct false or misleading testimony, *Brady* violations, and summation misconduct, the prosecutors were not disciplined; the Office had no formal or meaningful disciplinary policy, procedure, training, or practice; and the Office was indifferent to its *Brady* obligations.[2]

316.    As established by the testimony of executives at the Queens D.A.'s Office, the District Attorney himself read every appellate decision concerning the Office and made the

---

[2] The discovery obtained in that lawsuit is summarized in Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 559-566 (2011), a copy of which is attached as Exhibit B and is incorporated herein by reference.

decision in each instance where misconduct was alleged or found whether to initiate an investigation of the ADA involved or to impose discipline.

317.    However, the testimony and evidence further showed and shows that, with deliberate indifference to the violations of criminal defendants' constitutional rights, the District Attorney, with just one exception, never imposed discipline or authorized disciplinary inquiries.

318.    The *Su* case settled on or about October 15, 2008, for $3.5 million.

319.    Notwithstanding that settlement, the District Attorney's deliberately indifferent policies, customs or practices continued through and including the prosecution of plaintiff.

320.    Prior to the conviction of Plaintiff in 2010, Richard Brown, in 20 years as D.A., had disciplined just one prosecutor for violating *Brady*.

321.    Even in that one case, the Office tried to get the court to sweep the prosecutor's misconduct under the rug and only acknowledged his misconduct after the matter had received embarrassing news media attention.

322.    Despite hundreds of cases, prior to 2010, in which courts found summation misconduct or noted that such complaints had been made but it would not reach the issue because the evidence of guilt was overwhelming, Mr. Brown did not discipline a single prosecutor for such misconduct, no matter how egregious.

323.    With regard to Plaintiff's prosecutor, ADA Ross, the Office knew or should have known that she had repeatedly violated her *Brady* obligations in Plaintiff's case from the time his prosecution was initiated through his second trial in 2015, in the five-year-long *Newson* prosecution from 2010 through 2015, and allegedly in other cases, yet conducted no investigation into her alleged misconduct and did not discipline her.

44

324.     This is further evidence of the ongoing policy of deliberate indifference that existed prior to, during, and following Plaintiff's first trial and that created an atmosphere under which prosecutors knew that all that mattered in serious cases was winning.

325.     The District Attorney's policy, custom and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's constitutional obligations foreseeably encouraged such violations to continue.

326.     The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

327.     But for the ADA's misconduct caused by the District Attorney's unlawful or deliberately indifferent policies, customs and practices, Plaintiff would have been acquitted and released from custody, and would not have been incarcerated any further in connection with his murder case.

328.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial and trial proceedings.

329.    The Queens County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

330.    The District Attorney of Queens County, at all relevant times, was and is an elected officer of Queens County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

331.    The District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); New York has provided by statute (N.Y. County Law §§ 53, 941) that Defendant City's constituent counties (including Queens County), and hence Defendant City itself, has liability for torts committed by County officers and employees, such as the District Attorney and his assistants, and the City of New York represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

332.    The District Attorney of Queens County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

333.    During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

334.    By virtue of the foregoing, the Defendant City of New York is liable, to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

### FIFTH CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant THE CITY OF NEW YORK for the Queens District Attorney's Violations of Plaintiff's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment Rights to Pretrial Disclosure of Exculpatory Information and to Not be Deprived of Liberty Based Upon False or Misleading Evidence)**

335.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 123 and 176 to 324 as if fully set forth herein.

336.    Pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments, Plaintiff had a federal constitutional right to timely disclosure to the defense of exculpatory and other information which, considered in its totality, was likely to affect whether he would be deprived of his liberty before trial.

337.    Under these provisions, a prosecutor also was prohibited from knowingly relying in the grand jury on false or misleading evidence.

338.    Under these provisions, prosecutors were required to disclose exculpatory evidence to the defense so that it could exercise its right under state law to ask the grand jury to call exculpatory witnesses and consider exculpatory evidence.

339.    Further, under these provisions, the prosecution was required to disclose exculpatory and other evidence that, if known to the defense and the court, would be likely to result in the defendant's pretrial release.

340.    A criminal defendant has a federal constitutional right not to be held on excessive bail.

341.     In addition, under the above constitutional provisions, he has a right not to have the prosecution mislead the court, charged with responsibility for determining whether to grant reasonable bail, concerning the strength of the prosecution's case.

342.     Indeed, under New York's criminal procedure law at the time of Plaintiff's prosecution, the strength of the prosecution's case was a statutory factor that a judge was required to consider in determining whether to grant pretrial release.

343.     In this case, ADA Ross misled the grand jury into voting to indict Plaintiff by presenting Hilton as an apparently voluntary and reliable witness to Plaintiff's alleged shooting of Brown without disclosing to the grand jury, or the defense, that (a) Hilton was testifying as a prisoner of the D.A.'s Office, (b) until he was taken prisoner he had repeatedly refused to testify, and (c) he had made a formal statement in court, in explaining his refusal to testify, that he had been intoxicated and had not seen the shooting.

344.     Further, Ross failed to tell the grand jury, or the defense, that Hilton had affirmatively told Detective Bey that the shooter did not wear glasses and was cleanshaven.

345.     This evidence exculpated Plaintiff because, at the time of the shooting, he wore glasses as well as a mustache and goatee.

346.     Ross had a constitutional duty to find out from Detective Bey such exculpatory information and, under the circumstances of this case, to disclose it to the grand jury and to the defense.

347.     Following Plaintiff's indictment, Ross further violated Plaintiff's constitutional rights by withholding the aforementioned exculpatory information from Plaintiff and his counsel, and from the court charged with determining whether to deprive Plaintiff of his liberty pending trial.

348.    As a result of Ross's withholding of the aforementioned information, the court decided to detain plaintiff and he was deprived of his liberty for approximately two years before his initial trial.

349.    After Plaintiff's conviction was reversed on appeal, Ross continued to withhold the aforementioned information even though she knew its disclosure was likely to, or at least might have, caused the court to order Plaintiff's release from custody or to fix a reasonable bail Plaintiff could afford.

350.    She also withheld additional information she had learned about since Plaintiff's initial conviction that directly affected the strength of the prosecution's case and the court's bail determination.

351.    First, she withheld until just before trial that Turner had been arrested, again, on April 14, 2016, for possession of a loaded firearm and had refused to leave the automobile where he possessed such firearm, forcing police officers to break the window and pull him out of the vehicle.

352.    Second, she withheld that Turner had been convicted for promoting prostitution in Nassau County and in Florida, had allowed a girlfriend whose prostitution he was promoting to falsely use his legitimate sister's identity, and had been convicted in Florida for felony perjury for lying to police about his own identity.

353.    Third, she continued to withhold evidence, now even more voluminous, known to her Office and to the NYPD, that Turner had been a leader of the notorious Snow Gang.

354.    In this regard, when Turner was arrested for possession of the loaded firearm, a D.A.'s Intake Bureau Crime Report stated that Turner was a "known Snow Gang member who previously posted [a Facebook] video in possession of firearms and making threats."

49

355.    The Report further stated that another individual arrested with Turner told the police in a videotaped statement that Turner "is the leader of the Snow Gang" and that Turner "always" has guns on him.

356.    The District Attorney's "case tracking" report for the same case contained a "message alert" to notify James Evangelou, the chief of the District Attorney's Career Criminal Major Crimes Bureau, of the arrest of Turner, evidently because there was an alert that all Snow Gang or violent gang-related arrests, and/or any arrest of Snow Gang leader Turner, be reported to Evangelou.

357.    Ross handled Turner's gun case, making a cooperation agreement with him to reduce the charges and potential punishment, and knew or should have known of the above documents.

358.    Prior to the retrial, ADA Ross also obtained complaint follow-up forms (or DD5s) from the NYPD relating to a 2014 stabbing of Turner.

359.    She disclosed several of these DD5 reports to Plaintiff's counsel.

360.    But she withheld the only DD5 report that reported that Turner was a member of the Snow Gang.

361.    The NYPD had extensive investigative files on the criminal activities of the Snow Gang and Turner.

362.    The D.A.'s Office obtained, or had access to, these files because it was involved in prosecuting other members of the Snow Gang who had committed violent offenses.

363.    Indeed, at one of these trials, *People v. Lucas et al.*, Ind. No. 1659/2014, the office had a police lieutenant who was presented as an expert concerning the activities of the Snow Gang testify that Turner was a leader of the gang.

364.    This lieutenant had subpoenaed Turner's social media accounts which contained numerous of his postings bragging about his gang-related criminal activities.

365.    This lieutenant had spoken to the entire Queens D.A.'s Office about his knowledge of Snow Gang and Ross knew, or should have known, the information known to this officer, and to her Office, about Turner's involvement in criminal activities with the Snow Gang.

366.    Ross disclosed nothing to Taylor or his attorney about Turner's involvement in the Snow Gang (or any other gang) before or during the second trial.

367.    Ross also possessed in her file Turner's disciplinary records from his time at Rikers Island showing that the N.Y.C. Department of Corrections had determined that, as of that time, Turner was a member of the infamous Bloods gang.

368.    The records further showed that, in May 2016, Turner and two other inmates had assaulted another inmate over a gang dispute.

369.    Ross also possessed reports documenting that, a few weeks after that assault, Turner and a group of other inmates had converged on and attacked yet another inmate.

370.    Ross never disclosed any of these records either.

371.    Had the above evidence—the exculpatory as well as the impeachment evidence—been timely disclosed, the viability of the prosecution would have been destroyed and Plaintiff would have been released much sooner than December 2016, when the court finally granted him $75,000 bail.

372.    Ross's conduct causing Plaintiff to be deprived of his liberty before the first and the second trials was substantially caused by the deliberate indifference of the District Attorney and his designees to the rights of criminal defendants not to be unreasonably deprived of their

liberty before trial based upon false or misleading evidence or the suppression from the defense of exculpatory and other favorable evidence.

373.    Knowing that decisions about how to present evidence in the grand jury and what evidence and information to disclose to the defense come up in every case, the District Attorney had no policy manual, procedure, or protocol requiring the prompt disclosure to the defense of exculpatory evidence prior to the grand jury presentation, the presentation of exculpatory evidence to the grand jury so that the other evidence presented would not be false or misleading, and the disclosure to the court and to the defense of exculpatory or impeachment evidence that would be likely to, or might, influence the court to release the defendant on bail.

374.    Indeed, the District Attorney had no policy at all regarding the timing of disclosure of exculpatory or impeachment evidence except to disclose such evidence early enough so that any conviction would be unlikely to be reversed on appeal.

375.    Prosecutors who engaged in misconduct in the grand jury were never disciplined, nor were prosecutors disciplined in general, for withholding *Brady* material, presenting or failing to correct false or misleading evidence or argument, or engaging in any other behavior that violated the constitutional rights of criminal defendants.

376.    The failure of ADA Ross and her colleagues to disclose evidence that would have been likely to affect the decision of the grand jury to indict Plaintiff and of the court to release him on reasonable bail before the first and later the second trial was substantially caused by the deliberate indifference of the District Attorney and his designees to criminal defendants' aforementioned constitutional rights.

377.    By virtue of the foregoing, the Defendant City of New York is liable, to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.    For compensatory damages of not less than $15 million;

b.    For punitive damages of not less than $7.5 million;

c.    For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

d.    For pre-judgment interest as allowed by law; and

e.    For such other and further relief as this Court may deem just and proper.


LAW OFFICES OF JOEL B. RUDIN, P.C.


_____/s/_____

By:    Joel B. Rudin
       Haran Tae
       Matthew A. Wasserman
       Law Offices of Joel B. Rudin, P.C.
       152 West 57th Street, 8th Floor
       New York, New York 10019
       (212) 752-7600
       Email: jbrudin@rudinlaw.com

       *Attorneys for the Plaintiff*

Dated:  New York, New York
        June 19, 2020

53

## EXHIBIT A

1.  *People v. Roopchand*, 107 A.D.2d 35 (2d Dep't 1985): Affirming conviction but unequivocally condemning trial prosecutor for making inflammatory summation argument intended to elicit sympathy for the complainant and arouse animosity against the defendant, and warning the prosecutor that future infractions may lead to disciplinary action, and that the court expected the Queens County D.A. to issue an appropriate internal admonition.

2.  *People v. Jones*, 108 A.D.2d 824 (2d Dep't 1985): Reversing robbery conviction where, among other things, the prosecutor improperly elicited that the defendant had previously hit a woman with a bat, and then suggested on summation that the jury could never believe a man who had done this.

3.  *People v. Valdivia*, 108 A.D.2d 885 (2d Dep't 1985): Affirming conviction but "strongly condemn[ing]" prosecutor for improperly cross-examining alibi witness regarding his taking an affirmation instead of an oath and revisiting the matter in summation, and for characterizing defendant's testimony as "an out and out series of lies."

4.  *People v. Hooks*, 110 A.D.2d 909 (2d Dep't 1985): Reversing conviction for rape, robbery, and burglary where prosecutor cross-examined defendant on his prior conviction in such a way as to improperly create the inference that because defendant had previously committed a burglary, he had also committed the instant offenses.

5.  *People v. Brown*, 111 A.D.2d 248 (2d Dep't 1985): In reversing conviction on other grounds, reprimanding prosecutor for making comments during summation that characterized defendant as lying while characterizing the prosecution as "on the side of truth," and implying that the jury should convict even if not convinced beyond a reasonable doubt, so long as it believed its verdict represented the "truth."

6.  *People v. Torres*, 111 A.D.2d 885 (2d Dep't 1985): Reversing, in part, because prosecutor repeatedly cross-examined alibi witness on why the witness did not contact the police, improperly implying witness was obligated to come forward, and because prosecutor consistently implied during summation that defense had concocted alibi, and improperly suggested that the jury would be subject to derision if they acquitted defendant.

7.  *People v. Williams,* 112 A.D.2d 177 (2d Dep't 1985): In reversing, reprimanding trial prosecutor for intimating to jury during summation that they were required to find that the complainant had lied in order to acquit defendant, and improperly bolstering by injecting his integrity and the integrity of his office into the case.

1

8. *People v. Hines,* 112 A.D.2d 316 (2d Dep't 1985): Reversing in part because the prosecutor, during his summation, made inappropriate comments about the defendant, and emphasized the other "police procedures" which led to the selection of defendant as a suspect, clearly inviting the jury to infer that there was other evidence against defendant, of which they had not been told.

9. *People v. La Rosa,* 112 A.D.2d 954 (2d Dep't 1985): Reversing conviction where the prosecutor, in summation, improperly vouched for his own case, denigrated the defense, misrepresented material facts, and misquoted testimony.

10. *People v. Reyes*, 119 A.D.2d 596 (2d Dep't 1986): Affirming conviction but noting that prosecutor improperly told jury that "contrary to what the Defense Counsel would have you believe, a trial is not a search for reasonable doubt. Plainly simply a trial is a search for truth. Not supposed to be sitting here trying to pick reasonable doubt out from everything that goes on [sic]."

11. *People v. Mercado*, 120 A.D.2d 619, 502 N.Y.S.2d 87 (2d Dep't 1986): Ordering new trial where, among other errors, court allowed prosecutor to admit photograph of defendant posing with handguns for no other purpose than to arouse jurors' emotions, and inflammatory nature of photographs was made worse when prosecutor, in summation, commented on jury having seen defendant in his "Al Capone get-up."

12. *People v. Pascullo*, 120 A.D.2d 687 (2d Dep't 1986): Reversing conviction in part because prosecutor suggested improper inferences of racial motivation and informed the jury that an acquittal would be a condonation of racism.

13. *People v. Beaman*, 122 A.D.2d 848 (2d Dep't 1986): Reversing conviction because prosecutor called witness to stand knowing he would refuse to testify, and improperly commenting on this refusal during summation, thereby inviting jury to speculate that witness had been threatened and refused to testify out of fear.

14. *People v. Ciervo*, 123 A.D.2d 393 (2d Dep't 1986): Reversing conviction in part because of prosecutor's improper summation comments implying that a conviction was warranted based solely upon the defendant's character, and repeated characterizations of the defense case as a "con."

15. *People v. Roudabush*, 123 A.D.2d 649 (2d Dep't 1986): Affirming conviction but "condemn[ing]" prosecutor's misconduct during summation, and noting that court made its position on this misconduct "quite clear" during oral argument.

16. *People v. Anderson*, 123 A.D.2d 770 (2d Dep't 1986): Reversing conviction because prosecutor re-called witness (who had originally been a codefendant in the case) to the stand, even though prosecutor knew the witness was going to

invoke his privilege against self-incrimination, and improperly commented several times on this invocation of privilege during summation, thus inviting jury to draw an unwarranted inference against the defendant.

17.   *People v. Brown*, 125 A.D.2d 321, 510 N.Y.S.2d 135 (2d Dep't 1986): Reversing conviction because prosecutor improperly bolstered victim's testimony by implying that the defendant's stipulation that the victim had been raped and sodomized was a stipulation that the victim had told the truth, and by telling the jury something was "terribly wrong" with them if they did not believe the victim.

18.   *People v. Montalvo*, 125 A.D.2d 338 (2d Dep't 1986): Reversing conviction where prosecutor, in his summation, improperly commented upon the defendant's failure to testify and to call witnesses on his own behalf.

19.   *People v. Napoli*, 126 A.D.2d 674 (2d Dep't 1987): Affirming conviction but noting that prosecutor "went beyond the four corners of the evidence" in summation.

20.   *People v. Faison*, 126 A.D.2d 739 (2d Dep't 1987): Ordering new trial where prosecutor improperly cross-examined accused (1) on his failure to disclose alibi to police after being given *Miranda* warnings, and (2) on his failure to produce records indicating that he was at work at time of robbery, which suggested that defendant bore burden of proving alibi defense.

21.   *People v. Memminger*, 126 A.D.2d 752 (2d Dep't 1987): Ordering new trial on various grounds and "adominish[ing]" prosecutor "to remain within the bounds of fair comment during summation and to refrain from inappropriate and inflammatory remarks."

22.   *People v. Perez*, 127 A.D.2d 707 (2d Dep't 1987): Ordering new trial where, among other things, prosecutor improperly implied on cross-examination of accused that he was involved in previous criminal activity.

23.   *People v. Simms*, 130 A.D.2d 525 (2d Dep't 1987): Ordering new trial because of "numerous instances of prosecutorial misconduct which occurred throughout the course of the trial," including prosecutor's (1) eliciting of testimony that had been suppressed, (2) referring to that same evidence during summation, (3) repeatedly referring to facts not in evidence, (4) calling defendant's summation a "fairy tale," and (5) vouching for witnesses' credibility.

24.   *People v. Scoon*, 130 A.D.2d 597 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) argued in summation that witness was not involved in crimes of dishonesty when he knew that the witness had a youthful-offender adjudication for grand larceny, and (2) repeatedly commented on matters not in

evidence during summation.

25. *People v. Torriente*, 131 A.D.2d 793 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) cross-examined shooting victim about drug use, (2) cross-examined defendant on whether he had entered country illegally, (3) called police officer to introduce irrelevant testimony about defendant's place of residence, and (4) made prejudicial statements in summation about defense counsel's summation and witnesses' testimony.

