UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RHIAN TAYLOR,

                        Plaintiff,

    -against-

THE CITY OF NEW YORK and JOSEPH BEY,
Individually and as a Member of the New York
City Police Department,

                        Defendants.

**AMENDED COMPLAINT**

Index No. 18-cv-5500

**JURY TRIAL DEMANDED**

Plaintiff RHIAN TAYLOR ("Plaintiff" or "Taylor"), by his attorneys, the LAW

OFFICES OF JOEL B. RUDIN, P.C., respectfully alleges, upon information and belief, as

follows:

## NATURE OF ACTION

1.     This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking monetary

damages for Plaintiff, RHIAN TAYLOR, arising from his unconstitutionally obtained conviction

for murder in Queens, New York.

2.     Plaintiff was deprived of his liberty before trial, and convicted, due to the

unlawful withholding by police and prosecutors of exculpatory and impeachment evidence

favorable to his defense, and their reliance on false or misleading evidence and argument, in

violation of his constitutional right to liberty, due process, and a fair trial under the Fourth, Fifth,

Sixth and Fourteenth Amendments to the United States Constitution.

3.     Plaintiff's conviction ultimately was reversed, and he was acquitted after a second

trial, but not before he spent nearly nine years in jail or prison due to the police and prosecutorial

misconduct alleged in this complaint.

4.      The City of New York is liable because Plaintiff's constitutional injuries resulted

from the policies, customs and practices of the New York City Police Department ("NYPD") and

the Queens County District Attorney's Office ("QDAO") that were deliberately indifferent to the

liberty, fair trial and due process rights of criminal defendants.

<u>**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**</u>

5.      This action arises under 42 U.S.C. §§ 1983 and 1988.

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8.      This action has been commenced within the applicable period for each claim.

9.      Plaintiff has duly complied with all conditions precedent to the commencement of

this action.

<u>**THE PARTIES**</u>

10.     Plaintiff, RHIAN TAYLOR, is a citizen and resident of the State of New York

and the United States. He resides within the Eastern District of New York.

11.     Defendant JOSEPH BEY ("Bey"), was at all relevant times a detective employed

by the NYPD, acting within the scope of his authority and under color of State law. He is named

here in his individual and official capacities.

12.     Defendant THE CITY OF NEW YORK ("City"), of which the County of Queens

is a subdivision, is a municipal corporation of the State of New York and is a resident of the

Eastern District of New York. The QDAO and the NYPD are agencies of the City. The District

Attorney ("D.A."), assistant district attorneys ("ADAs"), and detective-investigators ("D.I.s")

employed by the QDAO, and police officers employed by the NYPD, are agents and employees

of Defendant City, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Murder

13.     On August 10, 2007, Darion Brown was hanging out with his friends, including Seprel Turner and Anthony Hilton, drinking alcohol and/or smoking marijuana, in Jamaica, Queens.

14.     An altercation occurred involving Brown and members of a local youth gang called "I.G.M." ("I Got Money"), and Brown was visibly nervous.

15.     Brown, Turner, Hilton, another friend named Wayne Peacock, and two girls then drove to the location of a house party they had heard about, at 221st Street and 133rd Avenue, in Laurelton, Queens.

16.     When they arrived, the house party had ended and numerous young people were still hanging out in the street.

17.     Shots rang out and Brown, seated in the driver's seat of his vehicle, was fatally wounded. He tried to drive away but lost consciousness and his car collided with a utility pole and came to a stop.

18.     Among the individuals who heard the shots were Rhian Taylor and several of his friends.

19.     They lived in the area and had attended the house party, which was a going-away celebration for one of their friends who was leaving for college.

20.     Plaintiff had been searched, like all the partygoers, upon his arrival at the party, and he was found to have no weapon.

3

21.     Upon hearing the shots fired, Taylor, his friends, and most of the other individuals in the area, including the additional occupants of Darion Brown's vehicle, fled to safety.

22.     Defendant Joseph Bey, a Queens homicide detective, was assigned the case.

23.     Police under Bey's direction gathered forensic evidence from the victim's car and the street, including shell casings, fingerprints, DNA, and other items, and they canvassed for witnesses.

24.     Plaintiff emerged as a suspect.

25.     Bey picked up for interrogation, and conducted identification procedures with, Turner and Hilton.

26.     Each of them identified Plaintiff as the shooter.

27.     Bey then arranged with Plaintiff to report to the 105th Precinct, where, on August 14, 2007, Bey arrested him for the murder.

28.     On April 18, 2008, Plaintiff was indicted by a grand jury sitting in the Supreme Court, Queens County, for second degree murder and possession of the murder weapon.

**The Trial Proceedings**

29.     Plaintiff's jury trial commenced on March 11, 2010, in the Supreme Court, Queens County.

30.     The prosecutor was Assistant District Attorney Karen Ross.

31.     She had been in the Office since 1998 and was highly experienced in handling murder and other serious prosecutions.

32.     The only evidence that Ms. Ross presented at trial that connected Plaintiff to the crime consisted of two witnesses—Turner and Hilton—and one piece of forensic evidence: a cigarette butt recovered by police near the shooting which contained Plaintiff's DNA.

33.     Since Plaintiff was present for the party, the cigarette butt was of little significance, and the trial turned on the reliability of Turner's and Hilton's identifications and the credibility of their testimony.

**Testimony of Anthony Hilton**

34.     Under direct examination by ADA Ross, Hilton testified he was a high school dropout and drug user.

35.     Hilton claimed that the shooting occurred as his friend Brown, seated in the driver's seat of his car, was flirting with and trying to pick up a girl hanging out in the street named Simone.

36.     Hilton testified he knew the girl and they were friends.

37.     Hilton testified he got out of the rear seat of the car, near where the girl was standing, and was admonishing Brown to stop flirting with the girl because she was like a cousin to Hilton.

38.     As Hilton directed Brown to stop speaking with the girl, Brown made fun of him as the girl's "kissing cousin" and continued to flirt with her.

39.     Hilton testified that Brown's "kissing cousins" comment caused tension in the nearby crowd.

40.     According to Hilton, he walked to the sidewalk, away from the car, to see if someone standing there whom he knew could help defuse the situation.

41.     As he was walking to the sidewalk, Hilton testified, he saw a heavyset, dark-skinned man suddenly fire four or five shots towards Brown from a distance of a few feet.

42.     Hilton identified Plaintiff, whom he observed in the courtroom, as the shooter.

43.     He claimed the shooter, like Plaintiff, was wearing glasses.

44.     Hilton testified that he fled, ran to Turner's house, and discussed with Turner what had happened.

45.     He testified that, minutes later, he returned to the scene, and saw Brown's car crashed into a utility pole down the block from the shooting.

46.     Although police were present, Hilton testified, he did not come forward then, or for the next week, because he did not want "police contact."

47.     Only after learning the police were looking for him did Hilton come forward to speak with police and identify Plaintiff as the shooter.

48.     Hilton acknowledged he had been convicted, as a youthful offender, of criminal possession of a weapon and had received a sentence of five years of probation.

49.     He further testified he had been convicted, as a youthful offender, for menacing another person with a gun and, as an adult, for disorderly conduct and criminal possession of stolen property.

50.     Hilton testified that, a week and a half before trial, he was in court for violating his probation on the gun possession matter.

51.     He testified that the only "promise" he received was that the District Attorney would ask the judge to leave him out on bail, but then the judge accepted his guilty plea and restored him to probation; he received no other "promise."

52.     Hilton testified that he had no other cases, and no other probation violation proceeding, pending.

53.     ADA Ross disclosed to the defense no additional impeachment information regarding Hilton.

54.     Plaintiff's defense counsel, in his cross-examination of Hilton, brought out that Hilton had never previously mentioned that the shooter wore glasses.

55.     He suggested that Hilton might have been the shooter himself.

56.     Hilton's DNA had been found in two specks of blood found by police on the side of the car where the shooting occurred.

57.     Neither Hilton nor the prosecution offered any explanation for the presence of his blood on the vehicle.

58.     Counsel elicited Hilton's admission that, after the shooting and before he came forward to talk with the police, he had gone over with Turner what had occurred.

