

**JAMES E. JOHNSON**
*Corporation Counsel*

**THE CITY OF NEW YORK**
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**PHILIP R. DePAUL**
*Senior Counsel*
Phone: (212) 356-2413
Fax: (212) 356-3509
pdepaul@law.nyc.gov

April 16, 2021

**BY ECF**
Honorable Steven L. Tiscione
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

  Re: Rhian Taylor v. City of New York, et ano.
    18 CV 5500 (KAM) (ST)

Your Honor:

  I am a Senior Counsel in the Office of James E. Johnson, Corporation Counsel of the City of New York, and the attorney representing the City of New York and Detective Joseph Bey in this matter. I write to oppose plaintiff's motion to compel dated April 2, 2021.

  Now that plaintiff's motion to amend has been decided, plaintiff may be entitled to discovery to which he previously had not been. But it is remarkable that not a single piece of information sought by this motion to compel has anything to do with the underlying investigation or prosecution of plaintiff or the newly added claims articulated in the amended complaint. At this late stage of the case, where the parties should be focusing the issues and preparing for depositions, plaintiff is instead pursuing massive amounts of irrelevant discovery—on top of the reams of Monell discovery he already has.[1]

  This is not to concede that plaintiff's motion to compel is actually seeking more Monell-related discovery. It does no such thing. Rather, it seeks yet more ammunition in plaintiff's counsel's years-long campaign against the Queens County District Attorney's Office (QDA). Monell discovery, while vast, is not a license to engage in a free-wheeling fishing

---

[1] In October 2019, the parties agreed that the Monell-related discovery in Bellamy v. City of New York, No. 12 CV 1025 (AMD)(PK) (E.D.N.Y.), Benitez v. City of New York, et al., No. 17 CV 3827 (SJ) (SJB) (E.D.N.Y.), and this case would be shared, given the similarity of the Monell allegations in each case. (See ECF No. 25-1.) In connection with this agreement, plaintiff already has thousands of pages of Monell discovery, and he has also taken the depositions several current or former executives of the QDA—some over the course of two sittings.

expedition just so plaintiff's counsel can undermine the careers of hard-working public servants. The Court should deny plaintiff's motion in its entirety.

**Turner Snow Gang Records from <u>Lucas</u> and <u>Ford</u> Prosecutions**

Plaintiff's request for records pertaining to Seprel Turner's alleged affiliation with the SNOW gang from the <u>Lucas</u> and <u>Ford</u> prosecutions should be denied. At the outset, defendants note that plaintiff's motion completely fails to mention that he is seeking the nearly exact same information directly from the QDA in his concurrent New York State Court of Claims action. On March 8, 2021, plaintiff filed a motion for a subpoena *duces tecum* compelling the QDA to produce information related to Seprel Turner from the <u>Lucas</u> prosecution file. (See Ex. A, Motion for Subpoena *Duces Tecum*.) The QDA opposed the motion on March 19. (See Ex. B, Opposition to Motion for Subpoena *Duces Tecum*.) That plaintiff would move for that same information in federal court is troubling. The Court can—and should—reject plaintiff's blatant forum shopping.[2]

This request should also be denied because it is extremely burdensome. By way of background, and upon information and belief, <u>Lucas</u> stemmed from an investigation into the SNOW gang in Queens, and initially involved 22 defendants. Trevor Lucas, in particular, was charged with conspiracy to commit murder as part of the SNOW gang and proceeded to trial with four co-defendants. The trial lasted five weeks. Part of the evidence supporting the conspiracy were public and private social media postings and messages of the alleged members of the SNOW gang. I have been informed that, given the breadth of the investigation, the QDA file itself is enormous, totaling nearly 800,000 pages of documents. Plaintiff's request for a search through such a huge file for information about Turner is unreasonable, and clearly not proportional to the needs of this case.

This is especially true given the evidence presented at <u>Lucas</u> trial, which plaintiff mischaracterizes in his letter. In December 2015, Lieutenant Robert Bracero testified as an expert on the history, hierarchy, practices, and language of the SNOW Gang and other gangs. He stated that the SNOW gang, originally know as the Chosen Ones, was formed by a group of aspiring rappers, including Turner, primarily for the purpose of *rapping together*. According to Lt. Bracero, the SNOW gang did not develop its violent character until later, when an individual named Lynnard Biggs took the name and started expanding the gang for notoriety. Most importantly, Lt. Bracero testified that Turner was *kicked out* of the SNOW gang when it was discovered that he had cooperated with the NYPD and the QDA in the underlying prosecution.