26. *People v. Romain*, 137 A.D.2d 848 (2d Dep't 1988): Ordering new trial in part based on prosecutor's "gross distortion" in summation of defendant's testimony, implying that he had admitted guilt when in fact he had not.

27. *People v. Chin*, 138 A.D.2d 389 (2d Dep't 1988): Ordering new trial where prosecutor improperly made unwarranted inferences in summation that defendant accused of rape against young girl planned to commit similar offenses with one of his character witnesses.

28. *People v. Dunlap*, 138 A.D.2d 393 (2d Dep't 1988): Reversing conviction based on prosecutorial misconduct even though proof of defendants' guilt was overwhelming, where prosecutor in summation diverted jury's attention from witnesses' inconsistencies with elaborate depiction of defendants as sharks hunting prey. *See also People v. Williams*, 162 A.D.2d 488 (2d Dep't 1990) (reversing codefendant's conviction on same ground).

29. *People v. Stewart*, 153 A.D.2d 706 (2d Dep't 1989): Vacating conviction where the "trial was marked by the prosecutor's efforts, even over sustained objections, to characterize the defendant as an individual predisposed to commit the crime charged."

30. *People v. Langford*, 153 A.D.2d 908 (2d Dep't 1989): Ordering new trial where prosecutor suggested, with no evidence, that defendant's alibi witness used drugs and was involved in charged robbery, and made several improper remarks in summation, including denigrating defense counsel and defense witnesses, and suggesting to the jury that, in order to acquit, they would have to find that a witness had lied.

31. *People v. Durham*, 154 A.D.2d 615 (2d Dep't 1989): Ordering new trial in part based on prosecutor's misconduct in summation, which included vouching for prosecution witnesses and referring pejoratively to defendant.

32. *People v. Gomez*, 156 A.D.2d 462 (2d Dep't 1989): New trial ordered where prosecutor (1) defied court's order limiting cross-examination of witness on pending criminal case, prompting court to accuse prosecutor of bad faith, (2)

cross-examined witness on his supposed communications with defendant, even though he knew the two were incarcerated and not free to converse, prompting court again to accuse prosecutor of bad faith, and (3) in summation, attempted to inflame the jury, vouched for witnesses' credibility, denigrated the defense, and shifted the burden of proof.

33. *People v. Pinkas*, 156 A.D.2d 485 (2d Dep't 1989): Ordering new trial where court ordered counsel not to commingle discrete allegations, but prosecutor "repeatedly sought to join the two incidents during her summation in spite of the direction by the Trial Judge to desist."

34. *People v. Rivera*, 170 A.D.2d 544 (2d Dep't 1991): Reversing rape conviction because the prosecutor failed to disclose police reports that were "in direct conflict" with the complainant's rape allegation.

35. *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991): Reversing conviction where the prosecutor failed to disclose the videotape of an interview of the alleged child victim.

36. *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991): Reversing conviction in part based on prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been."

37. *People v. Delace*, 174 A.D.2d 688 (2d Dep't 1991): Reversing robbery conviction where the prosecutor failed to disclose witness statements.

38. *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991): Reversing conviction where prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana.

39. *People v. Wilkens*, 177 A.D.2d 678 (2d Dep't 1991): Reversing convictions where, despite court order that defendant's use of aliases could be used only for identification purposes, prosecutor cross-examined defendant on the same topic for impeachment purposes and then argued on summation that defendant was not to be believed because he "hides behind three names."

40. *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991): Ordering new trial in part based on prosecutor's misconduct in summation, including improperly suggesting that defendant's daughter's unfazed demeanor on witness stand indicated that defendant had exposed her to drug dealing; trying to mislead the jury into finding defendant guilty by association; and announcing in open court that defendant's daughter was wearing T-shirt that court had refused to admit in evidence.

41. *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992): Reversing a rape conviction

involving a four-year-old child where, despite a court order, the prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

42.   *People v. Mack*, 180 A.D.2d 824 (2d Dep't 1992): Reversing conviction where prosecutor failed to turn over notes that could have been used to impeach witness.

43.   *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992): Ordering new trial where prosecutor's summation "went well beyond the bounds of fair advocacy" by calling defendant's alibi witness untruthful, by suggesting that defendant was selling drugs on the night of his arrest for a crime he was alleged to have committed on another day, and by suggesting that defendant's alibi was concocted after the witness met with defense counsel.

44.   *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992): Reversing a narcotics conviction where the prosecutor repeatedly denied the existence of a "buy report," which turned out to include a description of the buyer wholly at odds with the description the arresting officer had said he received and matched to the defendant.

45.   *People v. James*, 184 A.D.2d 582 (2d Dep't 1992): Reversing conviction where prosecutor represented that People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs but then cross-examined police officer extensively on that very evidence and emphasized it in summation.

46.   *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992): Reversing conviction where, among other things, prosecutor in summation improperly called People's key witness a "brave young girl" and asked jury not "to let her down."

47.   *People v. Campbell*, 186 A.D.2d 212, 587 N.Y.S.2d 751 (2d Dep't 1992): Reversing a robbery conviction because the prosecutor withheld hospital records which contained statements of the complainant contradicting her trial testimony.

48.   *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992): Reversing conviction where prosecutor cross-examined accused on psychiatric history and then commented on the matter in summation even though there was no relevance whatsoever to the defendant's psychiatric history or condition.

49.   *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992): New trial ordered where prosecutor repeatedly elicited evidence of uncharged crimes against accused in order to show his criminal propensity and bad character, attempted to paint him as guilty by association, and committed summation misconduct.

50.   *People v. Banch*, 80 N.Y.2d 610 (1992): Reversing manslaughter conviction where the prosecutor "mistakenly" gave the defense the wrong police memo book, withheld prior affidavits of a People's witness, and falsely represented that a

report by another People's witness contained no information required to be disclosed.

51.  *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993): Ordering new trial where prosecutor "engaged in a series of improper remarks and tactics," including eliciting testimony about defendant's postarrest silence and stressing the point in both his opening and summation; eliciting improper expert testimony and mischaracterizing the issue in summation; and, also in summation, referring to defense counsel's summation as a "con job," vouching for the complainant's truthfulness, and "derisive[ly]" commenting on the presumption of innocence and defendant's right to remain silence.

52.  *People v. Hill*, 193 A.D.2d 619 (2d Dep't 1993): Ordering new trial where prosecutor cross-examined defendant in a manner intended to improperly to show defendant's criminal propensity and then focused on this line of argument in summation.

53.  *People v. Davis*, 196 A.D.2d 597 (2d Dep't 1993): Reversing a rape and robbery conviction where the prosecutor had refused to disclose the basis for the People's expert's conclusion that defendant's DNA matched that found on the victim.

54.  *People v. Gaines*, 199 A.D.2d 335 (2d Dep't 1993): Reversing manslaughter conviction where the District Attorney's Office employed the same scheme condemned in *Steadman*, i.e., withholding a cooperation agreement made between the trial assistants' superior and the principal prosecution witness's attorney.

55.  *People v. Torres*, 199 A.D.2d 442 (2d Dep't 1993): Ordering new trial based in part on prosecutor's persisting in lines of cross-examination over sustained objections, including questioning a defense witness excessively about his drug use, questioning defendant about irrelevant matter of whether he thought drugs were a problem in schools, and accusing defendant of tailoring his testimony after hearing other witnesses testify.

56.  *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993): Reversing a defendant's manslaughter conviction where the District Attorney's Office made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a supervisor in the Office would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement. *See also People v. Blair*, 186 A.D.2d 665 (2d Dep't 1992) (noting that the scheme operated at "the executive level of the District Attorney's Office").

57.  *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994): Reversing robbery

conviction where the prosecutor withheld prior statements of the complainant describing the robbery, suggested, without evidentiary support, that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic.

58. *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994): Reversing assault conviction where the prosecution failed to disclose witness statements.

59. *People v. Baxley*, 84 N.Y.2d 208 (1994): Remitting a CPL 440 motion challenging a murder conviction for a hearing to determine the truth and materiality of a witness's affidavit, which stated that before trial he had informed the prosecutor that he and a People's witness had been induced by police to fabricate a jail-house confession, evidence the Court of Appeals deemed "crucial" to the People's case. (Mr. Baxley was killed in prison before the hearing could be held, according to his counsel, Harold Ferguson.)

60. *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994): Reversing conviction in part based on prosecutor's unspecified improper comments in summation regarding two defense witnesses and a prosecution witness.

61. *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995): Reversing conviction where prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

62. *People v. Spinelli*, 214 A.D.2d 135 (2d Dep't 1995): Reversing conviction where prosecutor failed to cross-examine defendant on his postarrest silence then attacked the defendant's credibility on that ground during summation, thus unfairly depriving defendant of chance to explain the silence.

63. *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995): Reversing conviction in part based on prosecutor's disregard of court's *Sandoval* ruling when cross-examining defendant, repeated references to defendant as a violent person, cross-examination questions calculated to compare defendant to Hannibal Lecter in *Silence of the Lambs*, remarks inviting jurors to put themselves in the shoes of victims being threatened by defendant, and waiving of a knife in front of the jury during summation.

64. *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995): Reversing conviction where prosecutor asked defendant whether the complainant was lying, asked defendant's character witness about her personal knowledge of the facts underlying defendant's past conviction, failed to establish a good-faith basis for questioning about a threat made by the defendant's father, and failed to stay within the four corners of the evidence during summation.

65. *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995): Ordering new trial based on "flagrant" and "pervasive" summation misconduct, where prosecutor (1) repeatedly referred to defendant as convicted felon, in an attempt to get the jury to convict defendant based on criminal propensity, (2) denigrated defendant, including by suggesting that defendant thought jurors just "fell off the stupid truck," and (3) attempted to shift the burden of proof.

66. *People v. James*, 218 A.D.2d 709 (2d Dep't 1995): Ordering new trial on other grounds but noting "some unacceptable practices engaged in by the prosecutor" — namely, the "repeatedly condemned tactic" of suggesting during cross-examination and summation that the complainant, in identifying the defendant, was either correct or lying, and excessive references to the defendant's criminal record.

67. *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995): New trial ordered where prosecutor failed to disclose police officer's notes.

68. *People v. Ferrara*, 220 A.D.2d 612 (2d Dep't 1995): Affirming conviction but noting that prosecutor "committed several instances of misconduct during the course of his summation" by commenting, without proper foundation, on a defense witness's failure to provide the police with information; suggesting that defense counsel's objections had deprived jury of hearing certain testimony; and telling the jury that it should take only 10 to 15 minutes to decide the case.

69. *People v. Torres*, 223 A.D.2d 741 (2d Dep't 1996): Reversing conviction where prosecutor made personal attacks on defense counsel and argued that there was no evidence that defendant was somewhere other than the scene of the robbery, which improperly shifted the burden of proof to the accused.

70. *People v. Brown*, 224 A.D.2d 539 (2d Dep't 1996): New trial ordered where prosecutor failed to disclose firearms report that contained substantially different information than that given by People's witness at trial, which prejudiced defense by depriving it of the opportunity "to cross-examine the [witness] and test his credibility."

71. *People v. Moustakis*, 226 A.D.2d 401 (2d Dep't 1996): Reversing conviction where the prosecutor presented a cooperating witness who "forgot" the details of his past crimes, but withheld 16 pages of interview notes detailing these crimes for the District Attorney's Office.

72. *People v. May*, 228 A.D.2d 523 (2d Dep't 1996): Reversing a murder conviction where the prosecutor failed to disclose a cooperation agreement with its star witness, and failed to correct his false testimony that no such agreement existed.

73.   *People v. Croons*, 231 A.D.2d 585 (2d Dep't 1996): Reversing robbery conviction where the prosecution wrongfully withheld prior statements of a key witness, the complainant.

74.   *People v. Bonnen*, 236 A.D.2d 479 (2d Dep't 1997): Reversing conviction based in part on prosecutor's failure to present evidence he had promised in opening that defendant had shot an additional victim, and then admitting at end of trial that he had "no information" as to that victim's whereabouts, prompting court to call prosecutor's representation in his opening statement "disingenuous."

75.   *People v. Ying*, 236 A.D.2d 630 (2d Dep't 1997): Reversing robbery conviction on other grounds, while condemning the prosecutor's withholding of the terms of a cooperation agreement with a People's witness.

76.   *People v. Brown*, 241 A.D.2d 460, 663 N.Y.S.2d 975 (2d Dep't 1997): Ordering new trial where People agreed that prosecution's failure to disclose prior statements of arresting officer was prejudicial and mandated reversal.

77.   *People v. Lippolis*, 246 A.D.2d 557 (2d Dep't 1998): Ordering new trial where prosecutor in his opening statement, among other things, improperly called the defendant a "parasite" and told the jury that "citizens like [them]selves indicted this defendant"; during direct examination of the arresting officer, elicited that defendant had remained silent after his arrest; and during summation, again referred to defendant's postarrest silence.

78.   *People v. Mackey*, 249 A.D.2d 329 (2d Dep't 1998): Reversing robbery conviction where the prosecutor "deliberately" set a trap for the defense at trial by withholding critical information required to be disclosed earlier.

79.   *People v. Walters*, 251 A.D.2d 433 (2d Dep't 1998): Ordering new trial where prosecutor repeatedly made inflammatory remarks designed to appeal to the jury's sympathy, such as commenting that the victim "was probably going to be a brilliant artist"; shifted the burden of proof by noting that the defendant did not call additional witnesses; stated that "the only real evidence is the People's evidence"; accused the defendant of tailoring his testimony after hearing the prosecution witnesses; described the defendant's testimony as "continued lies on top of lies, on top of lies," and "tales and lies, back and forth, back and forth"; gave his personal opinion on the truth and falsity of witnesses' testimony; vouched for the victim's credibility; and, "most egregious[ly]," insinuated that a gun recovered from defendant two weeks after the crime may have been used in the charged shooting, even though the prosecutor knew that a ballistics test had conclusively established otherwise.

80.   *People v. Anderson*, 256 A.D.2d 413 (2d Dep't 1998): Ordering new trial where

prosecutor (1) brought out only inculpatory portion of statement at trial and, thanks to trial court error, succeeding in blocking defendant's attempt to bring out exculpatory portion, and (2) compounded misconduct by telling jury in summation that accused had not made any exculpatory statement.

81. *People v. Brown*, 256 A.D.2d 414 (2d Dep't 1998): Reversing conviction on evidentiary grounds but noting as independent ground for reversal the prosecutor's improper comment on defendant's declining to testify, his misstatements of the evidence, and his references to matters not in evidence.

82. *People v. Rivera*, 259 A.D.2d 570, 684 N.Y.S.2d 896 (2d Dep't 1999): Affirming conviction but "deplor[ing] the continuous failure of the Assistant District Attorney to follow the admonitions of the trial court regarding his improper summation comments."

83. *People v. Alfaro*, 260 A.D.2d 495 (2d Dep't 1999): Reversing conviction on evidentiary grounds and noting "clear impropriety" of prosecutor's remarks in summation that the presumption of innocence was "gone" or "vanquished"; that while the court would instruct the jury that the defendant had "a lot of rights," they should also consider the victim's rights; and that the jury should infer the defendant's guilt based on his having had a lawyer with him when he surrendered to police.

84. *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999): Ordering new trial based on prosecutor's summation misconduct where prosecutor improperly vouched for complainant's truthfulness, appealed to the jury's sympathies and fears by describing the elderly complainant as a person who would be a "classic victim anywhere in this city," accused the defense of manufacturing evidence and putting on perjurious witnesses who were "more full of crap than a Christmas turkey," said he was "ticked off" that members of defendant's family were in the courtroom when a defense witness testified, and ended by telling jury that "[t]he only way this defendant walks out of the courtroom is if you let him."

85. *People v. Lewis*, 262 A.D.2d 584 (2d Dep't 1999): Ordering new trial in part based on prosecutor improperly asking a witness whether defense counsel offered him money or drugs in return for his testimony, and admonishing that such misconduct "is not to be repeated at any subsequent trial."

86. *People v. Washington*, 278 A.D.2d 517 (2d Dep't 2000): Reversing conviction on other grounds but noting impropriety of prosecutor's arguments in summation that defendant's testimony was "a lie" and "a pile of crock," and was "fabricate[d]" after having had "the benefit of counsel," and that the defense's version of events was "patently absurd" and that the jury should not be "fooled" by it.

87.   *Farakesh v. Artuz*, No 99-CV-3945 (JG), 2000 WL 1480896 (E.D.N.Y. Oct. 3, 2000): Granting habeas petition because prosecutor impermissibly elicited extensive testimony from detectives about defendant's postarrest silence, and repeatedly used this testimony in summation as evidence of defendant's guilty state of mind, and to impeach defendant.

88.   *People v. Smith*, 288 A.D.2d 496 (2d Dep't 2001): Ordering new trial where prosecutor "repeatedly stated unqualified pronouncements of the defendant's guilt, often inappropriately injecting her personal views," such as the remark, "of course he did it. This isn't an issue of who did it"; vouched for witnesses' credibility; appealed to the sympathy of the jury by commenting that the victim was "courageous" for going to the police and for "coming before you" and that the victim was "ill" but still came to court; referred to evidence as "uncontroverted," which was a veiled (and improper) reference to defendant's declining to testify; and implied that a witness who could not speak and therefore did not testify would have fully corroborated the complaining witness.

89.   *People v. Leavy*, 290 A.D.2d 516 (2d Dep't 2002): Prosecutor withheld *Brady* material such as promises of leniency given to cooperating witness, but court upheld conviction because defense had meaningful opportunity to cross-examine witness about it.

90.   *People v. Ni*, 293 A.D.2d 552 (2d Dep't 2002): Reversing assault conviction where the prosecutor's flagrantly improper comments during opening and closing statements shifted the burden of proof, inflamed the jury, and denigrated the defense.

91.   *Jenkins v. Artuz*, 294 F.3d 284 (2d Cir. 2002): Affirming grant of writ of habeas corpus where first prosecutor caused a mistrial by withholding a crucial witness's cooperation agreement until the day of his testimony, then second prosecutor, on retrial, allowed same witness to falsely deny the existence of the agreement, objected to the defense's efforts to bring it out, reinforced the witness's false denial on redirect, and bolstered the false testimony in summation.

92.   *People v. Lauderdale*, 295 A.D.2d 539 (2d Dep't 2002): Ordering new trial based in part on prosecutor's 31 references to defendant's highly prejudicial nickname, "Homicide."

93.   *People v. Bhupsingh*, 297 A.D.2d 386 (2d Dep't 2002): Reversing on other grounds, but noting that prosecutor's misconduct could have served as additional basis for reversal, where prosecutor persistently questioned defendant about collateral matters in a manner intended to denigrate him, continually asked leading questions of prosecution witnesses, placed inadmissible hearsay before the jury,

improperly elicited evidence of prior consistent statements made by the complainant, and made inflammatory comments in summation that denigrated the defense and appealed to the sympathy of the jury.