59.     Hilton denied in his testimony that he had been drinking that night.

60.     He testified that he doubted that Turner had been drinking, although he claimed not to remember for certain about Turner.

61.     Counsel, through his questioning, tried to show that Hilton had received benefits that provided him a motive to falsely accuse Plaintiff.

62.     However, the only possible "benefit" Hilton acknowledged was the D.A.'s promise to ask the court for bail on Hilton's probation violation.

63.     Indeed, during argument to Plaintiff's trial judge and to the jury at the end of the trial, ADA Ross represented that her request had no impact on Hilton and had provided him no benefit.

64.     The reason, she contended, was that, following Hilton's plea, the judge restored him to probation anyway, so the issue of bail release became moot.

65.     Plaintiff's counsel also tried to impeach Hilton's character by questioning him on his gun possession and menacing convictions.

66.     However, Hilton now insisted he had been falsely convicted in both cases.

67.     He denied that he had possessed any gun when he was arrested for gun possession.

68.     He denied that in connection with that arrest he had admitted to the police that he had shot himself with it.

69.     As for his menacing with a gun conviction, he denied, contrary to his guilty plea, that he really had a gun, insisting he had merely "been talking with his hands."

**Testimony of Seprel Turner**

70.     The prosecution's second witness accusing Plaintiff was Seprel Turner.

71.     ADA Ross presented him as wholesomely as she could, eliciting his testimony that he was a hip-hop artist who had a contract with a record producer.

72.     She also had Turner explain that an apparent teardrop tattoo under his eye, potentially symbolic of violent and criminal activity, was really a music note, and that the other, numerous tattoos he had were related to music or religion.

73.     Turner admitted he was a drug user who had been smoking marijuana two to three times a day for the past three to four years, smoked earlier on the day of the shooting, and smoked several times on the day before he testified at trial.

74.     He acknowledged that, in 2009, he was arrested in Queens for possessing a loaded semi-automatic handgun.

75.     He also admitted that, following his release on that charge, he was arrested again, in Manhattan, for possessing a gravity knife and stolen property.

76.     Facing up to 15 years in prison for the gun possession, Turner testified, he entered into a cooperation agreement with the Queens County District Attorney.

77.    Under this agreement, Turner testified, in exchange for his trial testimony against Plaintiff, his felony charges would be dismissed and his sole conviction would be for a misdemeanor, with a sentence of three years of probation.

78.    ADA Ross made no other disclosure, either directly to defense counsel or through Turner's testimony, of any potentially impeaching information.

79.    Regarding the shooting, Turner testified that, just before it occurred, Hilton spoke with the girl Simone.

80.    When Hilton said they were like cousins, Brown asked if they were "kissing cousins."

81.    Unlike Hilton, who did not testify to any argument involving the shooter, Turner claimed that a dark-skinned, chubby man then walked to their car and began arguing with Hilton and Brown.

82.    Turner testified Hilton got out of the car, and then the shooting occurred.

83.    Like Hilton, Turner described the shooter as wearing glasses, a description that Detective Bey testified Turner had not mentioned in their initial interview.

84.    Turner admitted he fled from the scene after the shooting, met up with Hilton, then returned, but did not come forward to tell police he had seen the shooting because he did not want to be considered a "snitch."

85.    However, he claimed that, three days later, after speaking with Brown's family, he decided to voluntarily accompany the police to the precinct and do the right thing by telling them what he knew.

86.    Turner testified that he identified Plaintiff at a lineup conducted several days after the shooting, and he identified him again in the courtroom.

9

87.     During his cross-examination of Turner, Plaintiff's counsel contended that the lineup, and a photo array that preceded it, were suggestive.

88.     He tried to impeach Turner's credibility in a number of ways.

89.     First, he asked whether Turner had been drinking alcohol prior to his claimed observation of the shooting, but Turner flatly denied it.

90.     Second, he suggested that Turner was not really cooperative with police and the prosecution following the shooting.

91.     However, Turner denied this.

92.     Turner specifically denied any knowledge of unsuccessful efforts by police and prosecutors to gain his cooperation during grand jury proceedings.

93.     Third, counsel questioned Turner to elicit admissions of criminal activity undermining his general character, but Turner essentially admitted only his criminal convictions.

94.     Fourth, counsel questioned Turner about his motive to lie owing to his cooperation agreement, under which he was going to receive misdemeanor probation, instead of the maximum of 15 years in prison, for possessing a loaded firearm.

95.     Under that agreement, if Turner gave any untruthful testimony, failed to fully cooperate at all times, or committed any additional crime, the agreement could be voided and he would face a greater conviction and sentence.

**Summations and Verdict**

96.     During his summation, defense counsel argued that both Hilton and Turner, when they testified at trial, had a motive—the assistance they had received from the D.A.'s Office with respect to their pending cases—to falsely accuse Taylor.

97.     Counsel knew about, and referred only, to Turner's written cooperation agreement and Hilton's release after ADA Ross had requested that no bail be set.

98.     Defense counsel had no evidence from which to argue Hilton or Turner had any additional motive to lie, either at the time they initially were interviewed by police and first identified Plaintiff as the shooter, or at the trial.

99.     In response, with regard to Turner, ADA Ross argued, among other things, that the cooperation agreement provided him no motive to lie because Turner had cooperated with police well before his arrest and agreement.

100.    As for Hilton, ADA Ross argued he had received no benefit at all because the judge had independently decided to restore him to probation, and thus he had no reason to lie.

101.    She argued that both witnesses had testified against Plaintiff solely "to get the right person" and obtain justice for their deceased friend.

102.    She contended they had "nothing to gain by pinning this on somebody who didn't do it."

103.    During deliberations, the jury asked to see the benefits received by both witnesses.

104.    However, the judge gave them only Turner's written cooperation agreement.

105.    The judge informed the jury that Turner's written cooperation agreement was the only evidence of benefits.

106.    On March 29, 2010, after one week of deliberations, Plaintiff was convicted of all charges against him.

107.    Plaintiff was sentenced to serve 20 years to life in prison and was sent upstate to serve his sentence.

108.　　On October 27, 2015, the New York State Court of Appeals reversed Plaintiff's murder conviction and his sentence for violation of his right to a fair trial.

109.　　The Court concluded that the judge had provided the jury a misleading response to the jury's inquiry about benefits because it omitted Hilton's testimony about ADA Ross's appearance on his behalf at the probation violation proceeding.

110.　　The Court reasoned that this omission prejudiced Plaintiff's defense because it undercut his counsel's argument that Hilton had a motive to lie.

111.　　After he was returned to New York City to face retrial, Taylor was remanded to Rikers Island in lieu of bail.

112.　　ADA Ross contended that his conviction at the first trial demonstrated the likelihood he would be convicted again and opposed his bail release.

113.　　In or about December 2016, Plaintiff moved for his bail to be reduced.

114.　　ADA Ross opposed this.

115.　　The court then heard argument about the various factors, listed in the Criminal Procedure Law, relevant to determining bail.

116.　　One of those factors was the strength or weakness of the prosecution's evidence.

117.　　The court then fixed a bail condition under which Plaintiff would be released upon his deposit of $75,000 cash bail.

118.　　On or about December 21, 2016, Plaintiff was released after family members and friends posted the bail.

119.　　At Plaintiff's second trial, Turner was the only witness to testify in court that Plaintiff had committed the murder.

120.     Hilton had been murdered after the first trial and his testimony from that trial was read to the jury at the second trial.

121.     On January 31, 2017, Plaintiff was fully acquitted.

122.     In all, Plaintiff spent more than two years in custody on the murder charge before his first trial, five years and nine months in prison on his conviction, and approximately one year in jail awaiting his second trial.

### Damages and Injuries

123.     Plaintiff's injuries and damages include, but are not limited to, his:

   a.   His wrongful conviction for murder and possession of the murder weapon;

   b.   Nearly nine years in jail or prison;

   c.   Loss of the services, society, companionship, and consortium of his family and friends;

   d.   Past and future mental and emotional suffering; and

   e.   Legal fees and expenses paid and/or owed to private attorneys for his first trial, direct appeal, and retrial, of approximately $200,000.