Setting that aside, plaintiff's letter makes clear that he already has information relating to Turner's (apparently very tenuous) affiliation with the SNOW Gang: his motion relies on Lt. Bracero's testimony. He also asked both Detective Bey and ADA Ross questions about Turner's involvement in the SNOW during their Court of Claims depositions. And plaintiff's counsel will soon receive more such information, as defendants are preparing to produce information from the NYPD regarding Turner's alleged affiliation in the SNOW gang. Further, and without waiving any objections defendants may have, plaintiff has indicated that he wishes to depose Lt. Bracero in this matter.

---

[2] Equally troubling is the fact that plaintiff is also seeking to compel the QDA to produce materials in the Court of Claims matter that this Court is currently reviewing *in camera*.

And it is not at all evident that any alleged failure to disclose affiliation with a gang—or, as it seems here, a rap group—constitutes a Brady violation. Turner was not prosecuted in Lucas. Indeed, by the time of trial in 2015 he had been kicked out of the SNOW Gang. And ADA Ross did disclose information related to Turner's criminal history and he was cross-examined on in both of the underlying trials, making any gang-related information cumulative impeachment. See Mack v. Conway, No. 05 Civ. 6519 (LTS)(KNF), 2010 U.S. Dist. LEXIS 3035, at *41-*45 (S.D.N.Y. Mar. 23, 2010) (finding that a failure to turn over information regarding witness's gang membership and other alleged criminal activity insufficient to state a Brady claim requiring *habeas* relief). See also Felix v. Ercole, No. 09-CV-4003 (ARR), 2010 U.S. Dist. LEXIS 62347 (E.D.N.Y. June 22, 2010) (rejecting Brady claim, in part because, the alleged undisclosed information concerned uncharged criminal activity).

Finally, since his conviction was reversed on appeal, records relating to Lucas' prosecution are sealed pursuant to N.Y. CRIM. PROC. LAW § 160.50. In fact, and upon information and belief, 12 of the defendants' cases are sealed. Contrary to plaintiff's assertion, bringing a § 1983 claim does not operate as a blanket § 160.50 waiver for all purposes and for all of time. Plaintiff's motion to compel this information should be denied.

**Newson Materials**

Plaintiff's request for Newson-related materials should be denied. First, plaintiff's requests are anything but "targeted." Plaintiff requests encompass 23 subcategories of information across 3 document requests. Those subcategories of information include *all* evidence vouchers and property vouchers, *all* lab requests, and *all* transcripts for all court appearances. Plaintiff's requests are incredibly overbroad and should be denied on that basis alone.

Second, Newson is completely irrelevant to this case. While they were handled by the same prosecutor, ADA Karen Ross, that is where the similarities end. And it is extremely important to emphasize that the Newson court found that there was no evidence of misconduct by ADA Ross. Indeed, after the defendants moved to dismiss their indictments on the ground of prosecutorial misconduct, the Newson trial court held a two-day hearing on the alleged failure to disclose the ballistics report. Based on the evidence, the trial court specifically found that ADA Ross *did not know* about the allegedly withheld ballistic evidence because of a *bureaucratic error by the police department*. The court also found that there was *no credible evidence* that the failure to disclose the ballistics report was intentional.

Given that this issue was already litigated and decided, plaintiff's pursuit of this discovery is not proportional to the needs of this case. And the only reason plaintiff believes that he is entitled to this discovery is so that he can somehow prove that the Brady violation was intentional. Even if it were, that would not be relevant to this case. Plaintiff should not be permitted to obtain discovery—again, from a *completely* separate case—solely for the purpose of second-guessing a state court judge. And, as above, regardless of the subsequent civil rights action, documents pertaining to the Newson criminal prosecution are sealed pursuant to § 160.50. As such, plaintiff's request should be denied.

**QDA Reversal Memoranda**

The QDA reversal memoranda sought by plaintiff are core prosecutorial work product and should remain protected. As we argued in connection with plaintiff's previous

motion to compel, (ECF No. 29), like all attorneys, prosecutors enjoy the protection of the work product doctrine—perhaps even more so. See In re McCray, No. 03 CV 9685(DAB)(RLE), 2011 U.S. Dist. LEXIS 135258, at *14 (S.D.N.Y. Nov. 22, 2011) (citing United States v. Nobles, 422 U.S. 225, 238 (1975)(noting that "the work product doctrine may be more vital to criminal proceedings than to civil litigation, noting that '[t]he interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt of [*sic*] innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case."). See also United States v. Jacques Dessange, Inc., No. 99 CR 1182 (DLC), 2000 U.S. Dist. LEXIS 3734, at *8 (S.D.N.Y. Mar. 27, 2000).