94. *People v. Ramashwar*, 299 A.D.2d 496 (2d Dep't 2002): Reversing conviction because prosecutor put her own credibility at issue by seeking to impeach two defense witnesses with their inconsistent prior statements to her, and by commenting upon the inconsistencies in summation.

95. *People v. Jones*, 305 A.D.2d 698 (2d Dep't 2003): Reversing robbery conviction where the prosecutor deliberately elicited police testimony in a manner that created the unfair impression that the codefendant had implicated the defendant to police, and where the trial court erroneously precluded the defense from cross-examining the complainant, who was the sole eyewitness, regarding the length of time it took him to identify the defendant at a lineup.

96. *People v. Jamal*, 307 A.D.2d 267 (2d Dep't 2003): Ordering new trial where prosecutor inappropriately told jury in summation that certain evidence was kept from them for "legal reasons"; argued that indictment was evidence of defendant's guilt; repeatedly gave his personal opinion as to the truth of prosecution witnesses' testimony and as to defendant's guilt; and shifted the burden of proof by referring to the People's evidence as "undisputed" and "[u]ncontroverted," while stating that defendant had "no explanation" and "no rational defense" and asking rhetorically, "[w]hat is the defense, ladies and gentlemen?"

97. *People v. Milligan*, 309 A.D.2d 950 (2d Dep't 2003): Ordering new trial in part based on prosecutor's improper vouching for witnesses' credibility.

98. *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003): Granting habeas corpus relief in a murder case where the prosecutor failed to disclose a crucial witness's cooperation agreement, knowingly presented the witness's perjured testimony denying the existence of such an agreement and lying about his criminal conduct, and improperly bolstered the witness's false testimony on summation.

99. *People v. Thomas*, 8 A.D.3d 303 (2d Dep't 2004): Conviction set aside by trial judge after verdict based on *Brady* violations, but verdict re-instated by Appellate Division because issue was not preserved.

100. *Turner v. Schriver*, 327 F.Supp.2d 174 (E.D.N.Y. 2004): Granting federal habeas corpus relief in a robbery case where the prosecutor failed to investigate and disclose the criminal record of the People's only witness to the crime, elicited false testimony from the witness that he had no record, and gave false summation on the witness' absence of a criminal record to bolster the witness' credibility.

13

101. *People v. Mitchell*, 14 A.D.3d 579 (2d Dep't 2005): Reversing conviction where prosecution withheld police reports, causing substantial prejudice to the defendant.

102. *People v. Brown*, 30 A.D.3d 609 (2d Dep't 2006): Reversing conviction based on jury-instruction error, but citing as independent ground for reversal misconduct by the prosecutor during cross-examination and summation, including "presenting himself as an unsworn witness at trial, suggesting that the defense counsel did not believe his own client, making public safety arguments, and implying that certain key evidence had been kept from the jury due to legal technicalities."

103. *People v. Knight*, 18 Misc.3d 1129(A) (Sup. Ct. Queens Cty. 2007): Setting aside verdict after defense discovered that prosecutor failed to disclose significant *Brady* material concerning one of the homicide victims and related to defendant's legitimate self-defense claim.

104. *People v. Bennett*, 40 A.D.3d 653 (2d Dep't 2007): Ordering new trial where prosecutor ambushed defense by representing that he would not call witness and that no *Rosario* existed, but then turning over *Rosario* material and calling witness, and capitalizing on these unfair tactics in summation.

105. *People v. Frantz*, 57 A.D.3d 692 (2d Dep't 2008): Ordering 440 hearing in murder conviction where prosecutor failed to disclose prior inconsistent statements of cooperating witness, who was the only witness to testify that the defendant committed the crime, concerning such witness's alleged observations of the defendant.

106. *People v. Sayers*, 64 A.D.3d 728 (2d Dep't 2009): Ordering new trial in part based on prosecutor's improper comments in opening and summation regarding evidence of defendant's uncharged crimes.

107. *People v. Bellamy*, 26 Misc. 3d 1210(A) (Sup. Ct. Queens Cty. 2010): Setting aside murder conviction based on prosecution's failure to disclose, among other things, benefits given to a key prosecution witness.  The prosecutor also gave a misleading and prejudicial summation.  Subsequent civil rights litigation revealed that the prosecution participated in manufacturing false identification testimony.

108. *People v. Spann*, 82 A.D.3d 1013 (2d Dep't 2011): Reversing conviction where prosecutor improperly commented on the defendant's medical evidence, presented to explain his perspiration and rapid heartbeat during traffic stop, by referring to it as a "distraction," a "smokescreen," and "smoke and mirrors"; impermissibly shifted the burden of proof by telling jurors that if they did not find the defendant's testimony "reasonable," they could not "form the basis of reasonable doubt"; and stated 14 times that police had recovered a handgun from under the passenger seat of the car, where defendant was sitting, although no evidence was

14

presented at trial to support that claim.

109. *People v. Anderson*, 83 A.D.3d 854 (2d Dep't 2011): Ordering new trial where prosecutor defied court's *Sandoval* ruling to ask "a series of irrelevant and prejudicial questions" concerning defendant's prior narcotics conviction, and in summation vouched for witnesses' credibility, denigrated the defense, and mischaracterized defendant's testimony.

110. *People v. Robinson*, 34 Misc.3d 1217(A) (Crim. Ct. Queens Cty. 2011): Ordering a hearing where prosecutor's delay in *Brady* disclosure was a "clear and unequivocal breach" of that prosecutor's responsibility.

111. *People v. Bedi*, Ind. No. 4107/96 (Sup. Ct. Queens Cty. March 13, 2013) (Griffin, A.J.S.C.): Setting aside murder conviction where prosecutor violated *Brady* by failing to disclose payments made to a key witness, and by failing to correct witness's false testimony that he did not receive such benefits.

112. *People v. Joyner*, 126 A.D.3d 1002 (2d Dep't 2015): Reversing weapon possession conviction where prosecutor's summation deprived defendant of a fair trial by accusing him, without evidence, of uncharged crimes, and making statements implying guilt by association.

113. *People v. Singh*, 128 A.D.3d 860 (2d Dep't 2015): Reversing rape conviction where prosecutor, during summation, acted as an unsworn witness, improperly invited the jury to speculate as to certain matters, denigrated the defense while vouching for the complainant's credibility, and shifted the burden of proof.

114. *People v. Negron,* 26 N.Y.3d 262 (2015): Setting aside attempted murder conviction where prosecutor failed to disclose evidence that was "plainly favorable" to the defense. Prior litigation in the case revealed that after the complainant failed to identify Negron in a lineup, the prosecutor took the complainant into a private room with members of the NYPD, which led the complainant to falsely identify Negron as the perpetrator.

115. *People v. Cantoni*, 140 A.D.3d 782 (2d Dep't 2016): Reversing conviction where prosecutor repeatedly shifted the burden of proof to the defendant, told the jurors that they would have to find the People's witnesses had lied in order to believe the defense, vouched for the credibility of police witnesses, and denigrated the defense.

116. *People v. Redd*, 141 A.D.3d 546 (2d Dep't 2016): Reversing conviction for "pervasive prosecutorial misconduct" where prosecutor, in opening and summation, misstated the evidence, vouched for the credibility of witnesses, called for speculation by the jury, made inflammatory statements, and improperly

denigrated the defense.

117. *People v. Brisco*, 145 A.D.3d 1028 (2d Dep't 2016): Reversing conviction because prosecutor, in summation, attacked defense counsel's integrity, improperly referenced facts not in evidence, misstated critical witness testimony, and made inflammatory "safe streets" arguments.

118. *People v. Davis*, 147 A.D.3d 1077 (2d Dep't 2017): Reversing conviction on other grounds but noting that prosecutor "made improper summation comments regarding the failure of the defendant to communicate certain information to the police at the time of his apprehension."

# EXHIBIT B

## Fordham Law Review

Volume 80 | Issue 2                                                    Article 5

2011

# The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong

Joel B. Rudin

---

Recommended Citation

Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537 (2011).
Available at: http://ir.lawnet.fordham.edu/flr/vol80/iss2/5

This Symposium is brought to you for free and open access by FLASH: The Fordham Law Archive of Scholarship and History. It has been accepted for inclusion in Fordham Law Review by an authorized editor of FLASH: The Fordham Law Archive of Scholarship and History. For more information, please contact tmelnick@law.fordham.edu.

# THE SUPREME COURT ASSUMES ERRANT PROSECUTORS WILL BE DISCIPLINED BY THEIR OFFICES OR THE BAR:  THREE CASE STUDIES THAT PROVE THAT ASSUMPTION WRONG

*Joel B. Rudin\**

## INTRODUCTION

Section 1983[1] creates a civil damages remedy against "every state official for the violation of any person's federal constitutional or statutory rights."[2]  Under § 1983, citizens are empowered to act as "private attorneys general" to enforce the Constitution against individual governmental actors or municipalities.[3]  In *Imbler v. Pachtman*,[4] the Supreme Court limited the use of this remedy against public prosecutors, finding that, like judges, they are entitled to absolute immunity from liability under § 1983 for conduct "within the scope of [prosecutors'] duties in initiating and pursuing a criminal prosecution."[5]  Recognizing that its decision might "leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty,"[6] the Court reasoned that "the immunity of prosecutors from liability . . . under § 1983 does not leave the public powerless to deter misconduct or punish that which occurs"[7] because "a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers."[8]

---

\*  Joel B. Rudin is a New York criminal defense and plaintiff's civil rights attorney who has handled several of the leading cases in New York involving individual and municipal civil liability for *Brady* and other due process violations by prosecutors.  He is the recipient of the New York State Association of Criminal Defense Lawyers' 2011 Justice Thurgood S. Marshall Award as outstanding criminal defense practitioner.  An associate in his law office, Terri S. Rosenblatt, provided invaluable assistance in the research and drafting of this article.

1.  42 U.S.C. § 1983 (2006).
2.  Kalina v. Fletcher, 522 U.S. 118, 123 (1997).
3.  *See* City of Canton v. Harris, 489 U.S. 378 (1989) (bringing claim against municipality alleging that police officer's failure to provide plaintiff necessary medical attention while in police custody violated her constitutional rights); Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658 (1978) (bringing suit against the City of New York and other governmental actors arguing that forced maternity leave violates constitutional rights).
4.  424 U.S. 409 (1976).
5.  *Id.* at 410.
6.  *Id.* at 427.
7.  *Id.* at 428–29.
8.  *Id.* at 429.

*Imbler* foreclosed a significant avenue for wronged criminal defendants to obtain redress, but it did not preclude all potential theories of civil liability against prosecutors and their offices under § 1983. Notwithstanding *Imbler*, a prosecutor may be sued for his or her conduct in an extra-judicial or "investigative" capacity.[9]  Additionally, under *Monell v. Department of Social Services of New York*[10] and *City of Canton v. Harris*,[11] a municipality may be sued where the unlawful custom, policy, or practice of its prosecutor's office causes constitutional injury to the plaintiff.[12]  Such an "unlawful policy" may be proven by showing that a municipality is deliberately indifferent[13] to its constitutional obligations through its failure to train, supervise, or discipline its agents or employees.[14]

Both of these paths to prosecutorial accountability are under attack in the courts.  With anecdotal evidence suggesting a recent upswing in multi-million dollar lawsuits filed against prosecutors' offices,[15] the Supreme Court recently has granted certiorari in a number of cases brought against prosecutors individually or against the municipalities that employ them.[16] In its decision denying *Monell* liability in *Connick v. Thompson*[17] on March 29, 2011, the Court again relied on *Imbler*'s assumption that prosecutors will be deterred from committing misconduct due to their amenability to

---

9. *See* Burns v. Reed, 500 U.S. 478, 494–96 (1991) (holding that prosecutor is entitled only to "qualified immunity" for providing assistance to police that contributes to a misleading arrest warrant application intended to bring a suspect before the court for criminal proceedings); *see also* Kalina v. Fletcher, 522 U.S. 118, 129–31 (1997) (holding that only qualified immunity protects prosecutor who acted like a complainant in personally attesting to the truth of a fact necessary to obtain an arrest warrant); Buckley v. Fitzsimmons, 509 U.S. 259, 269–70 (1993) (holding that only qualified immunity protects prosecutor who obtained a false expert opinion during a matter's investigative stage for later use at a criminal trial).

10. 436 U.S. 658, 694 (1978).

11. 489 U.S. 378, 398 (1989).

12. *See, e.g.*, Walker v. City of New York, 974 F.2d 293, 300 (2d Cir. 1992).

13. *Id.*

14. *Id.*; *see also* Ramos v. City of New York, 729 N.Y.S.2d 678, 695–96 (App. Div. 2001).

15. *See, e.g.*, Anahad O'Connor, *$18 Million to Man Wrongly Imprisoned*, N.Y. TIMES, Oct. 20, 2010, at A22 (reporting on *Newton v. City of New York*, No. 07 Civ. 6211, 2010 WL 4177383 (S.D.N.Y. Oct. 22, 2010); this verdict was subsequently vacated after trial); A. G. Sulzberger, *City to Pay Record $9.9 Million over Man's Imprisonment*, N.Y. TIMES, June 4, 2010, at A19 (reporting on *Gibbs v. City of New York*, 714 F. Supp. 2d 419 (E.D.N.Y. 2010)); Bruce Golding, *'Wrong Man' $30 M. Suit*, N.Y. POST (Feb. 23, 2011), http://www.nypost.com/p/news/local/manhattan/wrong_man_suit_JY7gsJ4EK1HyVSfYWC5V3J (reporting on *Bermudez v. City of New York*, No. 11 Civ. 750 (S.D.N.Y. filed Feb. 3, 2011)).

16. *See* Connick v. Thompson, 131 S. Ct. 1350, 1360–63 (2011) (holding that municipal prosecutor's office cannot be held liable under "failure to train" theory based on a "single incident" of a *Brady* violation); Van de Kamp v. Goldstein, 555 U.S. 335 (2009) (District Attorney has absolute immunity for policy concerning information-sharing with police); McGhee v. Pottawattamie Cnty., 547 F.3d 922 (8th Cir. 2008), *cert. granted*, 129 S. Ct. 2002 (Apr. 20, 2009), *dismissed*, 130 S. Ct. 1047 (Jan. 4, 2010) (considering whether prosecutor is immune from liability for manufacturing evidence; this case settled before a decision was entered).

17. 131 S. Ct. 1350.

"professional    discipline,    including    sanctions,    suspension,    and disbarment."[18]   This position has consistently been advocated by parties and their amici favoring the prosecutor's side of the debate.[19]

This Article challenges that assumption based on information uncovered through the very types of *Monell* and individual liability lawsuits that prosecutors and municipalities seek to curtail.  A number of commentators and scholars already have found that, contrary to *Imbler*, the discipline of prosecutors    rarely    occurs.       They    also    have    analyzed    the    existing mechanisms for internal and external prosecutorial oversight and found that, also contrary to *Imbler*, such mechanisms fail to provide an effective structure for prosecutorial accountability.  The information in these articles generally is drawn from publicly available data, or from voluntary responses by prosecutors' offices to surveys or interviews.  This material is summarized below in Part I.

However, the principal purpose of this Article is to present further evidence that prosecutors are rarely disciplined, and that prosecutors' offices lack effective policies or structures for accountability, based upon material that their offices have been compelled to disclose during the course of civil rights lawsuits brought by the author.  These materials, presented below in the form of case studies, show that in at least three New York City District Attorneys' Offices, *Brady* and related due process violations[20] committed by public prosecutors are tolerated by their respective offices, which almost never discipline or sanction offenders.  Deposition testimony as well as documentary discovery revealed that these District Attorneys' Offices have no codes of conduct,[21] no formal disciplinary rules or

---

18. *Connick*, 131 S. Ct. at 1363.

19. *See* Petitioners' Brief on the Merits at 13, 28, Connick v. Thompson, 131 S. Ct. 1350 (2011) (No. 09-571); Amicus Curiae Brief of the National District Attorneys Ass'n in Support of Petitioners at 10–11, Connick v. Thompson, 131 S. Ct. 1350 (2011) (No. 09-571); Brief of the National Ass'n of Assistant United States Attorneys & National District Attorneys Ass'n as Amici Curiae in Support Of Petitioners at 8–17, Pottawattamie Cnty. v. McGhee, 129 S. Ct. 2002 (2009) (No. 08-1065); Brief of Petitioners at 36, Van de Kamp v. Goldstein, 555 U.S. 335 (2009) (No. 07-854).

20. Brady v. Maryland, 373 U.S. 83, 87–88 (1963) (holding that prosecutors have an absolute constitutional due process obligation to turn over to defense counsel material information favorable to the defense).   The *Brady* rule includes material impeachment evidence. *See* Giglio v. United States, 405 U.S. 150, 153–54 (1972).  Prosecutors also are obligated under the Due Process Clause to refrain from presenting false or misleading evidence, or making false or misleading arguments, to the jury. *See* United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991).

21. As this Article went to press, the District Attorneys Association of the State of New York released a new ethics handbook. *See* DIST. ATTORNEYS ASS'N OF THE STATE OF N.Y., "THE RIGHT THING": ETHICAL GUIDELINES FOR PROSECUTORS (2011).  This handbook contains strong, generally progressive statements about specific ethical obligations of prosecutors, including the obligation to disclose *Brady* material pursuant to constitutional and ethical rules. *Id.*  It also includes a strong statement of potential consequences for prosecutors who act unethically, such as censure or written reprimand, termination, disbarment, and even criminal prosecution. *Id.* at 6–7.  However, the booklet makes no reference to any obligation of District Attorneys to adopt any formal or regular disciplinary procedures, to actually impose such discipline, or to refrain from ratifying misbehavior by defending it in the courts.  It remains to be seen whether the handbook's exhortations will be

procedures, and no history of imposing sanctions or any other negative consequences on prosecutors who violate *Brady* or related due process rules intended to guarantee defendants the right to a fair trial. To the contrary, they regularly defend such conduct no matter how strong the evidence that a violation occurred. The evidence provided in these lawsuits shows that judicial disciplinary bodies virtually never punish prosecutors for violating ethics rules.[22]

Ironically, in one of the cases discussed below, a court's disciplinary body suggested to a complainant that if he was not satisfied with the confidential "admonition" given to a prosecutor who had knowingly relied on false testimony to wrongfully imprison him, he could consult with counsel regarding "civil remedies."[23] When official attorney disciplinary bodies propose civil lawsuits as an alternative to the ineffectual attorney grievance process, it is time to question the Supreme Court's assumption that such "discipline" is an effective deterrent to prosecutorial misconduct.

## I. COMMENTATOR AND COMMITTEE STUDIES OF PROFESSIONAL ACCOUNTABILITY AND DISCIPLINE OF PROSECUTORS

Commentators and research committees have responded to the Supreme Court's assumptions about the susceptibility of prosecutors to professional discipline by studying whether, in fact, such discipline actually occurs. In reaching the consensus that "professional discipline of prosecutors is extremely rare,"[24] legal commentators and other researchers have, among other things, reviewed published decisions of state bar disciplinary authorities and conducted voluntary surveys of prosecutors' offices. These published studies uniformly conclude that prosecutors are "rarely, if ever," punished by professional disciplinary bodies, even when they engage in "egregious" misconduct.[25]

Richard A. Rosen, in 1987, surveyed all reported cases of attorney discipline in order to determine the proportion of those cases that involved the discipline of criminal prosecutors for violations of the *Brady* rule.[26] He also surveyed numerous state bar and prosecutorial oversight committees to

---

contradicted, as in the past, by official toleration of flagrant or intentional violations of the acknowledged rules.