### FIRST CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth and Fourteenth Amendments by Defendant Bey)**

124.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 123 of this Complaint.

125.     At all relevant times, Plaintiff had a clearly-established right, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, *Brady v. Maryland*, 363 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), to timely disclosure of all

material information that tended to show his innocence or that impeached the credibility of the prosecution's witnesses against him.

126.    While the defense, at trial, knew that Hilton and Turner had not previously mentioned that the shooter wore glasses, it did not know that both Hilton and Turner had affirmatively told Defendant Bey, during their initial interviews shortly after the shooting, that the shooter was *not* wearing glasses.

127.    In addition, they had told Bey the shooter was clean shaven.

128.    When Bey arrested Taylor three days after the shooting, he learned that Taylor regularly wore corrective glasses and observed that he had a mustache and a goatee.

129.    Bey thus knew that Hilton and Turner had provided descriptions of the shooter that were inconsistent with Plaintiff's appearance and their identifications of him as the shooter and thus were exculpatory of him.

130.    Nevertheless, Bey omitted these descriptions and their inconsistency with Plaintiff's appearance from his reports and other paperwork.

131.    Additionally, he failed to ever inform the D.A.'s Office of the information.

132.    As a result of Bey's failure to disclose the exculpatory information about the shooter's appearance in his sole possession, the information was never disclosed to the defense at any time prior to or during Plaintiff's trial (and his retrial).

133.    Bey also omitted from his reports, and failed to disclose to ADA Ross, his knowledge that Turner had lied to him when he denied to Bey that he could get in contact with Hilton.

134.    Further, Bey, knowing that Darion Brown had been involved in a gang dispute and was nervous about it on the night of his shooting, was aware that Turner was reputedly a

leader of a violent youth gang, but failed to find out the information about Turner's gang-related activities that was known to the NYPD and to disclose such information to the D.A.'s Office.

135.    Such information supported a potential defense that the shooting of Brown was the result of gang-related activity unconnected to Plaintiff and would have further impeached Turner's trial testimony.

136.    The information that Bey withheld from the prosecution, and thus from the defense, was favorable to the defense.

137.    It was material to the outcome of the trial at which Plaintiff was convicted.

138.    Accordingly, Bey had a constitutional obligation to promptly disclose such information to the prosecutor.

139.    In withholding the aforementioned information favorable to Plaintiff, Bey acted deliberately, intentionally, willfully, recklessly, negligently and/or with deliberate indifference to Plaintiff's constitutional right to due process and a fair trial or to the effect of such misconduct upon Plaintiff's constitutional rights.

140.    But for Bey's withholding of information favorable to Plaintiff, there is a reasonable likelihood that Plaintiff would have been acquitted at his first trial and released from custody on the murder charge.

141.    Bey's actions in withholding the favorable information was a foreseeable, substantial, and proximate cause of Plaintiff's conviction and subsequent deprivation of liberty.

142.    By virtue of the foregoing, Bey is liable to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

## SECOND CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Liberty, Due Process, and a Fair Trial Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments by Defendant Bey Through His Manufacturing of False or Misleading 'Evidence' and Suppression of Exculpatory Evidence)**

143.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 141 of this Complaint.

144.    An individual has a constitutional right, pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution, not to be deprived of his liberty based upon the deliberate preparation by a police officer and handing to a prosecutor of false or misleading evidence that would be reasonably likely to convince a jury of the individual's guilt, where such actions actually result in the individual's deprivation of liberty.

145.    In addition, a criminal defendant has an analogous right, arising from the same provisions of the Constitution, to prompt disclosure by a police officer or detective, to the prosecutor, of exculpatory or other information that so undercuts the basis for the defendant's prosecution that it is likely to, or may, result in his release from custody.

146.    Such information must be disclosed, among other reasons, because it would correct the false or misleading impression from other evidence that the police have provided to the prosecutor, or which the prosecutor has provided to the grand jury or to the court, regarding the strength of the prosecution's case.

147.    The strength of the prosecution's case is not only material to a determination whether to initiate and continue a defendant's prosecution, but also to a grand jury's discretionary determination whether to approve an indictment and to a court's determination

16

pursuant to the Eighth and Fourteenth Amendments and state law whether to release the defendant from custody, pending trial, on a reasonable bail.

148.    In Plaintiff's case, the assigned case detective, Defendant Bey prepared police reports that he knew, or should have known, were false or misleading with respect to Plaintiff's alleged responsibility for the murder of Darion Brown because they omitted information, known to Bey, tending to show that Plaintiff was innocent and/or that his accusers were unworthy of belief.

149.    More specifically, Bey prepared reports documenting his interviews of Turner and Hilton, and the identification proceedings he had conducted at which Turner and Hilton identified Plaintiff as the shooter, without including that Turner and Hilton had provided a detailed description of the shooter that ruled out Plaintiff as the guilty party.

150.    Further, Bey omitted from his reports that, rather than having independently accused and identified Plaintiff as the shooter, Turner and Hilton had discussed with each other what had occurred and Turner, after falsely denying he knew where to find Hilton, had then brought Hilton to Bey to be interviewed.

151.    Bey handed his documentation of his investigation to prosecutors knowing and intending that such documentation would be relied upon by prosecutors in deciding whether to initiate and continue a prosecution of Plaintiff for the murder, by a grand jury considering whether to indict Plaintiff, and by a court in deciding whether to release Plaintiff on bail.

152.    Bey knew that the documentation he handed to prosecutors was likely to convince reasonable jurors to convict Plaintiff of the murder.

153.    While handing to prosecutors false or misleading documentation of his investigation, Bey at the same time failed to disclose to them his knowledge of evidence tending to show Plaintiff was innocent and that his accusers were unreliable and not credible.

154.    Bey did so even though he knew that the decision the District Attorney's Office had to make whether to proceed with an indictment was a difficult one.

155.    Specifically, Bey knew the decision was difficult because (a) Hilton and Turner had refused to respond to grand jury subpoenas and Hilton only testified under the compulsion of a material witness proceeding; (b) Hilton had told the court during the material witness proceeding that he had been intoxicated and had not seen the shooting; (c) Hilton and Turner had criminal histories; and (d) three friends of Plaintiff had told the prosecutor during interviews that, at the time of the incident, Plaintiff was with them and had not been involved in the shooting.

156.    Especially in light of the weakness in the case against Plaintiff and the evidence the District Attorney already knew about supportive of his innocence, Bey's preparation of false or misleading reports and other documentation, as well as his knowledge of exculpatory and impeachment evidence that was unknown to the prosecutor, was highly significant to the prosecutor's decision whether to prosecute, the grand jury's decision whether to indict, and to the court's decisions, prior to each trial, whether to grant Taylor pretrial release on a reasonable bail.

157.    Bey's aforementioned actions and inactions were a substantial cause of Plaintiff's prosecution, detention without bail before Plaintiff's first trial, indictment by a grand jury, conviction, state imprisonment, and detention without bail before his second trial.

158.    In engaging in the aforementioned actions, Bey acted deliberately, intentionally, willfully, recklessly, and/or with deliberate indifference to the effect of his actions upon Plaintiff's constitutional rights.

159.    By virtue of the foregoing, Bey is liable to Plaintiff, pursuant to 42 U.S.C. §§

1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in

bringing this action.

## THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983/*Monell*; Claim Against Defendant THE
CITY OF NEW YORK for the Deliberate Indifference of the
New York City Police Department to the Constitutional Rights
of Criminal Defendants Under the Fourth, Fifth, Sixth, Eighth
and Fourteenth Amendments)**

160.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 138, 140 through 142, and 144 through 157 of this Complaint.

161.    The foregoing violations of Plaintiff's federal constitutional rights and injuries

were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable

to Defendant City, amounting to deliberate indifference to the constitutional rights of persons,

including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities by

the New York City Police Department.