The reversal memoranda sought here should be protected. By way of explanation, these memoranda are generally created by the QDA after a conviction is reversed on appeal. The memoranda address the arguments on appeal, the basis for the reversal, and, critically, a recommendation of how to proceed, i.e., whether to appeal, dismiss the indictment, etc. This is axiomatically core work product.

And even to the extent these memoranda contain factual work product, plaintiff is not entitled to them because he has not shown a substantial need for these materials and an inability to obtain the factual information from another source. See Crosby v. City of New York, 269 F.R.D. 267, 277-78 (S.D.N.Y. 2010). Indeed, the appellate decisions summarized in these memoranda are *publicly available* and plaintiff knows why these convictions were reversed. There is simply no reason why plaintiff should be entitled to an Appeals ADA's thoughts and legal analysis.

Plaintiff is also not correct that the work product privilege is overcome by his allegations that QDA executives were deliberately indifferent. If plaintiff's position were taken to its logical end, it would eviscerate the privilege every time a plaintiff makes a deliberate indifference claim. Plaintiff's request for these memoranda should there be denied.

**WSP Records for ADA Pomodore's Trial List**

Plaintiff's request for the witness security program files for ADA Debra Pomodore's trials is the most egregious of all. ADA Pomodore had no involvement in the underlying investigation or prosecution. She is not, and has never been, an executive at the QDA. In fact, for the vast majority of her tenure, she was a line assistant. Plaintiff's request to rifle through irrelevant files to second-guess her entire career is not just irrelevant and overbroad—it is discovery abuse.

ADA Pomodore tried and secured a murder conviction in People v. Petros Bedi— a conviction which plaintiff's counsel, Joel Rudin, later helped vacate. Plaintiff's description of that case in his letter is highly misleading, so some background is necessary. In 1996, Bedi killed a former business associate and then fled abroad. He was found in Peru and extradited for trial, which occurred in February 2000. Serafim "Sammy" Kompouras, one of the eyewitnesses to the murder, was initially assessed by the QDA for witness protection given Bedi's capacity for violence. Kompouras, a tailor with limited education who primarily spoke Greek, initially refused protection, accepting only $200 for a bus ticket. Upon Bedi's return to the United States, the QDA learned of a threat to Kompouras's life and he entered witness protection.

The QDA spent money on that protection. And information about those expenditures *was disclosed* to Bedi's criminal defense attorney: ADA Pomodore turned over a

one-page summary of payments totaling $18,840 made by witness security. This summary was created by and provided to ADA Pomodore by QDA witness security. The categories of information in the summary were typical of the kind of witness security information that the QDA disclosed at the time.

At trial, Kompouras was cross-examined about this by Bedi's criminal defense counsel. In what can only be characterized as extremely confusing testimony, Kompouras (through an interpreter) denied that he received assistance from the QDA. On redirect, ADA Pomodore used leading questions to have Kompouras affirm that the QDA had helped him find a new place to live, and also helped him find hotels and motels to stay in.

The Bedi trial transcript reveals that six sidebars occurred during Kompouras's testimony. Unfortunately, *none* of sidebars were transcribed, so it is not clear what the trial court and the parties resolved to do about Kompouras's odd testimony. During her deposition in Bellamy, and although she could not recall specific details, ADA Pomodore recalled that the trial court directed Bedi's criminal defense counsel to remedy the situation in a particular way, which he failed to do. Bedi was convicted.

In 2012, Mr. Rudin moved to vacate Bedi's conviction pursuant to N.Y. CRIM. PROC. LAW § 440.10. The conviction was vacated primarily because Kompouras's witness security file contained receipts signed by Kompouras indicating that QDA witness security actually paid him $2,800 in cash directly for expenses—a practice that ADA Pomodore was not aware of at the time of the trial. The cash receipts, the court reasoned, only became relevant when Kompouras denied receiving money, because the receipts could have been used to impeach him. The court also determined that the one-page summary of witness security payments produced to Bedi's counsel was incomplete; indeed, it did not include the $200 for Kompouras's bus ticket, and other payments made during trial.

But even though it found Brady and Rosario violations, the court *did not* state that ADA Pomodore engaged in intentional or even reckless misconduct. In fact, the trial court found that ADA Pomodore "gained little by not turning over either the cash receipts signed by Koumpouras or the other documents in the Witness Security Program file at the same time she provided the one page incomplete summary. . . even if she had been aware of their existence, those documents would, in all likelihood, have seemed to her of little significance at that point in the proceedings." (Ex C, People v. Bedi, Decision and Order, Mar. 13, 2013, at 31-32.). In other words, the court accepted that this mistake was the result of an administrative failure. Bedi ultimately plead guilty—with Mr. Rudin by his side.