22. *See infra* Part II.

23. *See infra* note 223 and accompanying text.

24. Bennett L. Gershman, *Reflections on* Brady v. Maryland, 47 S. TEX. L. REV. 685, 722 (2006).

25. Shelby A.D. Moore, *Who Is Keeping the Gate? What Do We Do when Prosecutors Breach the Ethical Responsibilities They Have Sworn to Uphold?*, 47 S. TEX. L. REV. 801, 807 (2006); *see also* Angela J. Davis, *The Legal Profession's Failure to Discipline Unethical Prosecutors*, 36 HOFSTRA L. REV. 275, 296 (2007) (terming the discipline received by the prosecutor in the "Duke lacrosse" case the "Mike Nifong exception" because the case represents a rare example of prosecutorial discipline); Ellen Yaroshefsky, *Wrongful Convictions: It Is Time to Take Prosecution Discipline Seriously*, 8 D.C. L. REV. 275, 276 n.7 (2004) (citing BENNETT L. GERSHMAN, PROSECUTORIAL MISCONDUCT § 14.1 n.5 (2d ed. 2002)).

26. Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for Brady Violations: A Paper Tiger*, 65 N.C. L. REV. 693, 718–20 (1987).

find unpublished or otherwise unreported instances where such discipline was imposed.[27]  He found only "nine cases . . . in which discipline was even considered,"[28] and only six where it was actually imposed.[29]  Ten years later, Jeffrey Weeks updated Rosen's study and found that, although there was no decrease in the amount of *Brady* violations committed, there were only seven additional instances where prosecutorial discipline was considered, and only four cases where it was actually imposed.[30]

In a similar study, Fred C. Zacharias reviewed every reported case of professional discipline for prosecutorial misconduct.[31]  He found only twenty-seven instances[32] in which prosecutors were disciplined for unethical behavior occurring at or affecting the fairness of criminal trials, including, but not limited to, violations of the *Brady* rule.[33]  Zacharias's study compared this rate of discipline to that of all lawyers nationally and concluded that "prosecutors are disciplined rarely, both in the abstract and in comparison to private lawyers."[34]

In connection with special investigative reports on the causes of wrongful convictions, committees of lawyers and other criminal justice professionals in New York and California examined whether prosecutors are disciplined by their own offices.  The New York State Bar Association Task Force on Wrongful Convictions (Task Force) examined fifty-three cases of wrongful convictions that were overturned by "exoneration," and conducted hearings at which both defense attorneys and prosecutors testified.[35]  It concluded that thirty-one of the wrongful convictions were attributable to "governmental practices," which were defined to include the use of false testimony, violation of *Brady*, improper evidence retention or transfer, and refusal to investigate alternative suspects to crimes.  It reported that "research has not revealed any public disciplinary steps against prosecutors."[36]  The Task Force also surveyed District Attorneys' Offices across New York State, twenty of which responded to a written questionnaire, to determine "whether sanctions [for prosecutorial misconduct] had ever been imposed," and found that just one prosecutor

---

27. *See id.* at 720.

28. *Id.*; *see also id.* at 700–03 (collecting as an "example" more than fifty reported cases of prosecutorial misconduct related to *Brady*).

29. *Id.* at 720–31.

30. Joseph R. Weeks, *No Wrong Without a Remedy: The Effective Enforcement of the Duty of Prosecutors to Disclose Exculpatory Evidence*, 22 OKLA. CITY U. L. REV. 833, 881 (1997).

31. Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. REV. 721, 743 (2001).

32. *Id.* at 751–54 tbls. VI & VII.

33. As opposed to "plainly illegal activity," such as "bribery, extortion . . . and embezzlement," or "allegedly abusive behavior towards tribunals, usually consisting of criticism of judges." *Id.* at 744–47.

34. *Id.* at 755.

35. FINAL REPORT OF THE N.Y. STATE BAR ASS'N'S TASK FORCE ON WRONGFUL CONVICTIONS 19, 29–31 (2009), *available at* http://www.nysba.org/Content/NavigationMenu42/April42009HouseofDelegatesMeetingAgendaItems/FinalWrongfulConvictionsReport.pdf.

36. *Id.* at 5, 17.

had been referred to an outside disciplinary committee by these offices, and only one prosecutor had been sanctioned internally.[37]  The Task Force also took and credited testimony from the author concerning his law firm's findings as to internal discipline of prosecutors in New York City.[38]  The Task Force concluded, "[T]here is little or no risk to the specific [prosecutor] involved resulting from a failure to follow the [*Brady*] rule."[39]

Meanwhile, in California, the Commission on the Fair Administration of Justice (Justice Commission) made similar findings.  The Justice Commission analyzed 2,131 California cases where criminal defendants raised claims of prosecutorial misconduct in trials, appeals, or post-conviction litigation.[40]  While courts had found prosecutorial misconduct in 444 of these cases, the Justice Commission focused on fifty-four cases that resulted in the reversal of the conviction and which also, pursuant to a specific provision of California Law, should have been reported to the state bar association for disciplinary investigation.[41]  The Commission could not find a single instance where any such referral was made.[42]  The Commission concluded, "[O]ur reliance upon the State Bar as the primary disciplinary authority is seriously hampered by underreporting."[43]  Moreover, the Justice Commission cited no specific examples of internal discipline in those cases, or in any others.[44]

Finally, a study conducted by two journalists at the *Chicago Tribune* in 1999 also investigated whether prosecutors' offices disciplined their employees for prosecutorial misconduct.  Their articles reported that out of 381 nationwide reversals in homicide cases (sixty-seven of which carried death sentences) since 1963 (the year *Brady* was decided) for "using false evidence or concealing evidence suggesting innocence,"[45] only "one [prosecutor] was fired, but [he] appealed and was reinstated with back pay,"[46] "another received an in-house suspension of 30 days," and a "third prosecutor's law license was suspended for 59 days, but because of other misconduct in the case."[47]  None were disbarred or received any public sanction.[48]

Scholars have noted that prosecutors' offices generally lack sufficient internal mechanisms to oversee and discipline attorneys effectively.  As part

---

37.  *Id.* at 30–31.

38.  *Id.* at 31; *see also infra* Part II.

39.  Final Report of the N.Y. State Bar Ass'n's Task Force on Wrongful Convictions, *supra* note 35, at 29.

40.  Cal. Comm. on the Fair Admin. of Justice, Final Report 71 (Gerald Uelmen ed., 2008), *available at* http://www.ccfaj.org/documents/CCFAJFinalReport.pdf.

41.  *See id.*

42.  *See id.*

43.  *Id.*

44.  *See id.* at 73–74.

45.  Maurice Possley & Ken Armstrong, *Trial & Error:  The Flip Side of a Fair Trial*, Chi. Trib., Jan. 11, 1999, at C1.

46.  Maurice Possley & Ken Armstrong, *Trial & Error:  The Verdict:  Dishonor*, Chi. Trib., Jan. 10, 1999, at C1.

47.  *Id.*

48.  *See id.*

of a Symposium at Cardozo Law School studying prosecutorial compliance with *Brady* and other discovery obligations,[49] several commentators identified design flaws in prosecutors' offices related to this lack of oversight.[50]    Elsewhere, commentators also have faulted prosecutors' offices for failing to implement the type of rigorous organizational oversight models used in administrative agencies[51] and corporations.[52] Rather than being uniquely amenable to professional discipline, prosecutors' offices appear far less equipped than other large organizations, including police departments, to manage and discipline employees.

The above research on prosecutorial discipline and internal supervisory policies, while contradicting the *Imbler* assumption about prosecutorial discipline, is limited by the lack of access to the internal records of prosecuting offices and to insider accounts of how such offices operate, as well as to the often secret disciplinary practices of judicial or bar grievance committees.    The next section presents such previously unavailable information as it relates to three large District Attorneys' Offices in New York:  Bronx, Queens, and Kings (Brooklyn) Counties.  New York City was compelled by court orders in several *Monell*-based lawsuits to provide document discovery and deposition testimony concerning these Offices' disciplinary procedures and practices.    The information that has been disclosed further refutes the Supreme Court's assumptions in *Imbler*.

---

49. *See generally* Symposium, *New Perspectives on* Brady *and Other Disclosure Obligations: What Really Works*, 31 CARDOZO L. REV. 1943 (2010).

50. *See* Rachel E. Barkow, *Organizational Guidelines for the Prosecutor's Office*, 31 CARDOZO L. REV. 2089, 2090–91 (2010) (explaining that prosecutors' offices should take a more "compliance-based" approach to misconduct because "[t]he existing framework for addressing prosecutorial misconduct is entirely backward-looking, and ineffective"). *See generally Voices from the Field:  An Inter-Professional Approach to Managing Critical Information*, 31 CARDOZO L. REV. 2037 (2010) (collecting reports from medical professionals, police department officials, corporate psychologists, and statisticians about alternative models for ensuring prosecutorial accountability); Barry Scheck, *Professional and Conviction Integrity Programs:  Why We Need Them, Why They Will Work, and Models for Creating Them*, 31 CARDOZO L. REV. 2215, 2215–16 (2010) (proposing the creation of an external monitoring body to review dubious convictions).

51. Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors:  Lessons from Administrative Law*, 61 STAN. L. REV. 869, 869–70 (2009) (addressing "design flaws" in the operation of prosecutors' offices, which contribute to "prosecutorial overreaching"). Barkow criticizes the vertical structure of prosecutors' offices, in which the same prosecutor investigating a case also prosecutes it. *Id.*  She recommends that prosecutors' offices should follow the model of administrative agencies in separating officials handling investigations from those handling advocacy functions. *Id.*

52. Stephanos Bibas, *Prosecutorial Regulation Versus Prosecutorial Accountability*, 157 U. PA. L. REV. 959, 961 (2009) ("The resulting dangers [of the lack of prosecutorial accountability] can be enormous.").  Bibas suggests that prosecutors' offices would benefit from following a corporate model in five areas:  office culture; managerial structure; internal policy-making; personnel actions, such as hiring, firing, promotion, and training; and the dissemination of information, performance evaluations, and incentives.    Following a corporate structure would increase accountability of individual prosecutors, as well as of the local District or State Attorney.  Bibas posits that a more formalized and predictable training and disciplinary model would tamp down prosecutors who "suffer from an excess of adversarial zeal and a notches-on-the-belt conviction mentality." *Id.* at 1000–11.

Case 1:18-cv-05500-KAM-ST   Document 43-3   Filed 07/24/20   Page 80 of 108 PageID #: 681

## II.  CASE STUDIES:  THE DISCIPLINARY POLICIES, PROCEDURES, AND HISTORY OF THREE NEW YORK CITY DISTRICT ATTORNEYS' OFFICES

### A.  The Bronx District Attorney's Office

Alberto Ramos was a criminal defendant who was unjustly convicted of rape in 1985, freed upon the discovery of *Brady* violations in 1992, and recovered a $5 million civil rights settlement in 2003.  In furtherance of the civil rights suit, the author compelled the Bronx District Attorney's Office to disclose personnel records for prosecutors involved in seventy-two cases in which courts had found improper behavior by prosecutors from 1975 through 1996, and to submit to oral depositions about the Office's "disciplinary" practices.  In subsequent companion lawsuits, which are ongoing, brought on behalf of two former criminal co-defendants victimized by *Brady* violations during an attempted murder trial in 1998, the author and his co-counsel[53] have obtained additional records through 2007, as well as the depositions of Robert T. Johnson, Bronx District Attorney since 1989, virtually all of his senior staff, and two line prosecutors.  These discovery materials have revealed that this major urban prosecutor's office, employing nearly 400 prosecutors and hundreds of support staff,[54] has no published code or rules of behavior for prosecutors, no schedule of potential sanctions for misbehavior or objective standards governing when such sanctions will be imposed, no written or formal procedure for investigating or disciplining prosecutors, and no procedure for keeping a record of prosecutors who have been cited for or are known to have engaged in improper behavior.  Officials could identify just one prosecutor since 1975 who, according to the Office's records, has been disciplined in any respect for misbehavior while prosecuting a criminal case.  Officials claim that several prosecutors have been verbally chastised, or temporarily denied raises in compensation, but there is no apparent record of it.

#### 1.  The *Ramos* Case

##### a.  The Criminal Prosecution

Alberto Ramos was a twenty-one-year-old college student and part-time childcare worker when he was arrested on September 6, 1984, and charged with raping a five-year-old girl at a Bronx day care center.  His arrest was the latest in a series of highly publicized day care center sexual abuse cases brought by then-District Attorney Mario Merola, a politically ambitious

---

53. Co-counsel is New York attorney Julia Kuan, who won the cases of each of the former criminal defendants who are now plaintiffs in the lawsuits.

54. Erin Einhorn & Jonathan Lemire, *DAs Urge Council:  Save Us!*, N.Y. DAILY NEWS, June 4, 2010, at 18 (explaining that the Bronx D.A.'s office is under pressure to fire forty-five prosecutors).

prosecutor.[55]  In May 1985, Ramos's case became the first of the Merola prosecutions to come to trial.[56]

The prosecution's case was based upon the child's sworn testimony claiming that she had been raped in a classroom bathroom while the other children were napping.[57]  For "corroboration," the People relied on a doctor's testimony that the child's mere ability to describe sexual intercourse indicated that she had experienced it, as well as the doctor's observation that the child had a vaginal irritation or rash.[58]  In addition, the child's grandmother testified that when she picked up the girl on the day in question, the child was upset.[59]  Other witnesses informed the jury that earlier that day, Ramos, exasperated by the children's rowdiness and his inability to control them, had inappropriately placed tape on the upper lip of several children, including the complainant, to quiet them.[60]  In her summation, the prosecutor forcefully argued that the child could not "make up" her claim of having sexual intercourse and that her vaginal "bruises" corroborated her testimony.[61]

Ramos was convicted.  He screamed in agony, "Kill me."[62]  Several weeks later, the judge, expressing frustration that he could not sentence Ramos to life in prison, meted out the maximum sentence of eight and one-third to twenty-five years.[63]  Ramos's direct appeal and his post-judgment motion to vacate his conviction were denied.[64]  Because he continued to deny his guilt, Ramos was likely to serve at least two-thirds, if not the entirety, of his maximum sentence.[65]  Meanwhile, the everyday reality of his punishment was brutal:  as a convicted child rapist, he was subjected to constant physical, sexual, and verbal abuse.[66]

Seven years into Ramos's hellish incarceration, fate intervened.  The alleged victim's mother had brought a civil lawsuit against the New York City-funded day care center and against Ramos.  The City's private

---

55. *See Frontline: Innocence Lost: Other Well-Known Cases*, PBS, http://www.pbs.org/wgbh/pages/frontline/shows/innocence/etc/other.html (last visited Oct. 20, 2011) (describing Merola's prosecution of the "Bronx Five" day care center workers).

56. *See* Ramos v. City of New York, 729 N.Y.S.2d 678, 684 (App. Div. 2001).

57. STEPHEN GILLERS, IN THE PINK ROOM 2–3 (2006).

58. *Id.* at 3.

59. *Id.*

60. *Id.*

61. *Id.* at 3–4; *see also* Trial Transcript at 429, 431, People v. Ramos, No. 3280-84 (N.Y. Sup. Ct. Bronx Co. May 9–20, 1985) (on file with author).

62. GILLERS, *supra* note 57, at 4.

63. *See* People v. Ramos, 614 N.Y.S.2d 977, 980 (App. Div. 1994).

64. People v. Ramos, 124 A.D.2d 1077 (N.Y. App. Div. 1986), *appeal denied,* 69 N.Y.2d 832 (1987).

65. *See, e.g.*, Daniel S. Medwed, *The Innocent Prisoner's Dilemma: Consequences of Failing to Admit Guilt at a Parole Hearing*, 93 IOWA L. REV. 491, 522 (2008) ("[P]ractically all New York state inmates [know] that a failure to 'admit' guilt at [a parole] hearing would probably ring the death knell to [their] chances for parole."); *see also* Edwards v. Goord, 362 F. App'x 195, 198 (2d Cir. 2010) (challenging unsuccessfully New York State Department of Correctional Services' denial of "good time" credit based on inmate's refusal to admit guilt resulting in inmate having to serve his complete sentence).

66. *See* Amended Complaint at 12, Ramos v. City of New York, No. 21770-93 (N.Y. Sup. Ct. Bronx Co. filed Oct. 20, 1995) (on file with author).

insurance carrier, fearing a massive judgment, settled, but a defense investigator, believing Ramos to be innocent, obtained permission to share his investigative discoveries with Ramos and his mother.[67] They, in turn, hired the author's law firm. Based largely upon the investigator's records, Ramos moved for a new trial, and an evidentiary hearing was held.[68]

The court found in its decision that the trial prosecutor had assured defense counsel that she would obtain and disclose all relevant social service and day care center records, but had then failed to do so.[69] Before or during trial, Assistant District Attorney Diana Farrell did obtain numerous documents and interviewed teachers and administrators, but she did not disclose the following information that was in her actual or constructive possession[70]:

(1) The child initially denied repeatedly that anything had happened other than he "taped my mouth," before finally accusing Ramos;[71]

(2) Prior to the alleged rape, the child had described watching sexually explicit programs on television, would use dolls to simulate sex during show and tell in school, was described by her teachers as "sexually wiser" than the other children and street smart, and would expose herself;[72]

(3) The child used to masturbate on a regular basis in school,[73] thereby explaining her vaginal irritation; and

(4) As revealed by a sign-in, sign-out book, the child's grandmother had not picked her up at all on the day in question; in fact, she had been picked up by her aunt.[74]

In vacating Ramos's conviction, the court issued a scathing opinion crediting the defendant's witnesses over the sometimes contrary testimony of the trial prosecutor. While declining to find that the prosecutor's misconduct had been willful, the court termed it "cavalier and haphazard," and continued: "The greatest crime in a civilized society is an unjust conviction. It is truly a scandal which reflects unfavorably on all participants in the criminal justice system."[75] The court released Ramos on his own recognizance, pending retrial.

The Bronx District Attorney appealed. In addition to attacking the evidentiary basis for the lower court's factual findings, the Office's brief, submitted in the name of the Bronx District Attorney Robert T. Johnson, contended that none of the undisclosed information consisted of *Brady*

---

67. *See Ramos*, 614 N.Y.S.2d at 980.

68. *See id.*

69. *See id.* at 982.

70. Decision and Order at 3, People v. Ramos, No. 3280-84 (N.Y. Sup. Ct. Bronx Co. dated June 1, 1992) (on file with author).

71. *Ramos*, 614 N.Y.S.2d at 981.

72. *See id.* at 980–81.