162.    Prior to Plaintiff's arrest, policymaking officials at the NYPD implemented no or

plainly inadequate policies, procedures, regulations, practices, customs, training, supervision,

and discipline concerning the continuing duty of police officers and investigators to preserve and

to make timely disclosure to the District Attorney's Office, during criminal investigations and

prosecutions, of all material evidence or information ("*Brady* material") favorable to a person

suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of

innocence as well as evidence affecting the credibility of prosecution witnesses, and to refrain from making reports that, because they omitted such information, were false or misleading.[1]

163.    As a result, many detectives were unaware they had any obligation to make a record of or to otherwise inform prosecutors of information that was favorable to the criminal suspect or defendant.

164.    In addition, the New York City Police Commissioner, as well as his delegates, did not discipline police officers found to have been responsible for the violation of criminal suspects' or defendants' right to disclosure of favorable evidence and not to be prosecuted based upon false or misleading evidence.

165.    Police officers thus understood that there would be no adverse consequence to them if they withheld such information from prosecutors.

166.    At the same time, the NYPD put substantial pressure on detectives to close cases by developing probable cause and making arrests.

167.    As a result, prosecutors would not be informed of evidence favorable to a suspect or defendant that was known to police and thus would be unable to comply with their own constitutional obligation to disclose such material to the defense in time to be used at bail hearings, in the grand jury, and at trial.

---

[1] Undersigned counsel for Plaintiff has obtained deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, establishing that, prior to and during the time period of Plaintiff's arrest and prosecution, the NYPD provided no or plainly inadequate *Brady*-related training, no or plainly inadequate training concerning making a record of information that was favorable to a criminal suspect or defendant, had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material, and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

168.    They also would be misled into relying on evidence provided to them by police that was false or misleading.

169.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for Defendant THE CITY OF NEW YORK, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

    a.    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.    that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

    c.    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

170.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

    a.    credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence;

    b.    civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had withheld material evidence;

    c.    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady*;

    d.    judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt

adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

e.     formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

f.     the inherent obviousness of the need to train, supervise and discipline police officers regarding such obligations to counteract the pressure on and incentive of officers to close cases by making arrests and winning convictions.

171.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation and continuation of criminal prosecutions, the documentation of information obtained during investigations, and the disclosure to prosecutors of *Brady* material.

172.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

173.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices,

training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

174.     The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in causing Defendant Bey to prepare and hand to prosecutors false or misleading documentation of his investigation, to withhold information favorable to Plaintiff from the prosecutors, and to thereby cause Plaintiff to be deprived of his liberty.

175.     By virtue of the foregoing, the City is liable, to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

<u>**FOURTH CAUSE OF ACTION**</u>

(*Monell*/**42 U.S.C. § 1983 Claim Against Defendant THE CITY OF NEW YORK for Queens District Attorney's Policy of Deliberate Indifference to Fair Trial Violations**)

176.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 123 as if fully set forth herein.

177.     At all times relevant to this Amended Complaint, Plaintiff had a federal constitutional right, pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments, to disclosure by the District Attorney's Office of all exculpatory and impeachment evidence and information which, considered in its totality, was likely to influence whether Plaintiff would be convicted at trial and thereafter deprived of his liberty.

178.     Under this requirement, known as the *Brady* rule, the assigned prosecutor of Plaintiff had an absolute responsibility to obtain and to disclose to the defense all such

information and evidence in the possession, custody, control or knowledge of the NYPD and of

the District Attorney's Office and to disclose it to Plaintiff's attorney sufficiently in advance of

trial so that he could adequately investigate it and utilize it at trial in his client's defense.

179.    There was a mountain of exculpatory and impeachment evidence, known to or in

the custody, possession or control of the Queens D.A.'s Office or the NYPD, that ADA Ross and

the D.A.'s Office failed to disclose to Plaintiff or his attorney for use at his first trial.

180.    Constitutional provisions guaranteeing Plaintiff due process and a fair trial also

prohibited from knowingly introducing, or failing to correct, false testimony, and from making

factual argument to the jury that she knew, or should have known, was false or misleading.

181.    ADA Ross violated these provisions as well.

182.    To begin with, ADA Ross had an absolute obligation to find out whatever

exculpatory or impeachment evidence was in the possession of detectives involved in the

investigation of the homicide in this case, including most clearly the assigned homicide

detective, Defendant Bey, and to disclose the same to the defense.

183.     However, due to her deliberate indifference to this obligation, Ross failed to

closely question Bey about and to find out the information favorable to the defense summarized

in paragraphs 126 to 129 and 133 to 134, *supra,* and failed to disclose such evidence to the

defense.

**Ross Fails to Disclose Additional *Brady* Material Regarding Turner**

184.    Ross also failed to disclose that, when Bey first picked up Turner and interrogated

him, Turner had a criminal history which provided him reason to be in fear of the police and to

provide information that would help them identify and arrest a suspect regardless of whether

such information was true.

185.    While falsely presenting Turner as a fully cooperating witness who wanted to obtain justice for his deceased friend and his family, Ross did not disclose that, after his initial interrogation by police, and assistance to them in finding Hilton, Turner refused to cooperate any further.

186.    She failed to disclose that Detective Bey made approximately 15 trips to Turner's home to subpoena him to the grand jury and left word for Turner with his family.

187.    She failed to disclose that Turner's mother had spoken with her son and then told Bey that her son would not cooperate.

188.    Ross knew this evidence contradicted Turner's false testimony at trial denying any knowledge of efforts by the prosecution to find him so that he could testify in the grand jury, yet she failed to either correct Turner's false testimony or disclose the evidence that disproved it.

189.    The evidence Ross withheld also contradicted Ross's false argument to the jury that he cooperated throughout the prosecution to avenge the murder of his supposed friend.

190.    Ross also did not disclose that, due to Turner's failure to comply with subpoenas or otherwise cooperate, she had to obtain a material witness warrant authorizing Turner's arrest so that he would be compelled to testify in the grand jury.

191.    She failed to disclose that, because Turner continued to refuse to respond to Bey's efforts to find him, he did not testify in the grand jury.

192.    The material witness warrant application detailed Turner's pattern of failure to cooperate and contradicted his trial testimony that he cooperated with the authorities to obtain justice for his friend.

193.    Nevertheless, Ross did not disclose to Plaintiff the warrant or the application for the warrant.

194.     Ross also did not disclose that, following Plaintiff's grand jury indictment, Turner continued to fail to cooperate with her.

195.     Ross failed to disclose that Turner refused to comply with a trial subpoena, which caused her to obtain still another material witness warrant dated November 24, 2009.

196.     This warrant application quoted Turner's mother as saying that her son would not cooperate and recounted the full history of Turner's failure to respond to subpoenas and other efforts to obtain his cooperation.

197.     Ross did not disclose that it was only following Turner's arrest for felony gun possession, and his refusal to testify unless the charges were reduced to a misdemeanor and he escaped a prison sentence, that Turner became willing for the first time to testify against Plaintiff.

198.     Ross did not disclose her knowledge, obtained from the NYPD, that Turner headed a notorious street gang, known as the "Snow Gang," and a predecessor gang, which operated in the same general neighborhood where the shooting occurred and which was involved in murders, drug dealing and prostitution.

199.     The evidence of Turner's gang involvement would have permitted the defense to investigate, and to present evidence, that the Brown shooting was gang-related and had nothing to do with Plaintiff.

200.     Turner's leadership of a violent, drug-dealing youth gang also would have been relevant to his general credibility and, because of his vulnerability to prosecution, would have given him a motive to testify in favor of the District Attorney to insulate himself from investigation or prosecution.

201.    Furthermore, since Turner's cooperation agreement required him to disclose all his involvement in criminal activity and not to commit any future crimes, disclosure of his ongoing involvement in gang-related criminal activities would have opened him up to cross-examination concerning whether he had been fully forthcoming with the District Attorney and whether the Office had knowingly overlooked his criminal activity, another benefit.

202.    Rather than investigate Turner's gang involvement, which Ross had learned about from the NYPD, Ross, by her own admission, did nothing more than ask Turner whether the gang allegation was true and, predictably, he denied it.

203.    This denial, since it was false, was a violation of Turner's cooperation agreement, but Ross did nothing to enforce the agreement against Turner.

204.    Finally, Ross failed to disclose Hilton's statement, before Plaintiff was indicted, that he and his friends (including Turner) were intoxicated at the time of the shooting, which contradicted Turner's false denial at trial that he had any alcohol to drink that night.