Defendants recount Bedi's intricate history to make clear that it—like everything else that is the subject of this motion—has nothing to do with this case. At the outset, there is no allegation that this case involved the practices of the QDA witness security program, nor can there be. The two eyewitnesses in this case, Anthony Hilton and Seprel Turner, were offered protection through the program and both refused. All records relating to Hilton and Turner's potential involvement in the program have been produced.

And defendants have not conceded that this request is relevant to the Monell claim in Bellamy, as plaintiff indicates, though Bellamy did involve a witness in the protection program. But, of course, plaintiff did not make this request in Bellamy, likely because document discovery in that case has been closed for over a year. And simply because the parties have

entered into a discovery-sharing agreement in this case and Bellamy does not mean that plaintiff can use it to circumvent discovery deadlines.

Moreover, the Brady and Rosario violations found in Bedi were the product of an administrative failure of the QDA—as numerous Monell witnesses have testified at their depositions. This was because, as a matter of custom at the time, witness security files were maintained by the investigators in the witness security office and not made part of the trial assistant's file. It did not involve a deliberate or even reckless failure to obtain impeachment evidence, as plaintiff alleges here. Indeed, ADA Pomodore sought and received a summary of money paid to Kompouras and she disclosed it to the defense.

Plaintiff also has a significant amount of information about ADA Pomodore. Plaintiff has her personnel file, salary history, and trial history. Plaintiff also deposed her extensively in November 2020. Plaintiff also has a tremendous amount of information about the QDA's witness security program. He has witness security files for approximately 50 cases. He deposed the former chief of the division and has obtained testimony about the witness security program practices from nearly all of the QDA executives he has deposed.

Notwithstanding this, plaintiff completely fails to explain how raiding the witness security files for cases tried by a single ADA, can show a policy or practice of the QDA. This is obviously because he cannot. Instead, this request, it seems, is yet another attempt for plaintiff's counsel to find fault with an ADA who has been the subject of his singular focus for years. This is the definition of discovery abuse and it should be rejected.

**Records of Additional Alleged Brady Violation**

It is abundantly clear that plaintiff cannot recover damages for the time he spent incarcerated for his knowing and voluntary plea to criminal possession of a weapon. Yet plaintiff still asserts that he entitled to prove a Brady violation so that he can recover those damages.

Defendants have previously shown that plaintiff's purported Brady claim for the gun possession charge is meritless, and we respectfully refer the Court to defendants' letter dated March 26, 2021. (See Ex. D, Defendants' Opposition to Plaintiff's Motion for a Pre-Motion Conference.) Moreover, at the pre-motion conference before Judge Matsumoto on May 29, 2021, she expressed extreme skepticism over whether plaintiff's purported claims could survive a motion to dismiss. (See Ex. E, Transcript of Pre-Motion Conference, at 9:4-7("it feels like it's one that would have to be granted, a motion that would have to be granted if the City were to move to dismiss [the Brady claim for the gun possession] based on the case law that they cited.") and at 14:4-7 ("I'm having a hard time foreseeing how that claim can survive. At least the one about Brady violation for the gun possession.") In fact, plaintiff withdrew his request to pursue that claim after the pre-motion conference. (See ECF No. 41.) Plaintiff should not be allowed to pursue discovery on a claim that he has not pled, and which—by all accounts—is meritless. This request should also be denied.

**Timing of Disclosures**

Defendants respectfully submit that there is no need for a timeline of disclosures. As of this writing, defendants are in the process of preparing a production of NYPD and QDA training materials, as well as the aforementioned records from NYPD regarding Turner's alleged

affiliation with the SNOW Gang.  Defendants are also in the process of reviewing thousands of emails collected from QDA.

In fact, much of the outstanding discovery depended on the outcome of the motion to amend.  Now that that motion has been decided, discovery can continue smoothly.  There is no need for the Court to impose arbitrary production deadlines, which it may then have to police.  Instead, the Court should deny plaintiff's motion to compel—which only seeks to significantly expand the scope of this case and further prolong discovery.

As such, defendants respectfully request that the Court deny plaintiff's motion to compel in its entirety.

Defendants thank the Court for its time and consideration of this matter.

Respectfully submitted,

*s/Philip R. DePaul*

Philip R. DePaul
Senior Counsel
Special Federal Litigation Division

cc: All Counsel (by ECF)