73. *See id.*

74. *See id.*

75. *See* People v. Ramos, No. 3280-84, slip op. at 9, 1992 WL 12620540 (N.Y. Sup. Ct. Bronx Co. June 1, 1992), *aff'd*, 614 N.Y.S.2d 977.

material.[76]  "By placing the dolls in close proximity she could have been simulating wrestling or some other activity," the District Attorney argued.[77] What is more, the dolls were not "anatomically correct."[78]  The District Attorney speculated that the child had not really seen sexual acts on television because "[i]t is common knowledge that such movies do not contain hard-core pornographic footage"[79]  The new information about masturbation was not material because the defense already had a document suggesting the child masturbated (although on the witness stand her teacher denied such knowledge).  Finally, the District Attorney argued that the sign-in, sign-out log need not have been disclosed because it did not "touch upon defendant's guilt or innocence."[80]  The Appellate Division affirmed the lower court's ruling in an even more scathing opinion.[81]  The District Attorney's Office then agreed that it lacked any "reasonable cause" to continue the prosecution, and dismissed all charges.[82]

### b.  The Attorney Grievance Process

Shortly after the trial court issued its decision vacating Ramos's conviction, Ramos's prosecutor received notice from the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Judicial Department, of a secret sua sponte disciplinary inquiry.[83]  The Departmental Disciplinary Committee is the New York State authority charged with the investigation and discipline of attorneys accused of professional misconduct.[84]  It may initiate an investigation of an attorney upon a complaint or "on its own initiative."[85]  Upon such investigation, it has the authority to impose sanctions on an attorney ranging from the most serious punishment of disbarment to a private letter of "admonition."[86]  Under the New York State Judiciary Law, the conduct of such an investigation—including its very existence—is confidential unless the Disciplinary Committee finds that the attorney should be publicly reprimanded.[87]

After learning of the Disciplinary Committee's investigation, Ramos's prosecutor sat down with Counsel to the District Attorney Anthony Girese,

---

76. Appellant's Brief at 29, People v. Ramos, No. 3280-84 (N.Y. App. Div. Sept. 7, 1993) (on file with author).

77. *See id.* at 30.

78. *Id.*

79. *Id.* at 31.

80. *Id.* at 32.

81. People v. Ramos, 614 N.Y.S.2d 977 (App. Div. 1994).

82. Ramos v. City of New York, 729 N.Y.S.2d 678, 685 (App. Div. 2001).

83. *Id.* at 668–69, 750–51.

84. *See Departmental Disciplinary Committee*, N.Y. STATE SUPREME COURT APPELLATE DIV. FIRST DEP'T., http://www.courts.state.ny.us/courts/ad1/Committees&Programs/DDC/index.shtml (last visited Oct. 20, 2011).

85. N.Y. COMP. CODES R. & REGS. tit. 22, § 605.6(a) (1994).

86. *Id.* § 605.5(a).

87. N.Y. JUDICIARY LAW § 90(10) (McKinney 2002).

and together they prepared a letter defending her conduct.[88] The letter stated that there was "no misconduct" on her part, and asked that any inquiry be deferred until the appeal was decided.[89] The prosecutor also wrote her own letters to the Disciplinary Committee defending her conduct.[90] She also gave confidential sworn testimony, which she refused during the lawsuit to consent to unseal.[91] The Committee dismissed the disciplinary action.[92] At no time did the Committee afford Ramos or his counsel notice of the prosecutor's contentions or any opportunity to provide any materials or arguments concerning whether she had committed ethics violations.

### c. The Civil Lawsuit

While the Ramos post-judgment hearing was underway, the Second Circuit decided *Walker v. City of New York*.[93] *Walker* contained two principal legal holdings of relevance to Ramos. First, a District Attorney's failure to adequately train or supervise his staff to comply with their obligations to disclose *Brady* material, and not to present false or perjured testimony, could give rise to *Monell* liability under § 1983.[94] The plaintiff would have to show that the District Attorney had been deliberately indifferent to an obvious need for greater training, supervision, or discipline, and that this policy of indifference was a substantial cause of the violation of the plaintiff's federal constitutional rights.[95] Second, although a New York municipality is not subject to suit under § 1983 for a District Attorney's "prosecutorial" decisions that he makes on behalf of the State, it may be sued for a District Attorney's "managerial" or "administrative" functions that he performs as a policymaker on behalf of the City of New York, including constitutionally faulty training or supervision of his staff.[96]

Based upon *Walker*, and armed with the Appellate Division's ringing denunciation of the District Attorney's conduct at Ramos' criminal trial,

---

88. *See* Deposition of Diana Farrell at 683, Ramos v. City of New York, No. 21170-93 (N.Y. Sup. Ct. Bronx Co. deposed Oct. 7, 1997) (on file with author).

89. *See id.* at 689.

90. *See* Letter from Diana Farrell to Andral Bratton, Departmental Disciplinary Comm., Supreme Court of the State of N.Y., Appellate Div., First Dep't (Mar. 15, 1995) (on file with author); Letter from Diana Farrell to Andral Bratton, Departmental Disciplinary Comm., Supreme Court of the State of N.Y., Appellate Div., First Dep't (Nov. 29, 1994) (on file with author).

91. *See* Deposition of Diana Farrell, *supra* note 88, at 687.

92. *See id.*

93. 974 F.2d 293 (2d Cir. 1992).

94. *See id.* at 296, 300.

95. Although *Walker* suggested that a showing of inadequate *training* could be made without a history of prior complaints or findings of similar misconduct, that view was overruled by the Supreme Court in *Connick v. Thompson*, 131 S. Ct. 1350 (2011). However, the Ramos lawsuit, and the others brought by the author, have been based on multiple prior incidents of misconduct, a history of failure to *discipline*, and evidence of ratification reflecting an unlawful policy.

96. *Walker*, 974 F.2d at 301.

Ramos elected to bring a § 1983 lawsuit in the State Supreme Court in Bronx County. Ramos claimed that the trial prosecutor's misconduct had resulted from the District Attorney's deliberate indifference to his staff's history of obtaining unlawful convictions by violating *Brady* and relying on false or misleading evidence and argument, exhibited by his failure to properly train, supervise, and discipline prosecutors to avoid or to deter such violations, and by his ratification of such misconduct when it occurred.[97]

To substantiate this claim, Ramos sought disclosure of the personnel and disciplinary records of the prosecutors who had been involved in seventy-two reported cases in which courts had found violations of *Brady* obligations (eighteen cases), or other violations of the duty not to present false, misleading, or inflammatory evidence or summation argument (fifty-four cases). The majority of the decisions had been handed down between the mid-1970s and District Attorney Merola's death in 1987, but a significant number had occurred from 1989 through 1996, during the Administration of District Attorney Johnson. The City resisted such document disclosure, and moved for dismissal or summary judgment regarding Ramos' § 1983 claim. While the lower court denied this motion, it limited disclosure of records to those relating to just ten of the seventy-two court decisions.[98] Both sides appealed. Ramos fully prevailed.[99]

In its decision, the Appellate Division, noting the "catastrophic" result when prosecutors wrongfully convict a defendant by withholding materially favorable information,[100] upheld Ramos' civil rights claim, while granting all of the document discovery Ramos sought. Agreeing with the Second Circuit's analysis in *Walker*, the court held that under state law, a District Attorney is a local policymaker with respect to training and supervising staff concerning its *Brady* obligations.[101] The court further held that under the facts in Ramos's case, the City could be liable for both the District Attorney's consistent failure to discipline prosecutors who caused unconstitutional convictions—by withholding *Brady* material or by knowingly relying on false or misleading evidence or argument—and for the District Attorney's ratification of such misconduct in Ramos's own case, through his "strident opposition" to Ramos's motion and failure to discipline Ramos's trial prosecutor.[102] The court directed the City to name the prosecutors involved in *all seventy-two* misconduct cases and to provide

97. *See* Amended Complaint, *supra* note 66, at 24–36. The complaint also named as defendants the Human Resources Administration (HRA) and the New York City Police Department, under different theories of liability. *Id.*

98. Decision and Order, Ramos v. City of New York, No. 21770-93, 1999 WL 34804917 (N.Y. Sup. Ct. Bronx Co. dated Oct. 27, 1999) (on file with author).

99. Ramos v. City of New York, 729 N.Y.S.2d 678 (App. Div. 2001).

100. *See id.* at 681.

101. *See id.* at 693.

102. *See id.* at 694–95.

their personnel records, including their salary cards and evaluations, and any evidence of discipline.[103]

The records, finally disclosed a year later without any confidentiality order, revealed that from 1975 through 1996, during the administration of three District Attorneys, there was just *one* incidence of any prosecutor being disciplined. This prosecutor was one of fourteen prosecutors who had been involved in more than one of the trials in which misconduct had been found.[104] A second prosecutor had conducted five of the trials, while a third had conducted four,[105] yet neither of these latter two prosecutors, according to the records, had ever been disciplined.[106] Indeed, the District Attorney's Office conceded that payroll and other records "do not indicate the existence of any disciplinary measures taken against any of th[e] ADAs."[107] A more detailed review of the three prosecutors just mentioned is revealing.

The prosecutor who received "discipline" did so in connection with a robbery conviction he obtained after trial in February 1977.[108] The criminal defendant promptly appealed that conviction and alleged an extraordinary number of prosecutorial improprieties.[109] In a decision dated April 13, 1978, the Appellate Division resoundingly agreed. It denounced the prosecutor for "overzealous," "improper conduct . . . throughout the trial, despite repeated admonitions by the court,"[110] including disparaging the "so-called presumption of innocence" and "reasonable doubt" and continually "disregard[ing] and overriding . . . the court's rulings and instructions."[111] In reversing the conviction, the court cited the Code of Professional Responsibility and implied that the prosecutor had violated it.[112] The prosecutor's salary record showed that when the trial occurred, he was earning $21,500.[113] Notwithstanding the Office's notice of his misconduct presented by the defendant's appeal, he received salary increases over the next year of $4,500—or 21 percent.[114] After the court handed down its decision, the prosecutor suffered a deduction of four weeks

---

103. *See id.* The court's directive was contained in its initial, published decision and in an unpublished supplemental order on file with the author. Plaintiff's Second Supplemental Demand for Discovery & Inspection, Ramos v. City of New York, No. 21770-93 (N.Y. Sup. Ct. Bronx Co. Mar. 17, 1998) (on file with author); *see also* Order, Ramos v. City of New York, No. 21770-93 (N.Y. App. Div. dated Dec. 27, 2001) (on file with author).

104. Personnel records disclosed in discovery, Ramos v. City of New York, No. 21770-93 (N.Y. Sup. Ct. Bronx Co. filed Apr. 1, 1996) (on file with author).

105. *Id.*

106. *Id.*

107. Letter from Stuart P. Levy, Assistant Dist. Attorney, Office of the Dist. Attorney, Bronx Cnty., to Hon. Betty Owen Stinson, Supreme Court of the State of N.Y., Bronx Cnty. (July 24, 2002) (on file with author).

108. *See* People v. Bussey, 403 N.Y.S.2d 739, 739 (App. Div. 1978).

109. *See id.*

110. *Id.*

111. *Id.* at 741–42.

112. *Id.* at 742.

113. Personnel records disclosed in discovery, *supra* note 104.

114. *Id.*

of pay, or approximately $2,150.[115]  However, he then received a bonus of $250 on June 30, 1978, and a $2,500 salary increase on July 1, 1978, more than making up for his lost income.[116]

Between 1978 and 1981, the same prosecutor was derided by three more appellate opinions in two cases (although neither conviction was reversed),[117] but continued to receive raises in compensation.  Dissenting judges in two of the decisions suggested that such "egregious" conduct be referred for professional discipline,[118] noting that the same trial assistant had been denounced in prior decisions for "outrageous and abusive conduct"[119] and "improper and tasteless" behavior.[120]  On November 24, 1981, Associate Judge Bernard Meyer of the New York Court of Appeals reminded the District Attorney of his "continuing obligation with respect to his trial assistants . . . to instruct them clearly and firmly against using such tactics."[121]  Yet, during the four-year period beginning July 1, 1978, the prosecutor received "merit" and other raises totaling $13,500, until he was earning $42,000 by July 1, 1982.[122]

On November 22, 1982, District Attorney Merola wrote to a member of the Appellate Division's Departmental Disciplinary Committee, asking it to reconsider its initial finding in connection with a disciplinary inquiry concerning the conduct of the prosecutor.[123]  Merola assured the Committee that he already had authorized disciplinary measures which took into account all of the prosecutor's misconduct and that, in light of his subsequent performance, these early trials in his career were an "aberration."[124]  It appears the Committee did reconsider, as there is no evidence that the prosecutor was sanctioned.

Significantly, in the prosecutor's next evaluation after the court decisions in 1980 and 1981 that so vehemently condemned his performances, his bureau chief scored his overall quality of performance as a "4" out of a possible "5."[125]  While the supervisor noted the Assistant District Attorney's "involvement with the App[ellate] Div[ision] Disciplinary Committee," he did so not as a reflection of the quality of the prosecutor's trial performance, but rather as an explanation for his drop off in "productivity."[126]  Indeed, praised for being "cooperative and

---

115. *Id.*

116. *Id.*

117. People v. Galloway, 54 N.Y.2d 396 (1981), *aff'g* 430 N.Y.S.2d 93 (App. Div. 1980); People v. Wheeler, 438 N.Y.S.2d 467 (App. Div. 1981).

118. *Galloway*, 54 N.Y.2d at 414 n.4 (Meyer, J., dissenting).

119. *Id.* at 415 (Meyer, J., dissenting) (quoting People v. Bussey, 403 N.Y.S.2d 739, 742 (App. Div. 1978)) (internal quotation marks omitted).

120. *Id.* (quoting *Wheeler*, 438 N.Y.S.2d at 467) (internal quotation marks omitted).

121. *Galloway*, 54 N.Y.2d at 415.

122. Personnel records disclosed in discovery, *supra* note 104.

123. Letter from Mario Merola, Dist. Attorney, Office of the Dist. Attorney, Bronx Cnty., to Martin London, Supreme Court, Appellate Div., Departmental Disciplinary Comm. (Nov. 22, 1982) (on file with author).

124. *Id.*

125. Personnel records disclosed in discovery, *supra* note 104.

126. *Id.*

conscientious," the only additional criticism the prosecutor received was for "lateness . . . which he has been counseled about *repeatedly*."[127]   The following year, the same supervisor had nothing but superlatives for this Assistant District Attorney.[128]   Recommending him for promotion to "senior trial status," the Bureau Chief gushed: "Tremendous ability to plead def[endan]ts with the weakest proof."[129]   He continued as a Bronx Assistant District Attorney until his retirement in 1997.[130]

   The prosecutor responsible for five of the misconduct decisions was found in an appellate decision in October 1982 to have engaged in "persistent misconduct [during summation, which] deprived the defendant of his right to a fair trial," resulting in the reversal of a manslaughter conviction.[131]   Three years later, the same court reversed another manslaughter conviction obtained by the same prosecutor six months after the prior decision.[132]   The court was irate that the prosecutor had "blatantly violated defendant's rights"[133] even after being chastised in the prior opinion, and termed the prosecutor's conduct "willful and deliberate."[134] The following year, reversing a third manslaughter conviction obtained by the same prosecutor, the same court commented:

> [W]hen the misconduct is so pervasive, so egregious and results in violations of fundamental due process rights, and the prosecutor's disregard of the court's rulings and warnings is as deliberate and reprehensible as that of this prosecutor, who has twice before provoked reversals by this court, a reversal is the only responsible remedy we can invoke as guardians of the rights of the People.[135]

   The prosecutor left the Office's employ in 1984, after six years.   There was nothing in his personnel file to indicate that he did not leave voluntarily or was disciplined in any way—*after* the trial in which he had "blatantly violated" the defendant's rights in conduct that the court found to have been "willful and deliberate"—he received a salary adjustment and "merit" bonus totaling $4,500, which amounted to more than 10 percent of his previous salary.[136]

   As for the prosecutor cited in four decisions, three involved summation and other trial-related misconduct—resulting in two reversals and one finding of harmless error—and one involved an apparent *Brady* violation which was remanded for an evidentiary hearing.[137]   Within five weeks of

---

127.  *Id.*
128.  *See id.*
129.  *Id.*
130.  *See id.*
131.  *See* People v. Perez, 455 N.Y.S.2d 89, 91 (App. Div. 1982).
132.  *See* People v. Rosa, 489 N.Y.S.2d 722, 728 (App. Div. 1985).
133.  *Id.* at 726.
134.  *Id.* at 728.
135.  People v. Sandy, 499 N.Y.S.2d 75, 77 (App. Div. 1986) (citations omitted).
136.  Personnel records disclosed in discovery, *supra* note 104.
137.  *See* People v. Qualls, 70 N.Y.2d 863 (1987) (remanding for evidentiary hearing concerning apparent *Brady* violation); People v. Jorge, 566 N.Y.S.2d 649, 650 (App. Div. 1991) (reversing murder conviction because prosecutor misstated the testimony and cited the Bible while exhorting the jury to "do your duty"); People v. Taylor, 556 N.Y.S.2d 307 (App.

the first reversal, he received "merit" increases and bonuses totaling $11,500, or more than 15 percent of his previous salary.[138]  Following the other court decisions, including the reversal in 1991, he received yearly "merit" increases ranging from $1,000 to $4,000.[139]  His evaluations were not provided.

Ramos's trial prosecutor also received no sanction for her misbehavior. During her deposition, she testified that "everything [she] did in connection with the Ramos prosecution was consistent with [her] training."[140]  She testified that she believed she was required to disclose only evidence that was "blatantly *Brady*" because it "tended to exonerate the defendant" or was "crucial" or, as to impeachment evidence, only if she determined after investigation that it was "truthful."[141]  She revealed that shortly after the hearing court's decision was handed down, she met with District Attorney Johnson, Chief Assistant Barry Kluger, and Counsel Girese, and received their complete support, including their agreement to appeal the decision.[142]  Before the appeal was denied, and believing that the negative publicity about the case had stalled her career, she voluntarily left the Office and solicited and obtained an appointment to the "18-B" panel, a court-certified panel of private attorneys assigned to represent indigent criminal defendants.[143]

Numerous other court decisions about which discovery was provided involved findings of deliberate, intentional, or flagrant misbehavior.  In one case, the appellate court upheld the defendant's claim that "he was deprived of due process by the prosecutor's knowing use of perjured testimony," and faulted the prosecutor's failure to comport with the district attorney's "responsibility and duty to correct what he knows to be false and elicit the truth."[144]  Another prosecutor, in *People v. Lantigua*,[145] was found to have knowingly withheld crucial *Brady* material which proved the falsity of her summation to the jury.  The appellate court wrote:  "It hardly advances the interest of justice for a prosecutor to use testimony she knows to be false to discredit the evidence given by defense witnesses during her summation."[146]  The appellate court found yet another prosecutor's "decision to accuse the defendant (and squarely implicat[e] his counsel) of fabricating his defense" during summation to be "indefensible."[147]  Other

---

Div. 1990) (declining to reverse for prosecutor's Biblical quotations); People v. Hamilton, 502 N.Y.S.2d 747, 748 (App. Div. 1986) (reversing robbery conviction "because the fundamental fairness of the trial was severely impaired by repetitive improper prosecutorial trial tactics").