**Ross Fails to Disclose *Brady* Material Regarding Hilton**

205.    As for Hilton, Ross falsely argued at trial that he had received no benefits related to his testimony and, like Turner, was motivated solely to obtain justice for his deceased friend.

206.    However, Ross did not disclose that, at the time he finally met with Bey and identified Taylor as the shooter, Hilton was being prosecuted by the Queens D.A.'s Office for possession of a stolen automobile.

207.    This provided Hilton with an interest in ingratiating himself with law enforcement authorities when they initially were looking for him.

208.    Ross failed to disclose that, contrary to her argument at trial and Hilton's testimony that he cooperated with the authorities to bring the killer of his friend to justice, Hilton, following his initial meeting with police, refused to cooperate with them any further.

209.    He failed to appear in court in his own case, bench warrants for his arrest were issued, and he faced prosecution for bail jumping.

210.    When served personally with a subpoena by Bey, he rejected the subpoena and told Bey he would not cooperate with the NYPD or the D.A.'s Office in connection with the shooting with which Plaintiff was charged.

211.    As with Turner, Ross secretly applied for, and obtained, a warrant for Hilton's arrest as a material witness.

212.    The warrant application outlined his failure to comply with compulsory subpoenas for his testimony.

213.    Ross secretly arranged for the assigned homicide case detective, Defendant Bey, to arrest Hilton and bring him before a Supreme Court justice to be arraigned on the material witness warrant.

214.    Ross did not ever disclose to the defense Hilton's refusal to cooperate, the bench warrants, the material witness application and order, Bey's arrest of Hilton, and the extraordinary events that then occurred in court on the material witness warrant.

215.    In front of the justice presiding at the material witness proceeding, Hilton stated, on the record, that he and his friends, presumably including Seprel Turner, had been "intoxicated" at the time of the shooting.

216.    This statement directly contradicted his later testimony at trial, and Turner's, that they had not been drinking before the shooting.

217.    Hilton also stated at the material witness hearing that he had only "heard" what happened.

218.    This contradicted his statements to Bey, as well as his grand jury and later trial testimony, that he had *seen* the shooting and that Plaintiff had committed it.

219.    Hilton then told the judge that, in defiance of the material witness warrant and of the court itself, he would not testify.

220.    The judge then ordered him to be detained in jail on $25,000 bail.

221.    Hilton changed his mind and, to avoid being incarcerated at Rikers Island, agreed to go into the District Attorney's "custody" and testify before the grand jury.

222.    This meant that, when he testified later the same day, he did so as a *prisoner* of the D.A.'s Office.

223.    This circumstance obviously affected the voluntariness, and the reliability, of his testimony accusing Plaintiff, and his motive to lie to win his own freedom.

224.    Even after telling the judge that he would cooperate, Hilton stated, again on the record, that he still had "doubts in [his] head."

225.    Both ADA Ross and another ADA who worked on Plaintiff's prosecution, Robert Ciesla, were present for and personally witnessed Hilton's statements and behavior during the material witness proceeding.

226.    However, Ross chose not to order the transcript of the proceeding and never disclosed any of the above events to the defense.

227.    Not only did Ross never disclose to the defense that Hilton had a grand larceny case pending at the time he first spoke with police and at the time he testified before the grand

jury, and that he had jumped bail on that case, but also never disclosed that, after Hilton finally testified, her Office dismissed his larceny case and never prosecuted him for bail jumping.

228.    As noted above, Hilton, under cross-examination at Plaintiff's trial, denied that he had possessed a gun prior to his arrest on January 8, 2008, denied that he had admitted possession to a detective, and denied that he had possessed a gun during a second arrest, where he was charged with menacing a store owner with such a weapon.

229.    All this testimony was false and Ross knew it or should have known it.

230.    Ross had a duty to correct such false testimony, but she unlawfully failed to do so.

231.    Regarding the gun possession case, the arresting officer's sworn grand jury and trial testimony, police reports, and statements by other prosecutors in Ross's Office disproved Hilton's trial testimony.

232.    This undisclosed evidence proved that Hilton had possessed a gun, shot himself in the foot with it, lied to police that some stranger had shot him, and then admitted to a police detective and to a friend that he had shot himself by accident.

233.    These aforementioned documents were in the case file of the D.A.'s Office.

234.    Ross was required by binding decisions of the United States Supreme Court to know about and to disclose such impeachment information to the defense.

235.    Yet, according to her own testimony, she never reviewed her Office's case file on Hilton, and thus did not obtain or disclose the evidence contradicting Hilton's false testimony and did not correct that false testimony.

236.    The Hilton gun possession case file also contained police documents showing that, when Hilton was arrested by police for the gun possession, the person he called to assist him was Turner.

237.    This was further evidence showing the closeness of their relationship and mutual trust in matters of criminal behavior, but Ross failed to disclose it to Plaintiff or his attorney.

238.    Ross also failed to disclose additional information in her Office's Hilton gun possession file showing that Hilton refused to cooperate with the police in the latter's investigation of Hilton's own shooting.

239.    Ross failed to disclose that, according to documents in the Office's case file, before shooting himself in the foot with his own gun, Hilton was wearing a protective boot because he previously had been shot in the foot.

240.    Regarding the menacing case, Hilton testified falsely at Plaintiff's trial that he had not possessed and menaced anyone with a gun, but that he merely "talk[ed] with [his] hands" and the person who called the police "assumed I had a gun."

241.    However, the District Attorney's own case file for that case noted that store surveillance video showed that Hilton had approached the complainant and pulled out a silver handgun.

242.    The case file was available to Ross but she did not  review its contents and did not disclose this evidence, contradicting Hilton's false testimony, to Plaintiff, or correct Hilton's false testimony.

243.    Ross further failed to disclose her knowledge that, in October 2009, Hilton was involved in still a third shooting.

244.    Hilton's involvement in three shootings, two unknown to Plaintiff's counsel, suggested access to guns, possible involvement in gang-related violence, and a violent proclivity that Plaintiff's attorney, suspecting that Hilton was the real shooter in Plaintiff's case, would have investigated and made use of at trial.

245.    While falsely portraying Hilton as a cooperative witness, Ross further failed to reveal to Plaintiff that, on February 18, 2010, a little more than one week before Plaintiff's trial began, Ross applied for and obtained still another material witness warrant that authorized Hilton's arrest.

246.    The warrant application, which Ross did not disclose, stated that Hilton *fled* from his probation officer when he learned that a detective from the D.A.'s Office was present to secure his cooperation and testimony.

247.    Thereafter, Hilton's probation officer sought Hilton's arrest for violating his probation.

248.    He apparently had been asked to do so by the D.A.'s Office because it needed Hilton as a witness in Plaintiff's upcoming trial but Hilton had been evading it.

249.    Ross did not disclose this either.

250.    On February 25, 2010, shortly before Plaintiff's trial, after being picked up on his probation violation, Hilton finally met with Ross.

251.    After he agreed to appear in court and testify, Ross had a detective-investigator from her Office contact the probation department to request that Hilton be released on his probation violation so that he would be available to appear in court and testify.

252.    Ross never disclosed this action to the defense.

253.    Ross personally appeared at Hilton's probation violation hearing later that day, spoke with the court and the probation department, and caused the court to restore Hilton to probation even though he had repeatedly violated the conditions of his release on probation.

254.    Before restoring Hilton to probation, the court asked Ross if such a result would be okay with her and she *agreed* to that disposition.

255.    Instead of disclosing all these events to the defense in Plaintiff's case, Ross falsely denied at Plaintiff's trial that she had any role in helping Hilton avoid incarceration for violating his probation.

256.    She made no disclosure of his history of defying subpoenas and other efforts to obtain his cooperation with her Office and in-court testimony.

257.    Ross also failed to disclose that, on that same day that she appeared in court with him on his probation violation, she appeared in court with him and assisted him on still another case.

258.    Hilton had failed to perform court-ordered community service, which was part of his sentence in this case.

259.    However, after he agreed to testify for Ross at Plaintiff's trial, she appeared in court and caused the judge to resentence him to time served.