138.  Personnel records disclosed in discovery, *supra* note 104.

139.  *Id.*

140.  Deposition of Diana Farrell, *supra* note 88, at 844.

141.  *Id.* at 303, 318–19, 762, 767, 769.

142.  *Id.* at 667.

143.  *Id.*

144.  People v. Olmo, 545 N.Y.S.2d 285, 286–87 (App. Div. 1989) (quoting People v. Savvides, 1 N.Y.2d 554, 557 (1956)).

145.  643 N.Y.S.2d 963 (App. Div. 1996).

146.  *Id.* at 969.

147.  People v. Negron, 556 N.Y.S.2d 41, 43 (App. Div. 1990).

appellate decisions found flagrant or intentional summation misconduct as well as *Brady* violations requiring reversal.[148]   All of the prosecutors in these cases continued to receive increases in compensation; none, according to the records provided, were disciplined.

Two more depositions of note were conducted.  Mitchell Borger, the Assistant District Attorney who handled the beginning stages of the Ramos prosecution, including the submission of testimony to the grand jury, testified that he was unaware of any disciplinary policy or procedure while he was at the Office or that any prosecutor had ever been disciplined.[149] The Executive Assistant District Attorney under District Attorney Johnson, Eric Warner, who had been Farrell's bureau chief at the time of the Ramos trial and was involved in training at the time of his deposition in 2000, testified to his understanding that *Brady* only applied where the defendant had made a specific request for the material.[150]  He did not recall that there was any *Brady* training at all under District Attorney Merola or that he had received such training himself; he could not find any evidence of *Brady* training materials before 1995 (six years into Johnson's tenure);[151] and he was unaware of any Assistant District Attorney at the Office having ever been disciplined for violating *Brady*.[152]

Ramos's case was concluded before any of this evidence could be presented to a jury.  In 2003, Ramos accepted a settlement of $5 million.[153]

---

148.  *See* People v. Banfield, 599 N.Y.S.2d 227 (App. Div. 1993) (reversing conviction where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants); People v. Byfield, 194 A.D.2d 331 (N.Y. App. Div. 1993) (companion case to *Banfield*); People v. Mudd, 585 N.Y.S.2d 364, 366 (App. Div. 1992) (finding summation statements "entirely outside the bounds of rhetorical comment"); People v. McReynolds, 572 N.Y.S.2d 8, 8 (App. Div. 1991) (finding that prosecutor "so overstepped the bounds of permissible comment that [the defendant] was denied a fair trial"); People v. Bagarozy, 522 N.Y.S.2d 848, 854–55 (App. Div. 1987) (deciding that inflammatory summation and evidence distracted jury from real issues in the case); People v. Bailey, 503 N.Y.S.2d 16, 18 (App. Div. 1986) (finding that inflammatory summation and vouching was "calculated to produce a wrongful conviction"); People v. Hamilton, 502 N.Y.S.2d 747, 750 (App. Div. 1986) (noting that "central theme" of summation was "wholly improper"); People v. Ortiz, 497 N.Y.S.2d 678, 680 (App. Div. 1986) (reversing conviction based on prosecutor's "obdurate pattern of inflammatory remarks throughout the . . . summation"); People v. Pressley, 462 N.Y.S.2d 864, 866–67 (App. Div. 1983) (reversing conviction for prosecutor's "repeated[ ] attack[s]" on defendant and improper "persistent references" to defendant's refusal to incriminate himself by cooperating with law enforcement); *see also* Rosario *Violation May Be Raised on CPA §440.10 Motion*, N.Y. L.J., Sept. 8, 1989, at 21 (summarizing decision in *People v. Okafor*, noting that court found *Rosario* and *Brady* violations and reversed conviction where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case).

149.  Deposition of Mitchell Borger at 184–92, Ramos v. City of New York, No. 21170-93 (N.Y. Sup. Ct. Bronx Co. deposed Mar. 11, 1998) (on file with author).

150.  Deposition of Eric Warner at 52, Ramos v. City of New York, No. 21170-93 (N.Y. Sup. Ct. Bronx Co. deposed June 15, 2000) (on file with author). *But see* United States v. Agurs, 427 U.S. 97, 110–11 (1976) (*Brady* material must be turned over to defense even without specific request).

151.  Deposition of Eric Warner, *supra* note 150, at 18–20.

152.  *Id.* at 82–83.

153.  Andrea Elliott, *City Gives $5 Million to Man Wrongly Imprisoned in Child's Rape*, N.Y. TIMES, Dec. 16, 2003, at B3.

At the time, this was the largest settlement of any wrongful conviction case in New York State.[154]  Defending the conduct of the District Attorney's Office to the *New York Times*, District Attorney Johnson and Chief Assistant Kluger contended that prosecutors were dealt with "on an individual basis," apparently informally, that often a prosecutor cited for misconduct was no longer employed by the Office when the appellate decision criticizing his conduct was handed down, and that "[n]ot one of [the seventy-two cases] involves a finding of deliberate or intentional . . . concealment of evidence. . . .  They were technical rulings or a slip of the tongue."[155]

### 2. The Maldonado *and* Poventud *Cases*

Despite the Ramos settlement and increased public attention to the problem of wrongful convictions, attitudes at the top of the Bronx District Attorney's Office do not appear to have changed.  This is revealed by depositions and document discovery in two additional companion lawsuits in which the author is co-counsel.  The lawsuits arise from a joint criminal prosecution in 1997–98 of two defendants, Robert Maldonado and Marcos Poventud, for the attempted murder and attempted robbery of a livery cab driver.  The cab driver, who was shot in the head and barely survived, was the only witness identifying either defendant at trial and linking them to the crime.  With the defense challenging the cab driver's ability to make accurate identifications, the police suppressed the fact that this eyewitness initially had identified as one of the perpetrators a man who was in prison when the crime occurred (the *Brady* material).  After this information later surfaced, Maldonado, who had spent four years in prison, was acquitted at a retrial, while Poventud succeeded in overturning his conviction after nine years in prison on collateral attack.  Maldonado's civil lawsuit is pending in the State Supreme Court in the Bronx; Poventud's is pending in the United States District Court for the Southern District of New York.[156]

In their separate lawsuits, both Maldonado and Poventud alleged that the police suppressed the *Brady* material from prosecutors as well as the defense, or alternatively that prosecutors learned about the *Brady* material but colluded with the police in suppressing it from the defense.  The latter theory was part of the plaintiffs' *Monell* claim, similar to the claim in the *Ramos* case, contending that the Bronx District Attorney's deliberate indifference to a history of *Brady* and related due process violations committed by his subordinates had been a substantial cause of the

---

154.  *Id.*

155.  Andrea Elliott & Benjamin Weiser, *When Prosecutors Err, Others Pay the Price*, N.Y. Times, Mar. 21, 2004, at 25.

156.  *See* Poventud v. City of New York, 07 Civ. 3998 (S.D.N.Y. filed May 22, 2007); Maldonado v. City of New York, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed June 14, 2004).

misconduct that caused the plaintiffs' wrongful convictions.[157] Discovery in the two cases was consolidated.

During pretrial discovery, the plaintiffs, as in the *Ramos* case, obtained disclosure of prosecutors' personnel and "disciplinary" records in connection with cases where courts had found misconduct.[158] Plaintiffs' demand was limited to cases that were decided under District Attorney Johnson, from 1989 through 2006.[159] Not a single document was produced evidencing any disciplinary action against any of the prosecutors.[160]

Depositions were taken of the Office's executive staff, including Odalys Alonso, the Chief Assistant District Attorney, who has responsibility for the overall management of the Office, including hiring, firing, and discipline; the Counsel to the District Attorney since 1989, Anthony Girese, who deals with legal issues and has been the Office's liaison with the Departmental Disciplinary Committee; the Chief of Appeals since 1994, Joseph Ferdenzi; and District Attorney Johnson.

Testifying as a representative witness under Federal Rule of Civil Procedure 30(b)(6) on the issue of discipline at the Office,[161] Alonso acknowledged that neither the Office's standard employment agreement, nor its employee manual, nor any other document, contains any provisions concerning internal disciplining of prosecutors for misconduct in connection with the handling of criminal cases.[162] The Office has no written policy or procedure setting forth specific rules of behavior, defining infractions of such rules—including whether punishment may be inflicted for negligence, recklessness, or deliberate indifference to defendants' constitutional rights as opposed to willful, deliberate violations—or providing notice of the types of discipline that may be imposed for infractions.[163] The "system" for discipline is that the District Attorney is told when court decisions or defense motions or appeals alleging improper behavior are received by the Office, and then he determines whether to conduct an investigation or to impose some form of discipline.[164] There is

---

157. *See* Amended Complaint, Poventud v. City of New York, 07 Civ. 3998 (S.D.N.Y. filed Oct. 28, 2010) (on file with author); Amended Complaint, Maldonado v. City of New York, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed Nov. 8, 2006) (on file with author).

158. *See* Plaintiff's First Set of Interrogatories & Request for Document Production, Poventud v. City of New York, No. 07 CV 3998 (S.D.N.Y. filed Oct. 12, 2007) (on file with author); Plaintiff's First Set of Interrogatories and Request for Document Production, Maldonado v. City of New York, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed June 14, 2004) (on file with author).

159. *See* Plaintiff's First Set of Interrogatories & Request for Document Production, Poventud v. City of New York, *supra* note 158; Plaintiff's First Set of Interrogatories & Request for Document Production, Maldonado v. City of New York, *supra* note 158.

160. Personnel records disclosed in discovery, Poventud v. City of New York, No. 07 CV 3998 (S.D.N.Y. filed May 22, 2007); Letter from Gerard J. Marino, Assistant Corp. Counsel, City of New York Law Dep't, to Anthony Cecutti, Romano & Kuan, LLC (Nov. 26, 2007) (on file with author).

161. Deposition of Odalys Alonso at 2, Poventud v. City of New York, 07 Civ. 3998 (S.D.N.Y. deposed Nov. 29, 2010) (on file with author).

162. *Id.* at 39–42.

163. *Id.* at 66–70.

164. *Id.* at 44–45.

no standard for determining when discipline will be imposed, other than the subjective judgment of the District Attorney.

Alonso, who has been a supervisor or a member of the executive staff during Johnson's entire twenty-two-year tenure in office, recalled only a single instance of formal discipline, occurring in January 2002.[165] Girese, in his deposition, could recall no instance.[166] Neither could District Attorney Johnson.[167] In the incident recalled by Alonso, Johnson himself happened to walk into a courtroom where one of his Assistant District Attorneys was delivering a summation and was offended that it contained gratuitously inflammatory content.[168] Alonso testified that Johnson immediately instructed that Assistant District Attorney's supervisor to discipline the Assistant District Attorney, which she purportedly did through an oral admonishment and by withholding any raise or bonus at the prosecutor's next salary review.[169] However, no records were produced evidencing that such sanctions were imposed.[170] On appeal, the Office fully defended the Assistant District Attorney's conduct as appropriate[171] despite the supposed finding by the District Attorney himself that the prosecutor had behaved so inappropriately that he deserved to be sanctioned. This was the single prosecutor during Johnson's twenty-two years in office that anyone could recall was formally "disciplined" for violating a rule of behavior in the prosecution of a criminal case.

Alonso did testify, however, that she was told by her predecessor, Chief Assistant District Attorney Kluger, that under Johnson's policy, whenever the Appellate Division reversed convictions for summation misconduct, he would orally chastise the Assistant District Attorney if he or she was still in the Office.[172] In most of these cases, the Office was at the same time arguing on appeal that there had been no misconduct. Johnson was unaware of any record of Assistant District Attorneys who have been orally chastised, and could not recall any specific instance where it occurred.[173] Johnson said that prior misconduct would be a factor in a subsequent disciplinary decision, but acknowledged that no records are kept of such misconduct or admonitions for it.[174] Records are kept, however, of individual prosecutors' successes in obtaining convictions at trial and by

---

165. *Id.* at 59–60. Odalys Alonso recalled that at some point in the past Assistant District Attorneys in the office were informed that another Assistant District Attorney was disciplined, but she did not recall any details about it, and the prosecutor did not receive any negative evaluation. *Id.* at 64.

166. Deposition of Anthony Girese at 119–20, *Poventud v. City of New York*, 07 Civ. 3998 (S.D.N.Y. deposed Mar. 24, 2011) (on file with author).

167. Deposition of Robert Johnson at 60–66, *Poventud v. City of New York*, 07 Civ. 3998 (S.D.N.Y. filed May 22, 2007) (on file with author).

168. Deposition of Odalys Alonso, *supra* note 161, at 124–25.

169. *Id.* at 131–33.

170. *Id.* at 140, 145–47 (stating that the prosecutor received a merit bonus and raise); *see also* Personnel records disclosed in discovery, *supra* note 160 (on file with author).

171. *Id.* at 154–57.

172. *See* Deposition of Odalys Alonso, *supra* note 161, at 81–82, 289–90.

173. *See* Deposition of Robert Johnson, *supra* note 167, at 64–66.

174. *See id.* at 58–59, 65–67.

guilty plea.[175]   Johnson testified that he has never had to consider any discipline for *Brady* violations because there have been no "intentional" violations, to his knowledge, during his twenty-two-year tenure.[176]   In fact, during the Johnson era, there have been numerous court decisions finding flagrant or intentional *Brady* violations or misconduct during summations.[177]   Moreover, there have been "dozens" more decisions finding improper behavior but declining to reverse under the harmless error doctrine.[178]

Johnson acknowledged that his Office has no policy concerning referrals of prosecutors to the outside Departmental Disciplinary Committee for apparent ethical violations.[179]   He also did not believe that the Office had ever made such a referral during his tenure.[180]   Counsel to the District Attorney Girese testified that it has been his role, since Johnson took office in 1989, to respond to inquiries from the Disciplinary Committee about alleged prosecutorial misconduct in his Office.   He was unaware, however, of any instance in which any prosecutor was sanctioned in relation to the handling of a criminal matter.[181]

---

175. *See id.* at 71–72.  Johnson denied that he gives this factor any weight in promotions. *Id.*

176. *See id.* at 43.

177. *See, e.g.*, People v. Garcia, 848 N.Y.S.2d 137, 140 (App. Div. 2007) (finding prosecutor committed "flagrant violation" when he withheld material impeachment evidence, and criticizing the People's defense of this conduct as "disingenuous" and "disquieting"); People v. Mickel, 710 N.Y.S.2d 70, 71 (App. Div. 2000) (reversing conviction where prosecutor failed to disclose "significant" *Brady* material); People v. Olivero, 710 N.Y.S.2d 29, 31 (App. Div. 2000) (finding prosecutor's comments in summation "manifestly unfair"); People v. Lantigua, 643 N.Y.S.2d 963, 969 (App. Div. 1996) (finding that prosecutor intentionally withheld *Brady* material and made knowingly false argument in summation); People v. Williams, 622 N.Y.S.2d 275, 275 (App. Div. 1995) ("The basis for the reversal of this case lies in the prosecutor's repeated disregard of the rulings of the trial court . . . in asking improper questions of witnesses so that the constitutional right of the defendant to a fair trial was violated."); People v. Banfield, 599 N.Y.S.2d 227, 227 (App. Div. 1993) (reversing conviction where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants); People v. Byfield, 194 A.D.2d 331, 332 (N.Y. App. Div. 1993) (companion case to *Banfield*); People v. Hernandez, 585 N.Y.S.2d 436, 436 (App. Div. 1992) (affirming conviction, but stating that it "deplore[d] [prosecutor's] excesses [in summation] in the strongest possible terms and ask[ed] that prosecutors be trained and admonished to refrain from such unnecessary conduct"); People v. Butler, 585 N.Y.S.2d 751, 753 (App. Div. 1992) (prosecutor's "overzealous[ ]" conduct and "numerous unwarranted remarks" during cross-examination and summation "deprived defendant of a fair trial"); People v. Mudd, 585 N.Y.S.2d 364, 366 (App. Div. 1992) (finding summation comments "directly contradictory to the evidence, prejudicial and entirely outside the bounds of acceptable rhetorical comment"); People v. McReynolds, 572 N.Y.S.2d 8, 8 (App. Div. 1991) (noting that prosecutor "impugn[ed] the defense counsel's integrity"); People v. Negron, 556 N.Y.S.2d 41, 43 (App. Div. 1990) (finding summation comments "particularly offensive" and conduct "grossly improper").

178. Deposition of Anthony Girese, *supra* note 166, at 129.

179. *See* Deposition of Robert Johnson, *supra* note 167, at 72–73.

180. *Id.*

181. Deposition of Anthony Girese, *supra* note 166, at 165–66.

### B. The Queens District Attorney's Office:  The Su Case

#### 1.  Criminal Proceedings

Shih Wei Su was eighteen years old when he was convicted of attempted murder at trial in Queens in 1992.  The underlying incident involved the shooting of two victims at a pool hall in what the prosecution contended was a youth gang-related incident.[182]  The principal prosecution witness was Jeffrey Tom, a member of the Green Dragons,[183] which was a rival of the gang with which Su was allegedly affiliated, the White Tigers.[184] Neither Tom nor the two victims who were with him at the time of the shooting implicated Su in their initial statements to police,[185] but they all changed their story at about the same time and implicated him in one way or another.[186]  Tom was the most damaging witness, claiming that he knew Su and heard him give an order to shoot.[187]  Although Tom had his own robbery-by-extortion case, he denied, under questioning by the prosecutor, that the lenient plea bargain he had received (a youthful offender adjudication and sentence of probation) had resulted from any deal with the District Attorney's Office.[188]  The prosecution in her summation argued that Tom's testimony was truthful.[189]  Su was convicted and received the maximum sentence of sixteen and two-thirds to fifty years in prison.[190]

Su repeatedly challenged his conviction, both on direct appeal and collateral attack,[191] claiming that Tom must have received some sort of promise or benefit in exchange for his testimony.[192]  However, the District Attorney argued successfully that either Su or his attorneys were remiss for not making Tom's sealed plea and sentencing minutes part of the record.[193] In 1999, over the District Attorney's objection, a judge finally ordered Tom's plea and sentencing minutes unsealed, reasoning that the District Attorney "has no legitimate interest in shielding possible perjury."[194]  The minutes proved that a prosecutor had made an explicit, on-the-record deal with Tom to grant him leniency in exchange for his trial testimony against Su.[195]  Tom's flat denials, elicited by a different prosecutor at Su's trial,

---

182.  Su v. Filion, 335 F.3d 119, 122 (2d Cir. 2003).

183.  *See id.* at 121–22.

184.  *See id.* at 122.

185.  *See* Complaint at 4, Su v. City of New York, No. 06 Civ. 687 (E.D.N.Y. filed Feb. 16, 2006) (on file with author).

186.  *Id.*

187.  *Su*, 335 F.3d at 122.