260.    Ross also failed to disclose that, during Plaintiff's trial, Hilton got in trouble with the probation department for providing an invalid address and failing to report for supervision.

261.    She failed to disclose that she had an investigator with her office contact the probation department on Hilton's behalf to resolve this problem.

262.    This event also contradicted, or rendered misleading, Hilton's testimony, which Ross did not correct, that he had no case or probation violation pending at the time he testified at the trial.

263.    Ross failed to disclose that, on March 23, 2010, while Plaintiff's jury was deliberating, Ross, having falsely argued Hilton was receiving no benefits in exchange for his testimony and having elicited his testimony he had no probation violation pending, appeared at

still another of his probation violation hearings and informed the judge that Hilton had been

having trouble reporting to probation and that she had taken steps to help him.

264.    As a result, the judge restored Hilton to probation and released him from custody,

acting against the recommendation of the Department of Probation, which requested that Hilton

be remanded and resentenced.

265.    On April 22, 2010, Hilton appeared in court once more on additional probation

violations and, owing to ADA Ross's intervention on Hilton's behalf, the court resentenced

Hilton to time served and terminated his probation.

266.    ADA Ross's conduct in the murder prosecution of Nathaniel Newson and several

co-defendants, during the same approximate period that Plaintiff was prosecuted by her, shows

that her failure to obtain and/or to disclose evidence under *Brady* in Plaintiff's case was no

accident..

267.    Nathaniel Newson, Trevor Bowen, Lance Hamilton, and William Trotty were

arrested and indicted in August 2010, for the murder of Damian Champbell.

268.    These defendants told the authorities that another individual, Shamiek Corbett,

committed this murder.

269.    Unbeknownst to these defendants, a ballistics analysis of shell casings recovered

from the crime scene matched shell casings recovered from two other homicides for which

Corbett was being prosecuted, one of which had occurred a mere two days prior to the

Champbell murder.

270.    Ross was the prosecutor assigned to try the Newson case and knew of the defense

position that Corbett had committed the murder.

271.    She also was assigned the Corbett prosecution and thus was responsible for obtaining all the police reports and documentation in connection with that matter.

272.    Thus, she knew, or should have known, about the ballistics analysis linking Corbett to the weapon used to kill Champbell and directly supporting the defense in the Newson case that Corbett was the shooter.

273.    Ross's failure to disclose the ballistics analysis until after jury selection had started, nearly five years after the report had been prepared, caused the court to declare a mistrial due to this *Brady* violation.

274.    Thereafter, during Fall 2015, when the Newson defendants' retrial was being conducted, Ross did not disclose until the retrial was underway a police property voucher indicating that police officers had found in Corbett's possession, a mere nine hours after Champbell's homicide, a cellphone belonging to Champbell.

275.    This document, also nearly five years old, even more strongly linked Corbett to the Champbell homicide that Newson and his co-defendants were accused of.

276.    Ross also did not disclose until the trial was underway a surveillance video from the night of the shooting showing that the sole alleged eyewitness, who had testified that she had observed the shooting from the location depicted in the video, was not at that location until *after* the shooting had already occurred.

277.    On or about December 10, 2015, Newson and his co-defendants were acquitted.

278.    As a result of Ross's failure to make timely disclosure of the above, extraordinarily powerful exculpatory evidence, the acquittal did not occur until these defendants had spent more than five years at Rikers Island awaiting trial.

279.    The aforementioned conduct of ADA Ross in failing to timely disclose information favorable to the defense prior to or during Plaintiff's trial, in introducing and failing to correct false or misleading testimony by her witnesses, and in making false and misleading arguments during the trial to the court and the jury, violated Plaintiff's constitutional rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

280.    The foregoing violations of Plaintiff's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant THE CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the Queens County District Attorney's Office, namely:

a.    The institution and implementation by the District Attorney of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

i.    The duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

ii.    The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

iii.    The continuing obligation to timely and fully disclose material, in the possession, custody or control of the District Attorney's Office or of the police, that is favorable to the defense within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 450 U.S. 150 (1972), and their progeny; and

b.    The District Attorney's deliberate indifference to the need, and his failure, to adequately instruct, train, supervise, and/or discipline his employees with respect to such matters.

281.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise and/or discipline

employees with regard thereto, were implemented or tolerated by policymaking officials for

Defendant City, including, but not limited to, the District Attorney of Queens County and his

delegates, who knew:

    a.    To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.    That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

    c.    That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and

    d.    That employees of the QDAO had a history of making wrong choices in such matters.

282.    The aforementioned policymaking officials had the knowledge and the notice

alleged in the preceding paragraph, based upon:

    a.    Numerous credible allegations, many substantiated by judicial decisions (some of which are listed in Exhibit A hereto and incorporated by reference) that Queens County ADAs had:

        i.    Participated in the manufacturing of false testimony or evidence, including identification evidence;

        ii.    Presented or failed to correct false or misleading testimony and argument;

        iii.    Failed to disclose at all, or on a timely basis, information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York;

        iv.    Made arguments at trial that were so false, misleading, inflammatory, or otherwise improper that they deprived the defendant of due process and a fair trial; and

    b.    The inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the

pressure that the Queens County District Attorney applied to prosecutors to obtain convictions.

283.    At the time of Plaintiff's trial, the Queens County District Attorney's indifference to the aforementioned types of prosecutorial misconduct was evidenced by his failure to conduct internal disciplinary investigations, or to discipline, the prosecutors who were known to engage in it, including but not limited to the prosecutors responsible for the misconduct found in the judicial decisions listed in Exhibit A, or to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees.

284.    Instead of disciplining such prosecutors, the District Attorney's policy, custom or practice was to give them raises, promotions, positive evaluations, and commendations, based in part on their record of winning at trial and their productivity in trying a lot of cases and extracting guilty pleas even in weak cases.

285.    The Office used evaluation forms, approved by the District Attorney or his Chief Assistant, with which bureau chiefs and other supervisors rated prosecutors in numerous categories of performance, but which nowhere asked for comment on their respect for or compliance with the due process or fair trial rights of criminal defendants.

286.    Every one of these evaluation forms were reviewed by John Ryan, the chief assistant to District Attorney Brown, and usually by Division chiefs, for purposes of determining raises, bonuses, and promotions.

287.    The district attorney delegated to Ryan and division chiefs the task of reviewing evaluations and recommending raises, bonuses, and promotions and almost always approved their recommendations.

288.    The evaluations were shown to the prosecutors who were evaluated in part for the purpose of communicating to them how successful they were being in implementing the goals of the Office and the types of behavior the Office approved of and wished to encourage.

289.    The completed evaluation forms would not reference court findings of misconduct or complaints by criminal defendants or their attorneys, no matter how egregious the misconduct.

290.    Thus, the message to the prosecutors was that the Office only cared about how aggressive and successful they were in processing and winning cases, not whether, in doing so, they violated the constitutional rights of the individuals they were prosecuting.

291.    The Office kept no records of negative court decisions or of complaints against individual prosecutors so that it could identify prosecutors who repeatedly were the subject of such decisions or complaints and who required greater training, supervision or discipline.

292.    Thus, when a court found that a prosecutor had committed misconduct, it had no data base or records from which to determine whether the same prosecutor had a history of engaging in similar or other misconduct.

293.    The Office kept no record of, and did not investigate, the failure of bureau chiefs and other supervisors to properly supervise staff attorneys to ensure that they complied with the due process and fair trial rights of criminal defendants.

294.    Although supervisors were supposed to monitor members of their bureau closely enough to ensure that constitutional violations did not occur, executives in the office would not follow up with supervisors to find out why *Brady* violations, summation, or other misconduct found by a court had been allowed or able to occur.

295.     Prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning but would suffer no negative consequence in the unlikely event their misconduct was exposed.

296.     Further encouraging prosecutors to win at any cost was their knowledge that the QDAO had no employee handbook or other published procedure for disciplining prosecutors who violated rules of behavior for criminal prosecutions, even though they had handbooks setting forth rules and disciplinary procedures in other areas, such as use of computers and equal employment opportunity rights.

297.     Policymakers at the Office failed to discipline misconduct affecting defendants' rights, no matter how egregious, despite being aware of and agreeing with the principle that the failure to discipline even one instance of unethical behavior can poison the atmosphere in the while office.