188.  *Id.* at 123–24.

189.  *Id.* at 124–25.

190.  Complaint, *supra* note 185, at 8.

191.  People v. Su, 624 N.Y.S.2d 904 (App. Div. 1995), *leave to appeal denied*, 85 N.Y.2d 980 (1995); People v. Su, 699 N.Y.S.2d 291 (App. Div. 1999), *leave to appeal denied*, 94 N.Y.2d 925 (2000); People v. Su, 721 N.Y.S.2d 841 (App. Div. 2001).

192.  Complaint, *supra* note 185, at 8 (reciting grounds for Su's post-trial motions).

193.  *Id.* at 8–9 (describing People's opposition).

194.  Motion:  Unsealing at 2, People v. Su, No. 658-91 (N.Y. Sup. Ct. Queens Co. dated Jan. 21, 1999) (on file with author).

195.  Su v. Filion, 335 F.3d 119, 123 (2d Cir. 2003).

had been false.[196]  But the New York courts still would not grant Su any relief, accepting the District Attorney's additional procedural argument that Su's *Brady* violation claim should not be considered on the merits.[197]

Finally, on July 11, 2003, the Second Circuit granted Su's federal habeas corpus petition and directed that he be retried within sixty days or released.[198]  The court excoriated the prosecutor for "knowingly elicit[ing] false testimony"[199] from a witness whose credibility was "central to the deliberations of any reasonable jury,"[200] for failing to correct such false testimony, and for "bolster[ing]" Tom's lies during her closing argument.[201]  In vacating the conviction, it reasoned that a conviction obtained through "testimony the prosecutor knows to be false is repugnant to the Constitution."[202]  As the Bronx District Attorney's Office had done in the *Poventud* case, the Queens District Attorney tried to get Su to accept a "time-served" plea bargain, but Su refused.  After postponing the trial on several occasions, District Attorney Richard Brown's Office, on November 5, 2003, moved to dismiss all charges.[203]

### 2. The Attorney Grievance Process

On September 12, 2003, even while he was facing the prospect of retrial, Su filed a formal pro se complaint against the prosecutor with the Grievance Committee of the New York State Appellate Division, Second Judicial Department.[204]  He asked for an investigation and sanction of the prosecutor for knowingly eliciting and failing to correct false testimony, and attached a copy of the Second Circuit's decision.[205]  Su later submitted a supplemental letter, informing the Committee that his case had been dismissed for insufficient evidence, and that the prosecutor had been responsible for his wrongful imprisonment from ages seventeen through thirty.[206]  He said he could not afford an attorney and that "while [the prosecutor] certainly will have her powerful attorneys and friends on her

---

196.  *See id.* at 121.
197.  *See id.*
198.  *See id.* at 130.
199.  *Id.* at 128.
200.  *Id.* at 129.
201.  *Id.* at 127.
202.  *Id.* at 126.
203.  *See* Proceedings at 2, People v. Su, No. 0658-91 (N.Y. Sup Ct. Queens Co. dated Nov. 5, 2003) (on file with author).
204.  Letter from Shih Wei Su to Second Dep't Grievance Comm. (Sept. 12, 2003) (on file with author).
205.  *Id.*
206.  Letter from Shih Wei Su to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Nov. 6, 2003) (on file with author); *see also* Jim Dwyer, *Prosecutor Misconduct, at a Cost of $3.5 Million*, N.Y. TIMES, Oct. 22, 2008, at A27 (reporting on Su's correspondence with the Grievance Committee).

side, I firmly believe . . . this committee will not allow [the prosecutor] to manipulate the justice [sic] again."[207]  Su was wrong.

On December 12, 2003, the prosecutor submitted a remarkable letter prepared by her attorney, but which she endorsed with her signature.[208]  It pleaded with the Committee for sympathy, pointing out that she was married and had two young children.  The Su case "was considered old and probably in a position to be dismissed for failure to prosecute . . . [and] was thought to be a loser and was dumped in her lap," the letter contended.[209]  "[P]erhaps without being adept as a result of her inexperience," the letter asserted, the prosecutor had inadvertently elicited false answers from her witness and had not known how to correct them.[210]  While acknowledging that the prosecutor's conduct had been "naive, inexperienced and, possibly, stupid," the letter shifted blame to the District Attorney's Office for not ensuring that she knew about the deal made by another prosecutor with her witness, contending, "[P]rosecutorial misconduct need not be the doing of the last assigned assistant, though he/she unwittingly kept it in motion and caused it to occur."[211]

Su refuted the prosecutor's arguments by letter dated January 22, 2004.[212]  He contended that she had not just been a passive, hapless victim of a rogue witness, but had refused to correct Tom's testimony when Su's trial counsel had complained that it could not be true, and that she then "*capitalized*" on the false testimony in her summation by "vouch[ing] for Tom's truthfulness, honesty, and lack of evasiveness."[213]  Su pointed out that the Second Circuit's decision had found her misconduct to have been deliberate.  Further, Su contended, the prosecutor could not blame her knowing elicitation of and failure to correct false testimony on inexperience when basic attorney disciplinary rules prohibit deceitful behavior and reliance on false or misleading evidence, and prosecutors are required by such rules to make timely disclosure of exculpatory evidence.  "The Grievance Committee and the Appellate Division regularly sanction attorneys for mere negligence in handling client funds and other client matters," Su wrote.[214]  Observing that the prosecutor had "cost me 13 years of my life," Su continued, "[e]ven intentional misconduct in such matters

---

207. Letter from Shih Wei Su to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Nov. 6, 2003) (on file with author).

208. Letter from Jerome Karp to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Dec. 12, 2003) (on file with author); Dwyer, *supra* note 206, at A27.  This letter was quoted in Mr. Dwyer's article, was the subject of questioning during the prosecutor's deposition in Su's civil rights case, and was introduced as an exhibit.

209. Letter from Jerome Karp to Melissa D. Broder, *supra* note 208.

210. *Id.*

211. *Id.*

212. Letter from Shih Wei Su to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Jan. 22, 2004) (on file with author).

213. *Id.*

214. *Id.*

pales in importance compared to the damage done by a public prosecutor who knowingly withholds exculpatory evidence or misleads the court or the defense."[215]   He asked for permission to participate in the proceedings regarding the prosecutor.

Su did not hear at all from the Committee, until he received a seven-line letter from Chief Counsel Diana Maxfield Kearse over a year later.   It informed Su that, on December 14, 2004, "all the facts pertaining to your complaint were presented to the Grievance Committee," and it had taken "appropriate action":  "the attorney has been issued an *Admonition* and a permanent record has been made."[216]   An "admonition" is the lightest sanction that may be imposed in New York, and does not result in any public record.[217]

On February 28, Su wrote Ms. Kearse, asking what "investigation," if any, had been conducted.[218]  "Was [the prosecutor]'s unbelievable defense that she was unaware of her obligation to correct testimony she knew to be false challenged in any way? . . .  What was the Committee's reasoning in concluding that knowing misconduct by an *experienced* prosecutor (*four years* in the Office!) resulting in a wrongful conviction and 13 years imprisonment merited only an Admonition?"[219]   Su requested the opportunity to present his case to the full Committee.[220]

Assistant Counsel Melissa D. Broder responded on March 22, 2005. There is no procedure to appeal a sanction, she wrote.  Su was "free to consult with counsel regarding any civil remedies which may be available to you regarding the above-named attorney."[221]  Su still did not give up. On March 30, he again wrote Chief Counsel Kearse:

> Even jaywalking can get prison time.  So can stealing a loaf of bread. How is it possible that an experienced prosecutor who knowingly broke every bar association code, every Constitutional law, and more only gets an admonition?
>
> I am not a lawyer . . . but I guarantee you that any person, no matter how "naive, inexperience[d], or possibly stupid," will know that false evidence is not allowed in the court.

---

215. *Id.*

216.  Letter from Diana Maxfield Kearse, Chief Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists., to Shih Wei Su (Feb. 3, 2005) (on file with author).

217. *See* Appellate Div. Second Judicial Dep't, *Attorney Matters:  How to Make a Complaint About a Lawyer*, http://www.courts.state.ny.us/courts/ad2/attorneymatters_ ComplaintAboutaLawyer.shtml (last visited Oct. 20, 2011), ("An Admonition is issued in those cases in which the committee finds that the lawyer committed clear professional misconduct that was not sufficiently serious to warrant the commencement of a formal disciplinary proceeding.").

218.  Letter from Shih Wei Su to Diana Maxfield Kearse, Chief Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Feb. 28, 2005) (on file with author).

219. *Id.*

220. *Id.*

221.  Letter from Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists., to Shih Wei Su (Mar. 22, 2005) (on file with author).

Case 1:18-cv-05500-KAM-ST   Document 43-3   Filed 07/24/20   Page 99 of 108 PageID #: 700

> With all due respect, the message that this committee is sending out is loud and clear:  Don't worry about using false evidence; you will only get an admonition if you are stupid enough to admit it.[222]

On April 26, 2005, Broder curtly reminded Su that "this matter is closed" and that he could consult with counsel regarding "civil remedies . . . . This should conclude our correspondences regarding this matter."[223]

### 3.  The Civil Lawsuit

On February 16, 2006, Su took up the Grievance Committee's suggestion.  He filed suit against the City of New York in the United States District Court for the Eastern District of New York, seeking monetary damages pursuant to § 1983 for his wrongful conviction.[224]  His lawsuit, modeled after the *Ramos* and *Walker* cases, contended that the prosecutor's misconduct had resulted from the deliberate indifference of the Queens District Attorney to his obligation to properly train, supervise, and discipline his staff regarding their *Brady* and related due process obligations.[225]  Su attached to his complaint an exhibit listing twenty-eight cases, decided between 1985 and 2004, involving wrongful withholding of evidence by Queens prosecutors, and fifty-nine cases in which such prosecutors during the same time frame relied on false, misleading, or inflammatory evidence or argument.[226]

During discovery proceedings, the court directed the City to provide personnel and disciplinary records (if any) for prosecutors involved in seventy-three appellate reversals for such misconduct, during the thirteen-year period from 1985 through 1998, including twenty-five cases involving the withholding of material evidence.  When disclosed, the records did not reveal a single instance through 2000 in which any prosecutor had been disciplined by way of dismissal, suspension, demotion, transfer, reduction in or withholding of compensation, negative written evaluation, or referral to the court's Grievance Committee, for any of the seventy-three cases.[227]  Discovery materials showed that, as in the Bronx, the Queens District Attorney's Office had (and has) no published or formal code of conduct for prosecutors, or any formal disciplinary policies or procedures.  The informal "procedure" was for the Chief of Appeals, whenever a motion or brief was received that caused him to be "concerned" about possible misconduct, to bring the matter to the attention of the Chief Assistant

---

222.  Letter from Shih Wei Su to Diana Maxfield Kearse, Chief Counsel, NYS Grievance Comm. for the Second & Eleventh Judicial Dists. (Mar. 30, 2005) (on file with author).

223.  Letter from Melissa D. Broder, Assistant Counsel, NYS Grievance Comm. for the Second & Eleventh Judicial Dists., to Shih Wei Su (Apr. 26, 2005) (on file with author).

224.  Complaint, *supra* note 185, at 1.

225.  *See id.* at 12–15.

226.  *See id.* at Ex. B.

227.  Personnel records disclosed in discovery, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. filed Feb. 16, 2006) (on filed with author).  As with the Bronx District Attorney's Office, names of the line prosecutors apparently involved in misconduct have been omitted, as they are unnecessary for the purposes of this Article.

District Attorney or District Attorney Richard Brown.[228]   Trial bureau supervisors might also report concerns up the chain of command.[229]  Also, the District Attorney would receive copies of appellate decisions.[230]  If the District Attorney concluded that a verbal reprimand was in order, he would handwrite a note to the Chief Assistant District Attorney, John Ryan, to "speak to" the Assistant District Attorney involved.[231]  However, only three such notes were produced,[232] neither Castellano nor Testagrossa knew of any Assistant District Attorney who actually had been "spoken to,"[233] and there was no such evidence in any prosecutor's personnel file[234]—with one exception.

Assistant District Attorney Claude Stuart was caught apparently lying to a state court judge about whether an exculpatory witness was available to come to court to testify, and his alleged misconduct was reported in the news media.[235]   The Disciplinary Committee ultimately suspended him from practice and he was fired by the District Attorney's Office.[236]  This fiasco might never have occurred had the Office disciplined Stuart when he previously was exposed for alleged misconduct.  In 1995, Stuart had obtained a conviction in *People v. Walters*[237] by arguing in summation that the defendant had committed a shooting with a gun recovered from him which Stuart *knew* had not been used in the crime.[238]  The appellate court reversed the conviction, finding Stuart's conduct "an abrogation of his responsibility as a prosecutor," "egregious," and "improper."[239]   The District Attorney's Chief of Appeals, John Castellano, testified in his deposition that he told the Chief Assistant District Attorney, John Ryan, that Stuart's conduct had been "not tolerable" and "inexcusable."[240]  However, Castellano was unaware if Stuart had been disciplined for that misconduct, and there was no discovery suggesting that he had been.[241]

The deposition of Su's prosecutor provided an interesting insight into the Office's attitude regarding *Brady* compliance.   While she acknowledged that her failure to disclose the truth about Jeffrey Tom's relationship with the Office had been inexcusable, she revealed that it had been consistent with her *training* to erect a "Chinese wall" in order to avoid obtaining

---

228.  Deposition of John Castellano at 22–23, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed May 29, 2008) (on file with author).

229.  Deposition of Charles Testagrossa at 19, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed June 11, 2008) (on file with author).

230.  *Id.* at 27.

231.  Deposition of John Castellano, *supra* note 228, at 257–58.

232.  Personnel records disclosed in discovery, *supra* note 227.

233.  *See* Deposition of Charles Testagrossa, *supra* note 229, at 19; Deposition of John Castellano, *supra* note 228, at 257–58.

234.  Personnel records disclosed in discovery, *supra* note 227.

235.  Stacy Albin, *Queens:  Murder Conviction Questioned*, N.Y. TIMES, Nov. 14, 2002, at B12.

236.  *In re* Stuart, 803 N.Y.S.2d 577 (App. Div. 2005).

237.  674 N.Y.S.2d 114 (App. Div. 1998).

238.  *See id.* at 116.

239.  *Id.*

240.  Deposition of John Castellano, *supra* note 228, at 263.

241.  *Id.* at 263–64; *see also* Personnel records disclosed in discovery, *supra* note 227.

knowledge of deals other prosecutors in the Office had made with cooperating witnesses.[242]   This policy was inconsistent with Ethical Consideration 7-13 of the New York State Code of Professional Responsibility, which prohibited prosecutors from consciously avoiding knowledge they are required to disclose to their adversaries.[243]

The Chinese wall policy was exposed and condemned in *People v. Steadman*,[244] even before Su's case was tried.  In *Steadman*, the New York Court of Appeals blasted the Queens District Attorney's unlawful policy, promulgated at an executive level, to erect just such a Chinese wall between trial prosecutors utilizing a cooperating witness and the prosecutor making a deal with the witness.[245]   The Office's Chief of Trials, Daniel McCarthy, had made the deal with a witness's *attorney*, knowing that the witness would later invoke attorney-client privilege to shield himself from cross-examination when he falsely denied knowledge of promised benefits.[246] The trial prosecutors had kept themselves ignorant of the discussions, and had done nothing to correct the witness's false or misleading denial of knowledge of any promises.[247]   After the witness's attorney, as an act of conscience, had disclosed the scheme to the defense and it had been denounced in a scathing opinion by the trial judge (issued before Su's trial),[248] the Office defended it on appeal as lawful, and promoted one of the two line prosecutors to a supervisory position.[249]   This prosecutor was not even chastised for his behavior in the case.[250]   Meanwhile, Chief of Trials McCarthy was hired by Bronx District Attorney Johnson to become his Director of Trial Training.[251]   In his deposition, Johnson denied having ever been aware of *Steadman*, before or after hiring McCarthy,[252] even though McCarthy's misconduct had been denounced in written opinions by the trial judge, the Appellate Division, and the Court of Appeals.  The Queens District Attorney conducted no internal investigation.[253]

---

242.  Deposition of Su's Prosecutor at 39–41, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed June 19, 2008) (on file with author).

243.  *See* New York Lawyer's Code of Professional Responsibility EC 7-13, *available at* http://www.nysba.org/Content/NavigationMenu/ForAttorneys/ProfessionalStandardsforAttorneys/LawyersCodeDec2807.pdf ("[A] prosecutor should not intentionally avoid pursuit of evidence merely because he or she believes it will damage the prosecutor's case or aid the accused.").  Though this ethics code has been superseded, it was the relevant language at the time of Su's prosecution.

244.  82 N.Y.2d 1 (1993).

245.  *See id.* at 7–8.

246.  *See id.*

247.  *Id.*

248.  Opinion and Order at 6–7, People v. Steadman, No. 3331-88 (N.Y. Sup. Ct. Queens Co. dated Apr. 20, 1990) (on file with author).

249.  *See* Deposition of Jack Warsawsky at 12, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed July 15, 2008) (on file with author) (testifying as to the promotion).

250.  *See id.* at 135–36.

251.  Deposition of Daniel McCarthy at 9, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed Aug. 11, 2008) (on file with author).

252.  Deposition of Robert Johnson, *supra* note 167, at 76–78.

253.  Deposition of John Castellano, *supra* note 228, at 204.

Su's prosecutor's behavior in failing to disclose the truth about the Jeffrey Tom deal should have been known internally for years, but the Office was indifferent to it. Prosecutors assigned to oppose Su's direct appeal and collateral attacks on his conviction acknowledged that they had an ongoing *Brady* obligation to investigate whether Su's *Brady* allegations were correct, but they never did so. When one such Assistant District Attorney attempted to question Su's trial prosecutor, the latter refused to cooperate, and no one in the Appeals Bureau brought this remarkable and intolerable stonewalling to the attention of executives in the Office.[254] After Su filed his federal habeas petition, Chief of Appeals Castellano questioned Su's prosecutor, who claimed not to recall why she had not corrected Tom's false testimony, and Castellano conducted no further investigation into her behavior before preparing opposition papers.[255] In 2003, shortly after she had left the Office, Su's prosecutor learned from a news report that the Second Circuit had vacated Su's conviction, and telephoned John Ryan, the District Attorney's long-time Chief Assistant, to complain. Ryan responded: "[Y]ou are just going to have a bad day, that's all."[256] Another high-level prosecutor in the Office told her, "Don't worry, you're a good attorney. Everything will work out."[257]

In another case resulting in federal habeas relief and strong condemnation of the prosecutor's conduct, there was no internal discipline but instead the prosecutor was *promoted*. In *Jenkins v. Artuz*,[258] a federal judge, granting habeas relief, found that the prosecutor had "engaged in a pattern of misconduct that was designed to conceal the existence of [a witness's] cooperation agreement during [Jenkins's] trial,"[259] and that this misconduct was "improper and, when considered cumulatively, severe."[260] Refusing to admit error, the District Attorney's Office appealed. The Second Circuit affirmed the District Court's issuance of the writ, holding that the prosecutor "misled the jury," both in her questioning of the cooperating witness and during her summation,[261] and that "no doubt . . . [this] behavior violated Jenkins's due process rights."[262] Deposition testimony and other discovery revealed that the Queens District Attorney did not even informally admonish the prosecutor.[263] She received a promotion not long after Jenkins was convicted and currently is a Deputy Chief in one of the Queens District Attorney's Office's trial bureaus.[264] Numerous additional

---

254. Deposition of Ranjana Piplani at 24–26, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed May 22, 2008) (on file with author).