298.     In addition to turning a blind eye to known violations of *Brady* and other fair trial obligations, the Queens County District Attorney followed a policy, custom or practice of encouraging prosecutors to consciously avoid, or be deliberately indifferent to, obtaining personal possession or actual knowledge of *Brady* material, including evidence of innocence, witness benefits, prior inconsistent statements by witnesses, prior criminal or dishonest activities by witnesses, evidence of such witnesses' motives to lie, and other impeachment material, and was deliberately indifferent to whether prosecutors discovered and disclosed such information.

299.     The Office had no policy under which prosecutors were required to make a record of evidence that potentially favored the defense under *Brady*, such as threats, coercion, or promises of benefits to cause witnesses to provide testimony, and affirmatively discouraged

prosecutors from taking notes of interviews with witnesses, thereby making no record of potentially inconsistent statements.

300.    Policymakers were aware that, in a majority of serious felony cases, the trial prosecutor was a different individual than the prosecutors who initially "rode" the case at the police precinct, conducted intake, presented the case to the grand jury, or handled pretrial hearings and other matters.

301.    They were aware that trials often did not occur until several years after the initial arrest or indictment.

302.    The Office had no policy, practice or protocol under which trial prosecutors were required to thoroughly interview previous prosecutors and detectives involved in the case, and to review other records of the Office, to find out whether exculpatory or impeachment information existed.

303.    The Office had no policy, practice or protocol requiring trial prosecutors to review case files of the Office likely to contain incriminatory information concerning its trial witnesses whom the office had prosecuted or was prosecuting, including prior statements of witnesses and evidence of the witnesses' criminal or dishonest conduct, even though such information, being in the Office's possession, had to be disclosed to the defense.

304.    The Office had no information management system under which exculpatory or impeachment information relating to its witnesses would be saved and made accessible to trial prosecutors using such witnesses.

305.    Policymakers knew or should have known that, in the absence of note-taking and other records, any information management system, any requirement that trial prosecutors interview all personnel who handled the case previously, and any requirement that they review

case files of witnesses, there was a high likelihood that exculpatory or impeachment information would not be disclosed under *Brady.*

306.    The Office trained prosecutors that in most cases they could get away with disclosing *Brady* material at the last minute, even during trial, because courts were loath to declare mistrials or overturn convictions due to late disclosure.

307.    The Office had no written or clear policy concerning disclosure of *Brady* material at arraignment, during the grand jury process, or for consideration by the court during bail hearings.

308.    Indeed, the Office had no *Brady* manual or handbook setting forth any policy or guidance in this complicated area for prosecutors to consult; its policy was simply to "follow the law."

309.    Indifferent to prosecutors' compliance with their obligation to timely disclose evidence favorable to the defense, the District Attorney did not participate in making policy to effectuate *Brady* compliance, but completely delegated authority to determine the policy of the Office to mid-level executives involved with training.

310.    When *Brady* violations were discovered, the Office almost always made procedural and various other strained and often misleading arguments in the hope that the court would do nothing, thereby communicating to line prosecutors that *Brady* violations did not matter to it and would have no consequence.

311.    The Office had no written policy for correcting false testimony by its witnesses and would argue, contrary to law, that it had no obligation to do so.

312.    The Office followed a practice of using material witness warrants to arrest and detain prospective witnesses, not only when they failed to comply with proper subpoenas

commanding their appearance in court, but also when they simply did not voluntarily cooperate with the D.A.'s Office, which was an unlawful misuse of the material witness statute.

313.    Prosecutors would then conceal from the defense the existence and the contents of the warrant applications and orders as well as the fact that the witnesses had been uncooperative or recalcitrant and were testifying or "cooperating" under compulsion.

314.    Evidence of the Queens County District Attorney's deliberate indifference to prosecutorial misconduct violative of a criminal defendant's rights, including false or misleading argument to the jury and *Brady* violations, was uncovered during the civil rights litigation in *Su v. City of New York*, 06 Civ. 687 (E.D.N.Y.) (RJD)(CLP), a case involving the wrongful conviction of a young man due to the prosecution's knowing use of false evidence and argument and *Brady* violations.

315.    During that litigation, discovery of personnel records, together with deposition testimony, showed that in dozens of cases where courts had found serious prosecutorial misconduct, including the use of and failure to correct false or misleading testimony, *Brady* violations, and summation misconduct, the prosecutors were not disciplined; the Office had no formal or meaningful disciplinary policy, procedure, training, or practice; and the Office was indifferent to its *Brady* obligations.[2]

316.    As established by the testimony of executives at the Queens D.A.'s Office, the District Attorney himself read every appellate decision concerning the Office and made the

---

[2] The discovery obtained in that lawsuit is summarized in Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 559-566 (2011), a copy of which is attached as Exhibit B and is incorporated herein by reference.

decision in each instance where misconduct was alleged or found whether to initiate an investigation of the ADA involved or to impose discipline.

317.    However, the testimony and evidence further showed and shows that, with deliberate indifference to the violations of criminal defendants' constitutional rights, the District Attorney, with just one exception, never imposed discipline or authorized disciplinary inquiries.

318.    The *Su* case settled on or about October 15, 2008, for $3.5 million.

319.    Notwithstanding that settlement, the District Attorney's deliberately indifferent policies, customs or practices continued through and including the prosecution of plaintiff.

320.    Prior to the conviction of Plaintiff in 2010, Richard Brown, in 20 years as D.A., had disciplined just one prosecutor for violating *Brady.*

321.    Even in that one case, the Office tried to get the court to sweep the prosecutor's misconduct under the rug and only acknowledged his misconduct after the matter had received embarrassing news media attention.

322.    Despite hundreds of cases, prior to 2010, in which courts found summation misconduct or noted that such complaints had been made but it would not reach the issue because the evidence of guilt was overwhelming, Mr. Brown did not discipline a single prosecutor for such misconduct, no matter how egregious.

323.    With regard to Plaintiff's prosecutor, ADA Ross, the Office knew or should have known that she had repeatedly violated her *Brady* obligations in Plaintiff's case from the time his prosecution was initiated through his second trial in 2015, in the five-year-long *Newson* prosecution from 2010 through 2015, and allegedly in other cases, yet conducted no investigation into her alleged misconduct and did not discipline her.

324.     This is further evidence of the ongoing policy of deliberate indifference that existed prior to, during, and following Plaintiff's first trial and that created an atmosphere under which prosecutors knew that all that mattered in serious cases was winning.

325.     The District Attorney's policy, custom and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's constitutional obligations foreseeably encouraged such violations to continue.

326.     The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

327.     But for the ADA's misconduct caused by the District Attorney's unlawful or deliberately indifferent policies, customs and practices, Plaintiff would have been acquitted and released from custody, and would not have been incarcerated any further in connection with his murder case.

328.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial and trial proceedings.

329.     The Queens County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

330.     The District Attorney of Queens County, at all relevant times, was and is an elected officer of Queens County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

331.     The District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); New York has provided by statute (N.Y. County Law §§ 53, 941) that Defendant City's constituent counties (including Queens County), and hence Defendant City itself, has liability for torts committed by County officers and employees, such as the District Attorney and his assistants, and the City of New York represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

332.     The District Attorney of Queens County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

333.     During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

334.     By virtue of the foregoing, the Defendant City of New York is liable, to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

### FIFTH CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant THE CITY OF NEW YORK for the Queens District Attorney's Violations of Plaintiff's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment Rights to Pretrial Disclosure of Exculpatory Information and to Not be Deprived of Liberty Based Upon False or Misleading Evidence)**

335.     Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 123 and 176 to 324 as if fully set forth herein.

336.     Pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments, Plaintiff had a federal constitutional right to timely disclosure to the defense of exculpatory and other information which, considered in its totality, was likely to affect whether he would be deprived of his liberty before trial.

337.     Under these provisions, a prosecutor also was prohibited from knowingly relying in the grand jury on false or misleading evidence.

338.     Under these provisions, prosecutors were required to disclose exculpatory evidence to the defense so that it could exercise its right under state law to ask the grand jury to call exculpatory witnesses and consider exculpatory evidence.