255. Deposition of John Castellano, *supra* note 228, at 73–77, 87.

256. Deposition of Su's Prosecutor, *supra* note 242, at 19.

257. *Id.* at 18.

258. 294 F.3d 284 (2d Cir. 2002).

259. *Id.* at 290 (quoting Jenkins v. Artuz, No. 98-CV-277, slip op. at 27 (S.D.N.Y. May 16, 2001)).

260. *Id.*

261. *Id.* at 294.

262. *Id.*

263. *See* Deposition of Therese Lendino at 11, Su v. City of New York, No. 06 Civ. 687 (E.D.N.Y. deposed Aug. 6, 2008) (on file with author).

264. *See id.*

decisions used strong language in condemning what the courts sometimes concluded was intentional misconduct,[265] but records reflected no internal sanctions.

While no records were kept of complaints, findings of misconduct, or alleged reprimands, the contrary was true when it came to success in obtaining convictions.  Charles Testagrossa, Executive Assistant District Attorney in charge of the Major Crimes Division in 2008 and an executive at the office for nearly twenty years, testified at his deposition that Assistant District Attorneys and their supervisors, under previous and the present District Attorneys, kept track of their trial win-loss records.[266]  He said he perceived that their victory percentage affected their promotions and compensation.[267]

As discovery in the Su case neared completion, the City strenuously opposed the plaintiff's efforts to depose the District Attorney, Richard Brown, and his chief assistant, John Ryan, concerning their *Brady* disclosure and disciplinary policies.  After the court directed Ryan to submit to a deposition and held open the possibility that Brown could be deposed as well, the parties reached a $3.5 million settlement.

### C. Brooklyn District Attorney's Office:  The Zahrey Case

### 1. Criminal Proceedings

Zaher Zahrey was an undercover narcotics detective for the New York City Police Department's Brooklyn North narcotics division with an excellent performance record when he fell under investigation by the NYPD's Internal Affairs Bureau (IAB) in 1994.[268]   IAB had been reconstituted to more vigorously combat police corruption after highly-

---

265. *See, e.g.*, People v. Ni, 742 N.Y.S.2d 61, 62 (App. Div. 2002) ("[I]nstances of prosecutorial misconduct were flagrant."); People v. Mackey, 670 N.Y.S.2d 879, 880 (App. Div. 1998) ("[P]rosecutor deliberately withheld information which was likely to be elicited on cross-examination."); People v. Elder, 615 N.Y.S.2d 915, 916 (App. Div. 1998) (finding that prosecutor's improper summation comments were "flagrant"); People v. Scott, 629 N.Y.S.2d 267, 268 (App. Div. 1995) (finding "flagrant" and "pervasive" prosecutorial misconduct); People v. Robinson, 594 N.Y.S.2d 801, 802–03 (App. Div. 1993) (noting that prosecutor's improper trial tactics and summation comments were "continued" and "persistent"); People v. Gomez, 548 N.Y.S.2d 568, 570 (App. Div. 1989) (reversing conviction for prosecutor's "frequen[t]" and "outrageous" "misconduct" during trial); People v. Perez, 511 N.Y.S.2d 687, 690 (App. Div. 1987) (finding that prosecutor made a "deliberate attempt to mislead the jury").  In other cases, the appellate courts criticized prosecutors' conduct as reckless or negligent. *See, e.g.*, People v. Banch, 80 N.Y.2d 610, 621 (1992) (criticizing "the People's seeming lack of care in discharging their discovery obligation").

266. *See* Deposition of Charles Testagrossa, *supra* note 229, at 44–45.

267. *See id.* at 46.

268. Fifth Amended Complaint at 11, 14, Zahrey v. City of New York, No. 98 Civ. 4546 (S.D.N.Y. filed Feb. 23, 2004) (on file with author). *See generally* Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000).

publicized hearings had exposed the department's lethargy in that regard.[269] Zahrey was suspected because he had continued playing playground "pick-up" basketball games with several individuals whom the police believed had been involved in criminal activity, including a local basketball legend and childhood friend, William Rivera.[270]  When Rivera was murdered, Zahrey came forward to try to assist Rivera's family in finding out the status of the homicide investigation, only to walk into a hornet's nest of IAB detectives who were on the case because the murder weapon had been an off-duty police officer's gun.[271]

An intensive, two-year investigation yielded just one witness—a crack-addicted career criminal named Sidney Quick—who claimed knowledge that Zahrey had committed crimes.[272]  At the direction of the Brooklyn District Attorney's Office, IAB Detective-Sergeant Robert Boyce repeatedly interviewed Quick, obtaining bizarrely inconsistent accusations that Zahrey had provided Rivera's alleged hold-up crew with confidential Police Department information on drug spots that could be robbed.[273] When these interviews led nowhere, Boyce later traveled to Sing-Sing State Prison, where Quick was by then serving a six-to-life sentence for robbery.[274]  Remarkably, Boyce tape-recorded the entire, two-hour interview in which he promised Quick "a very sweet deal" in exchange for his cooperation against Zahrey, and suggested a story to Quick, which was demonstrably false, implicating Zahrey in the attempted robbery and murder of a drug dealer.[275]  Brooklyn prosecutors who heard the tape tried for nearly two years to develop corroboration for Quick's accusations, a necessary prerequisite for prosecution under New York State law, but when they were unable to do so, they convinced federal authorities (who were not legally required to obtain corroboration) to take over the case and to prosecute—without initially disclosing the Quick tape and other exculpatory and impeaching information.[276]  Zahrey was held for nearly nine months without bail, pending the conclusion of federal trial proceedings.[277]  After a six-week trial, at which the author represented him, he was fully acquitted in June 1997.[278]

### 2. Civil Proceedings

In 1998, Zahrey brought a lawsuit against various individual prosecutors and detectives for investigative misconduct, and against the City of New

---

269. Craig Horowitz, *A Cop's Tale*, N.Y. MAG., July 16, 2001, at 32 (explaining that the Internal Affairs bureau was "beefed-up" shortly before the *Zahrey* prosecution "in the wake of the Mollen Commission report").
270. Fifth Amended Complaint, *supra* note 268, at 11–13.
271. *See id.* at 12.
272. *See id.* at 14–16.
273. *See id.*
274. *See id.* at 16.
275. *See id.* at 18–24.
276. *See id.* at 37–39.
277. *See id.* at 47, 50–51.
278. *See id.* at 52.

York.[279]  One of his claims was that the indifference of Brooklyn District Attorney Charles J. Hynes to violations of the Office's *Brady* and related due process obligations had caused the Office's line prosecutors investigating the matter to withhold exculpatory information from the United States Attorney's Office, while simultaneously urging that Office to initiate Zahrey's prosecution.[280]   The *Brady* claim was ultimately dismissed,[281] but before settling,[282] Zahrey succeeded in obtaining considerable discovery showing that the Brooklyn District Attorney's Office, like its counterparts in Queens and the Bronx, has no formal disciplinary rules and procedures, and no history of disciplining prosecutors found to have engaged in misconduct, including the withholding of *Brady* material.

In a deposition held on October 18, 2005, Dino G. Amoroso, former Counsel to the District Attorney, and then Executive Assistant District Attorney, testified that he was responsible for implementing Hynes' policies to ensure compliance with ethical standards and was knowledgeable about any specific investigations of prosecutors for alleged misconduct since Hynes' tenure began in 1990.[283]   The Office had no employee manual or other published rules or procedures concerning standards of behavior, potential sanctions for violating them, or procedures for investigating and imposing discipline, including with regard to *Brady* obligations.[284]   The Office would distribute memoranda on discovery and *Brady* obligations, but had no follow-up procedure to make sure individual prosecutors read them, and no *Brady* "policy."[285]   Prosecutors were told informally that "conscious" ethical violations, including under *Brady*, would have the "highest consequence," including dismissal from the Office—as opposed to inadvertent mistakes during the "hurly-burly of trials."[286]   Consistent with that approach, while it was conceivable that a

279.  Zahrey v. City of New York, No. 98 Civ. 4546 (S.D.N.Y. filed June 26, 1998).

280.  Fifth Amended Complaint, *supra* note 268, at 65–66.

281.  Zahrey v. City of New York, No. 98 Civ. 4546, 2009 WL 54495, at *26 (S.D.N.Y. Jan. 7, 2009) (reasoning that Zahrey had not been prejudiced by any *Brady* violations since he was acquitted at trial, but holding that Brooklyn prosecutors were subject to personal liability for their involvement in manufacturing and using evidence they knew had been manufactured to cause federal criminal proceedings to be initiated and continued against Zahrey).

282.  Zahrey settled in 2009 with the City and five individual defendants, including two supervisory prosecutors.  These two prosecutors, Charles Guria, the Chief of the Brooklyn District Attorney's Civil Rights Bureau, and Theresa Corrigan, now the Chief of the Gang Unit of the Nassau County District Attorney's office and formerly a supervisor in Brooklyn, agreed to a judgment without admitting liability, pursuant to Federal Rule of Civil Procedure 68, under which they were jointly and severally liable for $750,001 plus reasonable attorneys' fees for their alleged investigative misconduct.  The judgment was paid by New York City.

283.  Deposition of Dino G. Amoroso at 16–17, Zahrey v. City of New York, 98 Civ. 4546 (S.D.N.Y. deposed Oct. 18, 2005) (on file with author).

284.  *Id.* at 91–92.

285.  Deposition of Dennis Hawkins at 10–11, Zahrey v. City of New York, 98 Civ. 4546 (S.D.N.Y. deposed Mar. 13, 2000) (on file with author).

286.  Deposition of Dino G. Amoroso, *supra* note 283, at 90, 181–82.

prosecutor might deserve sanction for merely violating *Brady* "negligently," ordinarily only intentional misconduct would be punished.[287]

Amoroso testified that when a complaint or court decision was received identifying a possible ethical issue, it would be brought to the attention of the District Attorney, who would decide whether an investigation should be conducted or whether any other action was necessary.[288] Amoroso was fully informed about all such investigations that were conducted from 1990 to 2005. While he initially claimed that several disciplinary inquiries were conducted, he then acknowledged that none of them were for the purpose of determining whether a prosecutor had engaged in ethical lapses during the handling of criminal prosecutions. Rather, the investigations either were into personal misconduct by Assistant District Attorneys having nothing to do with their handling of individual cases, or concerned whether to retry defendants whose convictions had been reversed or vacated.[289] He did not know of a single instance in which any prosecutor had been so much as admonished for misconduct related to his or her handling of a criminal investigation or prosecution.[290]

During this fifteen-year period, however, there were numerous court decisions finding serious misbehavior by Brooklyn prosecutors, including in the *Brady* context. These cases included instances where Assistant District Attorneys withheld exculpatory witness statements or impeachment material, or made false and/or misleading presentations of the evidence at trial.[291] Numerous additional instances of misconduct through the present day were identified in the complaint in *Collins v. City of New York*, a lawsuit the author recently filed based upon findings by a federal judge of pervasive *Brady* violations, witness coercion, and other misconduct by the Chief of District Attorney Hynes' Rackets Division, Michael F. Vecchione.[292] In the highly publicized Jabbar Collins murder case,

---

287. *Id.* at 102–05.

288. *Id.* at 92–94.

289. *Id.* at 96–102, 105, 107, 110, 126–28, 133, 145–48.

290. *Id.* at 101–02, 105, 107, 128, 146–48.

291. *See, e.g.*, Leka v. Portuondo, 257 F.3d 89, 106 (2d Cir. 2001) (prosecutor suppressed evidence that would have had a "seismic impact" on the case); People v. Calabria, 94 N.Y.2d 519 (2000) (prosecutor repeatedly defied court's ruling and made false or misleading argument to the jury); People v. Cotton, 662 N.Y.S.2d 135, 136 (App. Div. 2000) (prosecutor's summation betrayed his "duty not only to seek convictions but also to see that justice is done" and his "duty of fair dealing to the accused and candor to the courts") (citation omitted) (internal quotation marks omitted); People v. LaSalle, 663 N.Y.S.2d 79, 80 (App. Div. 1997) (prosecutor withheld impeachment evidence that "clearly" should have been disclosed); People v. Roberts, 611 N.Y.S.2d 214, 215 (App. Div. 1994) ("There is no doubt that the People violated the principles of *Brady*."); People v. Khadaidi, 608 N.Y.S.2d 471, 472–73 (App. Div. 1994) (prosecution withheld interview notes with complainant containing prior inconsistent statements); People v. Jackson, 603 N.Y.S.2d 558, 559 (App. Div. 1993) (prosecution withheld several pieces of exculpatory and impeachment evidence in arson case); People v. Inswood, 580 N.Y.S.2d 39, 40 (App. Div. 1992) (prosecutor failed to turn over *Brady* material that revealed existence of potentially exculpatory witnesses).

292. *See generally* Complaint, Collins v. City of New York, No. 11 Civ. 766 (E.D.N.Y. filed Feb. 16, 2011); John Eligon, *In Suit, Freed Man Accuses Prosecutors of Misconduct*, N.Y. TIMES, Feb. 17, 2011, at A26.

Hynes's office agreed to federal habeas corpus relief for Collins,[293] his immediate release after fifteen years in prison, and the dismissal of the indictment without retrial,[294] rather than have Vecchione, the Office's chief "anti-corruption" prosecutor,[295] and other prosecutors in the Office, testify at a habeas hearing ordered by Federal District Judge Dora Irizarry.[296] The Office admitted that it had failed to disclose a secret recantation by its chief witness,[297] a recantation that Vecchione, in a previous sworn affidavit, had categorically denied ever occurred.[298]  In testimony that the federal court found "credible," a second key witness testified that he was a drug addict at the time he was questioned by Vecchione, and that Vecchione threatened him with physical harm and secretly incarcerated him for a week without following required material witness procedures.[299]  The court characterized the prosecution's failure to disclose this information, along with additional evidence refuting the testimony of the third and final significant prosecution trial witness, as "shameful."[300]  Immediately after Judge Irizarry made her denunciation of Vecchione's behavior and the conduct of the Office, Hynes ratified that behavior.  He told the news media that he would conduct no investigation, praised Vecchione as "a very, very principled lawyer,"[301] and pronounced him "not guilty of any misconduct."[302]   Collins's lawsuit contends that Vecchione's behavior did not simply result from Hynes's indifference to coercion of witnesses and *Brady* violations but that such misconduct, at least in high-profile cases that the Office was anxious to win, was the *policy* of the Office. [303]

---

293.  *See* Sean Gardiner, *Attorney Drops Attempt at Retry*, WALL ST. J., June 10, 2010, at A25; Tom Robbins, *Presumed Guilty:  A Jailhouse Lawyer Says a Top Brooklyn Prosecutor Rigged His Murder Conviction*, VILLAGE VOICE, June 2, 2010, at 8; A. G. Sulzberger, *Murder Conviction Voided over Prosecutors' Conduct*, N.Y. TIMES, May 26, 2010, at A21; A. G. Sulzberger, *Witness Issue Prompts a Hearing on Possible Misconduct by Prosecutors to Be Postponed*, N.Y. TIMES, May 27, 2010, at A27.

294.  *See* A. G. Sulzberger, *Facing Misconduct Claims, Brooklyn Prosecutor Agrees to Free Man Held 15 Years*, N.Y. TIMES, June 9, 2010, at A18; *see also* Mark Fass, *Judge Orders Inmate's Release, Blasts D.A.'s Lack of Remorse*, N.Y. L.J., June 9, 2010, at 1.

295.  KINGS COUNTY DISTRICT ATTORNEY'S OFFICE:  BUREAUS, UNITS & DIVISIONS, http://www.brooklynda.org/kcda-bur-units-divisions/kcda-bur-unit-div.htm (last visited Oct. 20, 2011) (listing Michael Vecchione as Chief of the Rackets Division, which "investigate[s] and prosecute[s] serious and complex crimes in the areas of organized crime, criminal misconduct by public officials and police officers, gang-related activity, major frauds, arson, narcotics and tax revenue crimes").

296.  Sulzberger, *supra* note 294, at A18.

297.  Supplemental Affidavit in Opposition [to] Amended Petition for Writ of Habeas Corpus of Kevin Richardson at ¶ 6, Collins v. Ercole, 08-CV-1359 (E.D.N.Y. filed May 7, 2010) (on file with author).

298.  Affirmation of Michael F. Vecchione at ¶ 15, People v. Collins, No. 2884-94 (N.Y. Sup. Ct. Kings Co. dated Nov. 3, 2006) (on file with author).

299.  Transcript of Civil Cause for Hearing Before the Honorable Dora L. Irizarry, United States Dist. Judge at 120, Collins v. Ercole, 08-CV-1359 (E.D.N.Y. dated June 8, 2010) (on file with author).

300.  *Id.* at 133.

301.  Sulzberger, *supra* note 294, at A18.

302.  Sean Gardiner, *A Solitary Jailhouse Lawyer Argues His Way Out of Prison*, WALL ST. J., Dec. 24, 2010, at A1.

303.  Complaint, *supra* note 292, at ¶¶ 437–523.

CONCLUSION

Contrary to the Supreme Court's assumption in *Imbler* and in subsequent decisions, experience shows that prosecutors are not disciplined—either internally by their Offices or externally by court or bar disciplinary committees—for violating their *Brady* or other due process obligations during criminal proceedings. Three major District Attorneys' Offices in "progressive" New York City lack any formal disciplinary rules or procedures, despite being large organizations employing hundreds of prosecutors and support staff.[304] Their informal "policy" is to confine consideration of discipline to cases in which courts have found "intentional" or willful misbehavior, even though courts often do not reach the issue of willfulness as it may be irrelevant to whether there was a violation of the defendant's due process rights requiring reversal of the conviction. In the relatively few *Brady* or other cases in which the court has found willfulness, the District Attorneys avoid discipline by rejecting the court's conclusion, or just passively failing to follow up with any investigation or consideration of discipline.[305]

In future cases, when analyzing policy considerations relating to individual and municipal liability by prosecutors or their employers for violations of the constitutional rights of criminal suspects or defendants, the Supreme Court should abandon the false assumption that prosecutors, theoretically subject to professional codes, really are disciplined or have reason to fear being disciplined by their offices or by outside disciplinary bodies. Otherwise, the Court will continue to premise significant civil rights decisions on a fiction that has plagued constitutional jurisprudence for thirty-five years.

---

304. *See supra* notes 149, 151–52, 155, 162–64, 228–231 and accompanying text.
305. *See supra* notes 123–30, 136, 138–39, 181, 227, 249–53 and accompanying text.