339.     Further, under these provisions, the prosecution was required to disclose exculpatory and other evidence that, if known to the defense and the court, would be likely to result in the defendant's pretrial release.

340.     A criminal defendant has a federal constitutional right not to be held on excessive bail.

341.    In addition, under the above constitutional provisions, he has a right not to have the prosecution mislead the court, charged with responsibility for determining whether to grant reasonable bail, concerning the strength of the prosecution's case.

342.    Indeed, under New York's criminal procedure law at the time of Plaintiff's prosecution, the strength of the prosecution's case was a statutory factor that a judge was required to consider in determining whether to grant pretrial release.

343.    In this case, ADA Ross misled the grand jury into voting to indict Plaintiff by presenting Hilton as an apparently voluntary and reliable witness to Plaintiff's alleged shooting of Brown without disclosing to the grand jury, or the defense, that (a) Hilton was testifying as a prisoner of the D.A.'s Office, (b) until he was taken prisoner he had repeatedly refused to testify, and (c) he had made a formal statement in court, in explaining his refusal to testify, that he had been intoxicated and had not seen the shooting.

344.    Further, Ross failed to tell the grand jury, or the defense, that Hilton had affirmatively told Detective Bey that the shooter did not wear glasses and was cleanshaven.

345.    This evidence exculpated Plaintiff because, at the time of the shooting, he wore glasses as well as a mustache and goatee.

346.    Ross had a constitutional duty to find out from Detective Bey such exculpatory information and, under the circumstances of this case, to disclose it to the grand jury and to the defense.

347.    Following Plaintiff's indictment, Ross further violated Plaintiff's constitutional rights by withholding the aforementioned exculpatory information from Plaintiff and his counsel, and from the court charged with determining whether to deprive Plaintiff of his liberty pending trial.

48

348.    As a result of Ross's withholding of the aforementioned information, the court decided to detain plaintiff and he was deprived of his liberty for approximately two years before his initial trial.

349.    After Plaintiff's conviction was reversed on appeal, Ross continued to withhold the aforementioned information even though she knew its disclosure was likely to, or at least might have, caused the court to order Plaintiff's release from custody or to fix a reasonable bail Plaintiff could afford.

350.    She also withheld additional information she had learned about since Plaintiff's initial conviction that directly affected the strength of the prosecution's case and the court's bail determination.

351.    First, she withheld until just before trial that Turner had been arrested, again, on April 14, 2016, for possession of a loaded firearm and had refused to leave the automobile where he possessed such firearm, forcing police officers to break the window and pull him out of the vehicle.

352.    Second, she withheld that Turner had been convicted for promoting prostitution in Nassau County and in Florida, had allowed a girlfriend whose prostitution he was promoting to falsely use his legitimate sister's identity, and had been convicted in Florida for felony perjury for lying to police about his own identity.

353.    Third, she continued to withhold evidence, now even more voluminous, known to her Office and to the NYPD, that Turner had been a leader of the notorious Snow Gang.

354.    In this regard, when Turner was arrested for possession of the loaded firearm, a D.A.'s Intake Bureau Crime Report stated that Turner was a "known Snow Gang member who previously posted [a Facebook] video in possession of firearms and making threats."

355.    The Report further stated that another individual arrested with Turner told the police in a videotaped statement that Turner "is the leader of the Snow Gang" and that Turner "always" has guns on him.

356.    The District Attorney's "case tracking" report for the same case contained a "message alert" to notify James Evangelou, the chief of the District Attorney's Career Criminal Major Crimes Bureau, of the arrest of Turner, evidently because there was an alert that all Snow Gang or violent gang-related arrests, and/or any arrest of Snow Gang leader Turner, be reported to Evangelou.

357.    Ross handled Turner's gun case, making a cooperation agreement with him to reduce the charges and potential punishment, and knew or should have known of the above documents.

358.    Prior to the retrial, ADA Ross also obtained complaint follow-up forms (or DD5s) from the NYPD relating to a 2014 stabbing of Turner.

359.    She disclosed several of these DD5 reports to Plaintiff's counsel.

360.    But she withheld the only DD5 report that reported that Turner was a member of the Snow Gang.

361.    The NYPD had extensive investigative files on the criminal activities of the Snow Gang and Turner.

362.    The D.A.'s Office obtained, or had access to, these files because it was involved in prosecuting other members of the Snow Gang who had committed violent offenses.

363.    Indeed, at one of these trials, *People v. Lucas et al.*, Ind. No. 1659/2014, the office had a police lieutenant who was presented as an expert concerning the activities of the Snow Gang testify that Turner was a leader of the gang.

364.     This lieutenant had subpoenaed Turner's social media accounts which contained numerous of his postings bragging about his gang-related criminal activities.

365.     This lieutenant had spoken to the entire Queens D.A.'s Office about his knowledge of Snow Gang and Ross knew, or should have known, the information known to this officer, and to her Office, about Turner's involvement in criminal activities with the Snow Gang.

366.     Ross disclosed nothing to Taylor or his attorney about Turner's involvement in the Snow Gang (or any other gang) before or during the second trial.

367.     Ross also possessed in her file Turner's disciplinary records from his time at Rikers Island showing that the N.Y.C. Department of Corrections had determined that, as of that time, Turner was a member of the infamous Bloods gang.

368.     The records further showed that, in May 2016, Turner and two other inmates had assaulted another inmate over a gang dispute.

369.     Ross also possessed reports documenting that, a few weeks after that assault, Turner and a group of other inmates had converged on and attacked yet another inmate.

370.     Ross never disclosed any of these records either.

371.     Had the above evidence—the exculpatory as well as the impeachment evidence—been timely disclosed, the viability of the prosecution would have been destroyed and Plaintiff would have been released much sooner than December 2016, when the court finally granted him $75,000 bail.

372.     Ross's conduct causing Plaintiff to be deprived of his liberty before the first and the second trials was substantially caused by the deliberate indifference of the District Attorney and his designees to the rights of criminal defendants not to be unreasonably deprived of their

liberty before trial based upon false or misleading evidence or the suppression from the defense of exculpatory and other favorable evidence.

373.     Knowing that decisions about how to present evidence in the grand jury and what evidence and information to disclose to the defense come up in every case, the District Attorney had no policy manual, procedure, or protocol requiring the prompt disclosure to the defense of exculpatory evidence prior to the grand jury presentation, the presentation of exculpatory evidence to the grand jury so that the other evidence presented would not be false or misleading, and the disclosure to the court and to the defense of exculpatory or impeachment evidence that would be likely to, or might, influence the court to release the defendant on bail.

374.     Indeed, the District Attorney had no policy at all regarding the timing of disclosure of exculpatory or impeachment evidence except to disclose such evidence early enough so that any conviction would be unlikely to be reversed on appeal.

375.     Prosecutors who engaged in misconduct in the grand jury were never disciplined, nor were prosecutors disciplined in general, for withholding *Brady* material, presenting or failing to correct false or misleading evidence or argument, or engaging in any other behavior that violated the constitutional rights of criminal defendants.

376.     The failure of ADA Ross and her colleagues to disclose evidence that would have been likely to affect the decision of the grand jury to indict Plaintiff and of the court to release him on reasonable bail before the first and later the second trial was substantially caused by the deliberate indifference of the District Attorney and his designees to criminal defendants' aforementioned constitutional rights.

377.   By virtue of the foregoing, the Defendant City of New York is liable, to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.   For compensatory damages of not less than $15 million;

b.   For punitive damages of not less than $7.5 million;

c.   For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

d.   For pre-judgment interest as allowed by law; and

e.   For such other and further relief as this Court may deem just and proper.

LAW OFFICES OF JOEL B. RUDIN, P.C.

By:   _____/s/_____
      Joel B. Rudin
      Haran Tae
      Matthew A. Wasserman
      Law Offices of Joel B. Rudin, P.C.
      152 West 57th Street, 8th Floor
      New York, New York 10019
      (212) 752-7600
      Email: jbrudin@rudinlaw.com

      *Attorneys for the Plaintiff*

Dated: New York, New York
       March 8, 2021