FILED
CLERK

9:54 am, May 19, 2021
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RHIAN TAYLOR,                    . Civil No. 18-CV-05500-KAM-ST
                                 .
            Vs.                  .
                                 .
                                 .
                                 . 100 Federal Plaza
CITY OF NEW YORK, ET AL.         . Central Islip, NY 11722
                                 .
                                 . April 26, 2021
. . . . . . . . . . . . . . . .

TRANSCRIPT OF TELEPHONIC HEARING
BEFORE THE HONORABLE STEVEN TISCIONE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For The Plaintiff:        LAW OFFICES OF JOEL B. RUDIN, P.C.
                          BY: HARAN TAE, ESQ.
                          152 W. 57th Street
                          8th Floor
                          New York, NY  10019

For The Defendants:       NEW YORK CITY LAW DEPARTMENT
                          BY:  PHILIP R. DePAUL, ESQ.
                          100 Church Street
                          Room 3-208
                          New York, NY  10007

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**TRACY GRIBBEN TRANSCRIPTION, LLC**
859 Nutswamp Road
Red Bank, New Jersey 07701
**(732) 263-0044    Fax No. 732-865-7179**
**800 603-6212**
www.tgribbentranscription.com

1        THE COURT:  All right, this is Taylor v. City of New

2   York, et al., 18-CV-5500.  Can I have counsel please state your

3   appearances for the record.

4        MS. TAE:  Yes, this is Haran Tae from the Law Offices

5   of Joel B. Rudin.  I'm representing plaintiff Rhian Taylor.

6        MR. DePAUL:  And Your Honor, this is Philip DePaul

7   from the Office of the Corporation Counsel representing

8   defendants.  Good afternoon.

9        THE COURT:  Good afternoon.  All right, before we

10  move on to the new stuff let me just go over with you the

11  materials that I did review that were submitted in camera.

12  Unfortunately it took a while because the original materials

13  that were submitted got lost in the transition of my Chambers

14  from Brooklyn to Central Islip, so I had to get them

15  retransmitted electronically.

16       So most of them I have, you know, reviewed and have,

17  you know, made a determination.  There's a couple of items that

18  I wanted to just ask some additional questions about.  So I'll

19  go through them in order, and these are the materials that were

20  provided to me so to the extent that there's issues about other

21  materials, I can't answer.  I can only tell you which ones I've

22  gone through.  So if there's any missing you have to let me

23  know.

24       So the files were identified by about privilege, I

25  guess privilege log numbers.  So with respect to privilege log

number 7 I find that it's not relevant and doesn't need to be disclosed.

With privilege log number 13, I do think that that is something that should be disclosed and is not privileged for purposes of this case. I can't, you know, make any ruling as to whether any of it would be admissible at trial but at least for purposes of discovery I think it's disclosable.

For privilege log number 24, that's also not disclosable, not relevant and covered by privilege.

Privilege log number 39 is mostly irrelevant but there are one or two pages that discuss the criminal history of Hilton and Turner. And those specific items should be, you know, turned over so you can redact the majority of it. But you know, two pages I believe that refer to the criminal history of those two witnesses should be disclosed.

Who is Tyrell Garcia, and what relevance does he have? The next couple of ones are all related to Tyrell Garcia.

MS. TAE: Sure. Your Honor, if I may explain. Tyrell Garcia is one of the plaintiff's alibi witnesses.

THE COURT: Okay.

MS. TAE: There are three individuals, Stefan Alexander, Tyrell Garcia and Omari Lodge who were with plaintiff at the party that immediately preceded the shooting.

THE COURT: Okay.

1  MS. TAE: And they would testify on his behalf that

2 he was not the shooter.

3  THE COURT: Okay. And then, all right. Because a

4 lot of these other materials relate to those three witnesses.

5 They're materials that were prepared by the defense, I guess,

6 to cross examine these witnesses, and some of it is like their

7 criminal history and things like that.

8  MS. TAE: Yes, Your Honor, so our position is that

9 all that information would be relevant because the defendants

10 have indicated that they intend to depose those individuals.

11 And so we believe we're entitled to that information as

12 potential impeachment evidence and we think it would be greatly

13 unfair if the defendants, you know, have information that might

14 potentially bear on these witnesses' credibility or that of

15 plaintiff's, then you know, we wouldn't likewise be able to

16 have that information as well.

17  MR. DePAUL: Your Honor, if I may be heard. I don't

18 think that's necessarily accurate.

19  THE COURT: Okay.

20  MR. DePAUL: I believe from my memory of those files.

21 Included within those files are, for example, draft cross

22 examinations and note taking by the Prosecutor in preparation.

23  THE COURT: Yes.

24  MR. DePAUL: That is not information that plaintiffs

25 would be entitled to.

1           THE COURT:  I think you have to separate it out a

2 little bit, because I think you're right.  I think there are

3 materials within those broad categories.  And you know, if

4 you're looking at the privilege log, it's privilege log number

5 44 and number 45 relates to Tyrell Garcia.  Number 47 to number

6 49 is kind of an amalgamation of all the different defense

7 witnesses.  And then number 67 is interview notes of Stefan

8 Alexander, Tyrell Garcia and Omari Lodge.

9           MS. TAE:  So Your Honor, just to clarify, we would

10 not be seeking, you know, things that are clearly core or

11 products such as cross examinations.

12           THE COURT:  Yes.

13           MS. TAE:  We're seeking what are clearly factual

14 materials.  I mean, just because, for example rap sheets were

15 gathered by an attorney doesn't make that work product

16 privileged.  But to the extent that there's factual material

17 and they're including witness statements, we would be seeking

18 those materials.

19           MR. DePAUL:  Well,  Your Honor, you know, plaintiffs

20 can --

21           THE COURT:  Okay.  I'm sorry.

22           MR. DePAUL:  You know, plaintiffs can subpoena the

23 criminal histories of those individuals.  I think the

24 compilation of those criminal histories does go to core work

25 product.  I think it is my understanding also that they're

1  subpoenaing the criminal histories for the individuals in the

2  State Court case, and Haran, you can correct me if I'm wrong.

3  But I believe that they're obtaining, they're already getting

4  these materials in the State Court case.

5      THE COURT:  Well, I don't care how they get them, but

6  I think they are entitled to the criminal histories of the

7  witnesses.  So to the extent that some of that is included

8  within these categories of documents, I don't particularly care

9  how you disclose it to them.  If you want to disclose it to

10 them through this process, that's fine.  But I do think that

11 they're entitled to those records.

12      I agree with you that, you know, the draft cross

13 examinations and the handwritten notes of the ADA, you know,

14 with sample questions and things like that are not disclosable.

15 But you know, in terms of the actual, you know, whether you

16 turn over a rap sheet or you redact things but turn over the

17 factual information about the prior criminal record, that stuff

18 needs to be turned over.

19      MS. TAE:  And Your Honor, we would just request that

20 to the extent that there are factual materials in there that

21 are not criminal histories, that they would be disclosed as

22 well.

23      THE COURT:  So the only fact and, you know, defense

24 counsel can, I guess, stop me if I'm missing something.  But

25 the only factual materials I see in there, and this I guess

maybe we should talk about is, you know, there are notes from the Prosecutor, it looks like her interviews with the three witnesses. I don't know if there were prior reports turned over about, you know, those interview, because you know, typically --

MS. TAE: There are no reports, I'm sorry, Your Honor, I didn't mean to interrupt you.

THE COURT: Yes. At least on the Federal level usually we have the agents write up a report of any interviews conducted of witnesses and that gets turned over. Obviously things are a little different on the State level. So I don't know what's previously been turned over. But the factual summary of those witness interviews needs to be turned over.

So if there's no formal report then you've got to turn over the notes, because that's the only other thing there is.

MS. TAE: Yes, Your Honor. My understanding is that this is, her notes are the only record memorializing her interviews of these witnesses. There are no other reports or recordings.

THE COURT: Okay. And that would be privilege log number 67. Again, I don't know. But if there is no report or any other, you know, document that outlines that information then I think you've got to turn over the notes.

MR. DePAUL: Okay.

1    THE COURT:  But you know, from looking at everything

2  else, like I said, the only other factual information is the,

3  you know, the rap sheets, the criminal history stuff and the

4  interview notes of their interviews.  The rest of it is, you

5  know, not relevant.  But those particular factual things I

6  think need to be turned over.

7    MR. DePAUL:  Okay, thank you, Your Honor.

8    THE COURT:  And I think that the same goes for

9  privilege log number 47 to number 49, which is like the

10  materials for defense cross examination, you know, of defense

11  witnesses.  You know, things like, you know, notes of, you

12  know, potential questions and all of that stuff is not

13  disclosable.  But to the extent that there's materials

14  contained in that packet that are, you know, criminal history

15  and related to prior bad acts, that stuff needs to be turned

16  over.

17    MR. DePAUL:  Okay.  Thank you, Your Honor.

18    THE COURT:  So privilege log number 51.  This was a

19  Grand Jury memo, it looks like it was prepared, you know, in

20  preparation for going into the Grand Jury.  You know, I've

21  reviewed it, I'm not really sure what relevance it has.  It

22  doesn't really contain much.  Why is plaintiff looking for it?

23  Maybe you can help me understand why you think this is

24  relevant.

25    MS. TAE:  Sure.  So Your Honor, I mean, it's been

hard because we haven't really been able to find out from the

defendants kind of the nature of what's inside the memo.

THE COURT: Sure.

MS. TAE: But we applied for this memo because we had

a basis to believe that the memo contained factual information

concerning kind of what happened leading up to the Grand Jury

involving these two witnesses, Anthony Hilton and Seprel

Turner. And so during discovery in this case we had found out

that Mr., I'm sorry, the NYPD and the D.A.'s office had

attempted to subpoena these two witnesses, multiple times, they

were uncooperative, and that as to Mr. Hilton and to Mr.

Turner, they had applied for material witness applications. I

believe Mr. Steve Ziades (phonetic), he's our local on this,

did these initial applications.

They weren't able to locate Mr. Turner but they did

locate Mr. Hilton, got him in for a material witness hearing.

During the course of that hearing Mr. Hilton, you know, denied

knowledge of the shooting, claimed that he was intoxicated

which directly contradicted his trial testimony, told the Court

that he had already told Mr. Cesar (phonetic), the

representative from the D.A.'s office what had happened. Mr.

Cesar also confirmed to the Court that he had had conversations

with Mr. Hilton as to the underlying shooting.

And then when he continued to refuse to cooperate he

was actually held and jailed, and then given the choice of

1  either testifying in the custody of the D.A.'s office or being

2  sent to Rikers.

3          THE COURT:  Okay.

4          MS. TAE:  And then after he had been jailed for some

5  period of time he agreed to testify in the Grand Jury.  So our

6  basis it that --

7          THE COURT:  None of that is in here.  The only thing

8  that's even tangentially mentioned is just, you know, an

9  identification of potential, you know, issues with the case

10 that, you know, just generally mentions cooperation and

11 willingness of witnesses to come forward.  But that's nothing

12 in terms of, you know, that whole litany of things that you

13 just talked about.

14         There's no factual information about, you know, the

15 material witness warrant and all that stuff.  That's in a

16 different one.  But the memo itself doesn't really have

17 anything that would be useful to you.

18         MS. TAE:  Okay.  You mentioned, Your Honor, that the

19 memo does identify potential issues with gaining the

20 cooperation of these witnesses?

21         THE COURT:  Just as in a general, like, you know,

22 what are potential problems, you know, cooperation and

23 willingness of witnesses to go forward.  That's, you know,

24 generally speaking.  There's nothing specific.

25         MS. TAE:  Well, to the extent that information is

1  contained within the memo we would request that at least that

2  information be disclosed, even if that memo is redacted in some

3  form to not include what Your Honor deems to be irrelevant

4  information.

5           THE COURT:  Let me just look at it again.  Sorry, I'm

6  just pulling it up right now to refresh my memory exactly what

7  it is.  And of course my computer just crashed.  Got to love

8  technology.  All right, I don't know that there's anything

9  surprising about that statement.

10          MR. DePAUL:  Right, and it's, obviously it's

11  generally an issue in every criminal case, so.

12          THE COURT:  Yes.  So I mean, I don't know how helpful

13  it is to you.  I also don't know particularly why it's such a

14  bad thing to turn over if it's just that part.  Okay.

15          MS. TAE:  Yes, Your Honor.  So I mean, if it's not,

16  if there isn't any issue with not disclosing it --

17          THE COURT:  Yes, I think turn over that last page,

18  it's just one sentence basically on the last page where it says

19  issues.

20          MS. TAE:  Thank you, Your Honor.

21          THE COURT:  Like I said, nothing ground shattering

22  about that.  I mean, it's basically an issue in every case.

23  All right, let's see, what's the next thing.  So that's the

24  Grand Jury memo.  So number 55 is mostly criminal history and

25  prior bad acts by Turner and Hilton.  This is the part that

1  also has stuff related to the material witness and his arrest

2  basically at the time that they were going to get him to

3  testify.

4          MS. TAE:  Yes, Your Honor, so we believe that --

5          THE COURT:  Yes, I think that more -- yes, I think

6  that more directly goes to your issue about his lack of

7  willingness to testify and I would assume what your argument

8  is, that they essentially forced him to testify.  And to the

9  extent that it involves criminal history, that also goes to

10 the, yes.  So that I think is, that's all covered.  I think

11 number 55 is stuff that needs to be turned over.

12          MR. DePAUL:  Okay.

13          THE COURT:  It's not, it's all factual.  There's no,

14 like, opinion stuff or anything like that.  You know, if I

15 miss, if there's like a Post-it note somewhere that I missed, I

16 didn't see any on that, but if there's one like that that has

17 the Prosecutor's thoughts or something, you can redact that.

18 But I didn't see anything like that in number 55.

19          MR. DePAUL:  Okay.

20          THE COURT:  And then number 62 and number 65 are not

21 relevant.

22          And that's, I think we already addressed number 67,

23 which is the notes for the interview, interviews of the fact

24 witnesses.

25          MR. DePAUL:  You did, yes.

1          THE COURT:  Okay.  And that's everything I reviewed,

2    everything that I received.

3          MS. TAE:  Thank you, Your Honor.

4          MR. DePAUL:  That's correct, Your Honor.  Thank you.

5          THE COURT:  All right, so let's move on to the new

6    stuff.  So in terms of the new stuff we've got, the first issue

7    is the, I guess records regarding Turner's connection to the

8    Snow Gang.  I was a little unclear.  It sounded like you were

9    gathering some of those materials so you are going to produce

10   something?  I'm not sure where you stand on that.

11         MR. DePAUL:  Sure, Your Honor.  We gathered materials

12   from the NYPD, from the NYPD's Gang Unit, related to his

13   suspected involvement in the Snow Gang.  We have those records,

14   we're reviewing them with the PD right now because there are

15   some law enforcement concerns about some of the pages.

16         THE COURT:  Okay.

17         MR. DePAUL:  But some of those pages will be produced

18   to plaintiff.

19         THE COURT:  Okay.  All right, well, you're going to

20   have to produce what you can and to the extent that you're not

21   producing stuff you'll have to put it in a privilege log so

22   they can look at what you're not producing and see whether

23   there's anything they want to make out of it.

24         MR. DePAUL:  Correct, Your Honor.

25         MS. TAE:  Yes, Your Honor.  But our request

1 encompasses also records related to Mr. Turner from the D.A.'s

2 file as well, not just the NYPD's files. And those are the

3 requests that the defendants are opposing.

4      MR. DePAUL: And the problem for us there, Your

5 Honor, as we said in our letter, the files for those cases,

6 especially the Lucas case, is enormous. I've been told it's

7 roughly over 800,000 pages of documents because it involves so

8 much social media searches. To require us to go through that

9 for cases that are not related to this case when plaintiff will

10 have information related to Turner's involvement in the Snow

11 Gang is really a, it's really a burdensome argument.

12      MS. TAE: Well, Your Honor, we don't believe that

13 defendants, I mean, defendants need to actually show that it's

14 going to be anywhere near as burdensome as they suggest. I

15 mean, the Lieutenant testified at trial about social media

16 posts created by Turner. So I mean, it's likely that there's

17 some sort of organization in the D.A.'s files where they've

18 either collected his social media posts in a folder or have

19 some sort of a repository related to Turner specifically and

20 may be segregated somewhere, indexed or searchable.

21      My understanding is also Mr. Lucas brought a civil

22 lawsuit in the Eastern District and in connection with that

23 lawsuit all of the discovery related to the underlying

24 prosecution was ordered to be disclosed. And so you know, it's

25 likely that all of this material is already in PDF form or

1 presumably text searchable or at least organized in some way

2 where they wouldn't have to actually go through the entirety of

3 the files in order to locate the ones related to Mr. Turner.

4 MR. DePAUL: I just don't think that's the case, Your

5 Honor, at least any more. I don't know the status of the file

6 as it exists with respect to the civil case. But I've been

7 told by the D.A.'s office that it's papers, and they would have

8 to go through it to find out the information.

9 And I would also say, because we talked about this in

10 our letter, Your Honor, the Lieutenant testified that Turner's

11 involvement in the Snow Gang was minimal. He was involved in

12 it at the beginning but I believe by the time of plaintiff's

13 second trial he had already been kicked out of the gang because

14 of his cooperation in this case.

15 So not only is it extremely burdensome for us to have

16 to undertake this search, it's very tenuous related to

17 plaintiff's claims because as far as I can tell and based on

18 the information that I have, Snow Gang wasn't formed until

19 after plaintiff's first conviction and he was kicked out of the

20 Snow Gang before plaintiff's second trial.

21 So there's really no overlap here between whatever

22 involvement Turner had with that gang and the claims related to

23 plaintiff's two trials.

24 MS. TAE: Your Honor, if I may address that.

25 THE COURT: Yes.

1          MS. TAE:  First all we're not just seeking about the

2   NYPD's records, I mean, we're seeking the D.A.'s records and

3   they may have conducted their own investigation, and likely

4   that is actually the case.  And we know it's blatantly untrue

5   that Turner, you know, was, had minimal involvement and you

6   know, was only involved to the extent that, you know, he was

7   rapping.  I mean, that's untrue from the D.A.'s own records.

8          We received a 2016 gun case for which he got a

9   cooperation agreement in connection with plaintiff's retrial,

10  and there his co-defendant stated that Turner was the leader of

11  the Snow Gang, he had guns on him.  And then we also have a

12  2018 arrest where it shows in an internal document from the

13  D.A.'s office that they had some sort of system-wide message

14  alert for Turner that basically flagged whenever he was

15  arrested.  And indicated to the Prosecutor that was in charge

16  of the case that they should notify the head of the Career

17  Criminals Bureau, and they should do that before offering any

18  sort of plea to Turner.

19          And even if he was kicked out, the reasons that he

20  was kicked out are relevant here because A.D. Ross tried to

21  argue at the retrial that plaintiff was responsible for the

22  alleged threats against these two witnesses, that they were,

23  you know, the victims of violence and assault.  And if there's

24  information in there related to turner being kicked out of the

25  Snow Gang due to his cooperation against plaintiff, that's

1 relevant information.

2      And so I don't see why we wouldn't be entitled to

3 that material.  I'd also like to --

4      MR. DePAUL:  Well, I disagree with --  go ahead.

5      MS. TAE:  I'd also like to note that, you know, what

6 materials are actually in the possession of the D.A.'s office

7 and not just the NYPD is relevant because it shows what was in

8 the actual possession of the office, it worsens, you know, Ms.

9 Ross' Brady violation, especially where she testified in her

10 court of claims deposition that she was aware that there were

11 people in her office prosecuting Snow Gang members.  But then

12 she claimed that she had no credible information that Turner

13 was a member of the Snow Gang.

14      And so we need that information to show the extent to

15 which we were prejudiced, plaintiff was prejudiced, and we

16 can't do that unless we have the materials that she's going to

17 have to turn over.

18      THE COURT:  I do think, you know, you're going to

19 have to do some more exploring with the D.A.'s office about

20 what materials there are regarding Turner's Snow Gang

21 membership because, you know, this is one of the things that,

22 you know, the failure to turn over is, you know, forms the

23 gravamen of plaintiff's claim to Brady violations among other

24 things, not turning over evidence of his gang membership.  And

25 I don't know what the records are or what they say regarding

1 his gang membership. But clearly, you know, he was somehow
2 affiliated with the gang at some point.

3      So I think there needs to be more explanation of, you
4 know, what materials exist to show, somebody at some point, you
5 know, testified that he belonged to the gang and was kicked
6 out. Well, where is that information coming from? It's coming
7 from somewhere.

8      MR. DePAUL: It's based on the, it was based on the
9 investigation that Lieutenant Bursaro (phonetic) conducted in
10 connection with his testimony, and his partner Detective Gayard
11 (phonetic) in connection with the Lucas trial. And I mean,
12 those are the records, I mean, that was the records we were
13 producing from NYPD is related to that.

14      THE COURT: Okay.

15      MS. TAE: I mean, Your Honor, the burden is clearly
16 on the defendants to show that they are entitled not to
17 disclose this information. I don't think they've met their
18 burden here. They haven't conducted any sort of search to
19 determine, you know, whether there is additional information in
20 the D.A.'s file separate from the information from Lieutenant
21 Bursaro and the NYPD and whether there is, like, some sort of
22 separate repository where information related to Turner are
23 saved. And I think that's the bare minimum of what they should
24 at least try to find out. I'd also --

25      MR. DePAUL: Your Honor, I think that --

1          THE COURT:  One at a time.

2          MR. DePAUL:  I've indicated that file is 800,000

3    pages long, Your Honor.  I mean, I don't understand, and that

4    it's really not searchable at this stage.  So, I mean, I don't

5    know what more, else I have to show.

6          MS. TAE:  I mean, it's possible that the file has, I

7    mean, there's a file that's literally titled Seprel Turner.  We

8    don't know.  And I don't know that defense counsel has actually

9    ascertained whether or not it's organized in some way.  And

10   maybe, you know, maybe I would suggest that he reach out to

11   corporation counsel from the Lucas lawsuit.  I mean, maybe

12   they've organized the material there.  And it would be the same

13   material.  So I mean, maybe that's also one avenue he could

14   explore.

15         THE COURT:  All right, well, you're going to turn

16   over the stuff from the NYPD investigation.  I think you should

17   at least consult with the D.A.'s office and find out if there

18   is, you know, anything that, you know, that they have that

19   could, for example, again I don't know how the file is

20   organized but sometimes when they do these large gang or

21   organized crime prosecutions they do separate out, you know,

22   suspects and gang members and, you know, have separate files

23   for each gang member.

24         If they have something like that, that might be

25   relatively easy to search.  If they don't, then you know, I'm

1   not going to make you go through 800,000 pages without
2   something more specific to go on.  But at least find out what
3   is there.
4           MR. DePAUL:  Okay.  Thank you, Your Honor.
5           THE COURT:  And turn over the NYPD stuff.
6           MR. DePAUL:  Yes, yes, Your Honor.
7           MS. TAE:  And Your Honor, I'd like to ask about the
8   Ford prosecution file.  This is a separate prosecution from the
9   Lucas file that we were just discussing.  So this file we're
10  requesting records from because Ms. Ross indicated during her
11  court of claims deposition that this was a prosecution which
12  she herself handled where she first found out, allegedly first
13  found out about Turner's Snow Gang affiliation.  So that's the
14  basis for the request and there, I mean, defendants haven't
15  made any sort of showing or argue that it would be burdensome
16  to review that file to see if there's any information relevant
17  to Turner in there.  So we would request that those records be
18  turned over.
19          THE COURT:  That's when the ADA apparently learned
20  that he had a Snow Gang affiliation?
21          MS. TAE:  Yes.
22          MR. DePAUL:  That was her testimony, Your Honor.  I
23  did consult with the D.A.'s office with that prosecution, too.
24  My understanding is that it's in similar form, but I can talk
25  with them to see what's feasible.

1          THE COURT:  See what's feasible.  I mean, obviously
2    if she found out during the course of that prosecution then
3    there's got to be some material there indicating, you know,
4    what the gang membership was.  This information is coming from
5    somewhere, it's just a question of finding where it's coming
6    from.
7          MS. TAE:  Thank you, Your Honor.
8          THE COURT:  All right.  Explain to me the Newsome
9    materials, because I'm not quite understanding why you need
10   that for this case.
11         MS. TAE:  I'm sorry, Your Honor, before we move on
12   could we get a date as to when defendants could get back to us
13   with that information?
14         MR. DePAUL:  Your Honor, I'm speaking with the D.A.'s
15   office tomorrow.  I can probably, it's going to take them some
16   time to figure out what's feasible and what is not.  So at
17   least a week, Your Honor.
18         THE COURT:  That's fine, get back to them in a week.
19         MS. TAE:  So Your Honor, just moving on to the
20   Newsome material.  So this was a shooting homicide of an
21   individual named Danyae Champelle.  It was prosecuted by ADA
22   Ross and it involved four co-defendants.  And there during jury
23   selection the defense discovered that hidden within, like 500
24   pages of discovery there was a DD5 file that showed a
25   ballistics comparison had been conducted between the

1  Champelle murder and another unrelated shooting that had been
2  committed two days earlier by an individual named Shameke
3  Corbitt (phonetic), who Ross was also prosecuting.

4           So the defense moved for a mistrial and the Court
5  directed Ms. Ross to figure out if there had, in fact, been a
6  match between those two shootings.  She determined that there
7  had been and subsequently disclosed the DD5 that was dated a
8  few weeks after the incident back in 2010, four years before
9  the trial that showed the ballistics match.

10          So then the trial court then had to consider whether
11 to grant the extraordinary relief of dismissing the murder
12 charges on the basis that the prosecution had committed an
13 intentional Brady violation.  The Court ultimately did not find
14 evidence of deliberate misconduct by Ms. Ross, but I think
15 we're still entitled to the case file on it because the Court
16 really only had a small piece of the universe of evidence.  It
17 heard testimony from the NYPD but it didn't review what was in
18 the D.A.'s file, Ms. Ross didn't testify at the hearing.

19          The defendants in that case didn't have the benefit
20 of civil discovery.  Moreover, we weren't a party to that
21 proceeding, we're not bound by it, neither is the Court.  So I
22 think we are entitled to investigate what happened.  And I
23 mean, even if it wasn't deliberately withheld by Ms. Ross we
24 think it's still relevant information.  I mean, the fact that
25 she was prosecuting, she was prosecuting this individual

Corbitt for the attempted murder, and the request for
comparison was made in that case. And then she knew that there
was a comparison that they requested and, and to be, remain
willfully ignorant of the results, I mean, that's beyond
belief.

And you know, clearly it's relevant to the fact that,
you know, she was being deliberately indifferent to her
obligation to seek out Brady information that was within the
possession of either the NYPD or others in her office as
required by Kyles v. Whitley.

Additionally, I mean, there's information in that
case law not only relating to the exculpatory ballistics
report, but additional Brady violations that she committed in
connection with the retrial, which obviously was never
litigated in the criminal case because it happened after the
mistrial and because the retrial resulted in acquittal.

So those Brady violations included an exculpatory
surveillance video that showed that the star prosecution
witness was not at the location she claimed to be when she
observed the shooting. There's also a cell phone document
which showed that Corbitt when he was arrested, I think 9 hours
after the Champelle murder, on this unrelated attempted murder
was actually found in possession of Champelle's cell phone.
And that, you know, those are additional Brady violations as
well.

1        So I mean, I think all of this information is

2 relevant to our Monell claim because it's evidence of

3 additional Brady violations.  And even if the evidence showed

4 that, you know, she didn't intentionally but instead

5 recklessly, I think it shows that the office's failure to

6 investigate or discipline her, or to have training and

7 procedures to ensure that such violations, even unintentional

8 didn't occur.  I think that's all relevant to our Monell claim

9 involving the D.A.'s office.

10      And I also note that, you know, Ms. Ross will also be

11 a witness so, you know, this information goes to her

12 credibility.  And it's relevant possibly as Rule 404B evidence

13 because it shows an absence of mistake.

14      MR. DePAUL:  Your Honor, I mean, I think for all the

15 details that plaintiff's counsel just laid out the most

16 important takeaway from this is that it has nothing to do with

17 this case.  There was a hearing held in Newsome and the Court

18 found specifically that this was not an intentional or a

19 reckless Brady violation, it wasn't intentional, it wasn't even

20 part of an error committed by the D.A.'s office, it was an

21 error committed as the Court ruled by the NYPD.

22      Now Mr. Newsome did bring a civil suit and that was,

23 discovery was had and that case was settled.  This plaintiff in

24 this case doesn't need to relitigate these issues over and over

25 again simply because it involves the same prosecutor.  This

would result in many trials about whether ADA Ross committed

Brady violations in any of her other cases, which is just not

relevant, and definitely not proportional to the needs of this

case.

MS. TAE:  I mean, the question here is whether this

information is discoverable.  I mean, that's irrespective of

whether such evidence would be admissible at trial.  And I

think here it is.  I mean, we have a targeted request, we're

not seeking the full file, we're only seeking the documents

specifically relating to the Brady evidence that was withheld

and what evidence defense requested and what was disclosed.

And I don't understand defense argument that this is

unrelated to our case when it's directly relevant to our Monell

claim involving the D.A.'s office.

MR. DePAUL:  It, you're just looking to get, to find

out if she committed a Brady violation in another case, which

is not your claim.

MS. TAE:  We already know that she committed a Brady

violation.  I mean, your argument is that she didn't commit

intentionally, but she still committed it.  I mean, the

prosecution really has an obligation to seek out Brady

information, that's a function of the NYPD.

MR. DePAUL:  We understand that, but it's not, it's

not the purpose of your, of civil discovery for you to get to

relitigate her career, or the decisions she made in connection

with that case, especially when the hearing was held on the

Brady violation in the first trial and a civil claim was

brought by Mr. Newsome.  And discovery was held in that case.

MS. TAE:  We're not relitigating her career, we're

trying to obtain discovery that's relevant to show the office's

deliberate indifference to the need to train and supervise and

potentially discipline prosecutors as to their Brady

obligations.

MR. DePAUL:  And Your Honor, I will note that, as we

noted in our letter, this case has been consolidated with

Bellamy versus City of New York  and another case, Benitez,

which has been settled.  Plaintiff's counsel has obtained days

of testimony from executives of the Queens D.A.'s office, both

current and former, about exactly these practices, the need for

training, the need for discipline.  They have tens of thousands

of pages of documents on these things.

What's different about this one, Your Honor, is that

it's specifically related to this prosecutor and it really

doesn't relate to the policies and practices of the office.

They're really just looking to find another mistake that this

ADA allegedly made.  And civil discovery in one case shouldn't

be permitted, it's not that broad to allow them to do that.

MS. TAE:  I mean, I don't understand it.  I mean,

doesn't that actually support plaintiff's claim that this is

relevant because it is evidence regarding potential Brady

violations that this Prosecutor may have committed in another case?

MR. DePAUL: But Your Honor, the claims in this case are related to what happened to this plaintiff, not what happened to another civil plaintiff or another criminal defendant. Whether or not ADA Ross committed a Brady violation in another case, which she didn't, and the Court ruled that she didn't, is not relevant.

And again it's, for us to go down this road and relitigate another case just increases the scope of discovery in this case when we should be trying to focus on resolving paper discovery disputes and moving on to depositions. And for us to go down this road of litigating an entire civil case that was already brought and settled is really too far afield.

MS. TAE: Your Honor, we're not trying to relitigate anything, we're trying to investigate what happened in that case and we do think it's relevant because Ms. Ross is a witness, her credibility is at issue here and you know, whether or not she committed a Brady violation intentionally or recklessly or, you know, failed to follow up is all relevant information. And I just don't see how, you know, given the broad discovery rules under the, you know, under federal discovery, we should be entitled to this information.

I mean, I'd also note that Judge Glasser in the Newsome civil lawsuit sustained a claim that the misconduct was

intentional and you know, the City settled for six figures

prior to discovery.

MR. DePAUL: Well, I don't, I don't understand why,

Your Honor, I don't think that's necessarily accurate. I don't

know why plaintiff's counsel is saying it was pre-discovery.

ADA Ross was deposed in that case, they were clearly in

discovery. And whatever ruling that was made by Judge Glasser

was done on a Rule 12(b)(6) motion. So Your Honor, I truly, I

think this request is really too far afield. It has nothing to

do with this case, it doesn't have anything to do with the

policies and practices of this office. They just want to find

another mistake allegedly made by this ADA.

MS. TAE: I mean, I think the point is we are trying

to discover whether or not it was a mistake or, you know, this

Brady violation was a result of inadequate training,

supervision and discipline by the office. Either way it's

relevant because it either shows that she was intentionally

violating their rights by withholding this information or she

was indifferent to her obligations to seek out Brady

information while it was in the possession of the NYPD. And it

was caused by the office's deliberate indifference.

MR. DePAUL: But a court examined this, Your Honor,

and ruled that this --

MS. TAE: That doesn't matter.

MR. DePAUL: Excuse me, Haran.

1     MS. TAE:  I'm sorry.

2     THE COURT:  A court ruled on this and determined that

3 it was a bureaucratic error created as it resulted from the

4 Police Department, not from the Queens D.A.'s office.

5     MS. TAE:  Again, Your Honor, as I mentioned before

6 first of all we weren't a party to that proceeding, there's no

7 identity of parties.  We didn't have the opportunity to

8 litigate it.  We're not bound by it and the court there only

9 had a small piece of the evidence, they didn't hear or consider

10 all of the possible evidence.  Ms. Ross didn't testify at the

11 hearing, they didn't review what was in the D.A.'s file, they

12 only heard testimony from a representative from the NYPD as to

13 why the ballistics match wasn't reported to the Champelle

14 murder.

15     We know that ADA Ross prosecuted the attempted murder

16 of Corbitt, who knows if she received notification of a match

17 in connection with that case.  I mean, we're entitled to

18 investigate that.

19     MR. DePAUL:  Your Honor, I have nothing further to

20 say.

21     MS. TAE:  I mean we, Your Honor --

22     THE COURT:  I'm not going to let you litigate an

23 entirely different case.  You might be entitled to some

24 limited, very specific records regarding that.  But you're

25 going to have to narrowly tailor it because I'm not going to

1  let you go through and relitigate an entirely separate case

2  just because it's the same Prosecutor.

3       MS. TAE:  Your Honor, we're not trying to relitigate

4  it, we narrowed our request for documents specifically relating

5  to the Brady evidence that was withheld, and then a transcript

6  showing what the defense requested and what was disclosed.

7  We're not requesting the full file.

8       MR. DePAUL:  But Your Honor, basically if you look at

9  the request it basically is the full file, or something close

10  to it.  They're requesting all evidence, all property vouchers,

11  all evidence requests.  The transcript for every single court

12  appearance for the entire case.  You know, just because there

13  are sub-categories of information in the request doesn't mean

14  the request isn't burdensome and it doesn't really encompass

15  almost the entire file.

16       The requests that they have served are extremely over

17  broad and really, to the extent that this information should be

18  produced really would need to be much more targeted than they

19  are now.

20       THE COURT:  Like I said, I think you might be

21  entitled to some very limited discovery but I'm not going to

22  let you go full scale into the entire separate case.  So you're

23  going to have to narrow your request.  Maybe you can check and

24  see what discovery was already collected in the other civil

25  case, that may make it easier to figure out what's there and

1 maybe you could help them narrow and target the discovery

2 request in a way that, you know, produces the relevant

3 information without going full scale into a whole separate

4 case. I really don't think we need to relitigate that whole

5 thing but there might be some relevant information that's

6 already been collected, particularly when, you know, there was

7 another civil case in that, regarding that issue. So maybe see

8 what's already been collected and plaintiff will have to narrow

9 the request a little bit more.

10          MS. TAE: Yes, Your Honor.

11          THE COURT: Okay, the reversal memorandums. I mean,

12 that seems like work product.

13          MS. TAE: And so, Your Honor, I mean, even to the

14 extent that the memos -- well, sorry, Your Honor, I'll back up.

15 So our understanding is that the memos often contained not just

16 an analysis of whether or not certain claims are meritorious

17 but also kind of their findings of what had happened in the

18 underlying case and the alleged misconduct. It's factual

19 material.

20          And you know, even to the extent that it contains

21 core work product material I think where we are alleging that

22 the D.A.'s office was deliberately indifferent and, you know,

23 the state of mind of the executives is directly at issue in

24 this case here, that privilege would be overcome because the

25 reversal memos helped to put the D.A. on notice of misconduct

1  and the need for training and/or discipline.

2  So that information is relevant because it would show

3  that the executives had actual notice about the extent of the

4  misconduct.  And it kind of shows, you know, we can compare

5  what happened in the memo versus what happened after the D.A.'s

6  office appealed.

7  So what matters is what the D.A.'s office thought of

8  the misconduct that was alleged and their findings in

9  connection with respect to that alleged misconduct.  And I

10  would just note that the City voluntarily produced reversal

11  memos in connection with the <u>Benitez</u> lawsuit, which is this

12  other lawsuit also involving a Monell claim against the D.A.'s

13  office as well as an additional lawsuit, <u>Sevius (phonetic)</u>

14  <u>versus the City of New York</u>.

15  So the fact that, and they've taken the position that

16  the fact that they prepared these reversal memos showed that

17  they weren't deliberately indifferent because it was

18  disseminated to executives at the D.A.'s office and the trial

19  prosecutors.  So they may contend that their reversal memos are

20  evidence in their favor on the Monell claim, so you know, if

21  they do that then I think we're entitled to that information.

22  THE COURT:  Well, I mean, to the extent they're going

23  to use it as affirmatively in their defense, then sure, you'd

24  be entitled to it.  I don't know if they're going to do that in

25  this case.  Are you, Mr. DePaul?

1      MR. DePAUL:  I don't, at this stage, Your Honor, I
2  haven't really made that decision.  But at this stage I don't
3  intend to.  I mean, to the extent we plan on using it,
4  obviously I understand my obligation to produce it.  But as
5  Your Honor said it's pre-core work product and what is
6  contained in these memoranda are what we said in our letter.
7  It's the grounds for appeal, grounds for potential appeal based
8  on a reversal of a conviction by the second department.  And it
9  just, it sets forth what the ADA, particular ADA's file
10 processes are on the merits of a particular appeal.

11     Plaintiff's counsel knows why these cases were
12 reversed.  They have the cases, they have the court decisions,
13 there is no reason for them to say that they need this thought
14 processes of the ADAs on whether or not the office should take
15 an appeal.

16     You know, and as we also said in our letter I don't
17 think plaintiff's argument about the fact that they're bringing
18 a deliberate indifference claim has a lot of merit to it
19 because that would mean, in any case when a plaintiff is
20 bringing a deliberate indifference claim there can be no claim
21 of attorney work product privilege, and I just don't think
22 that's the case.

23     So I think for those reasons, for all of the reasons
24 we stated in our letter, this is core work product and should
25 be protected.

1          THE COURT:  Why these four cases specifically?

2          MS. TAE:  So we had made a request for a number of

3     different cases where there have been reversals based on

4     allegations of prosecutorial misconduct.  Mr. DePaul indicated

5     that of that list only these four have reversal memoranda.

6          THE COURT:  Okay.

7          MR. DePAUL:  Yes, Your Honor, we consulted with the

8     D.A.'s office and they informed us that only these four had

9     reverse memorandums.

10          THE COURT:  Had reverse memorandums.

11          MS. TAE:  And Your Honor, I just note that the law in

12    the Circuit is clear where the courts routinely order

13    disclosure of the work product that's relevant to civil rights

14    claims.  I mean, there's a number of different cases.  The

15    defendants in their opposition brief cited, in their opposition

16    letter cited to the McCrae case, but there actually the Judge

17    ordered that core work product related to the ADA's

18    investigation of plaintiffs be produced, including records

19    containing the defendant ADA's thought processes and analyses

20    and recommendations regarding the investigations because the

21    Court found that information was relevant to the plaintiff's

22    claims there.

23          THE COURT:  Well, I'm not going to, I wouldn't say

24    it's routine.

25          MR. DePAUL:  And since I was involved in that case,

1  Your Honor, there was a particular claim against the ADAs in

2  that case, they were actually defendants in that case.  So the

3  Court found because there was a claim against the individual

4  ADAs, for their investigative, well, for their investigation

5  during their initial hours of the case.  That's why the Court

6  found those documents to be relevant and ordered production of

7  it.

8       THE COURT:  Is there anything more you can tell me

9  about these four cases?

10       MS. TAE:  Sure, Your Honor, I can kind of summarize.

11  So these were, I can go kind of one by one.  There's a Mackey

12  case, this was a reversal of a robbery conviction where the

13  Court found that the Prosecutor deliberately set a trap for the

14  defense at trial by withholding a record book that was

15  maintained by the complainant which constituted Rosario

16  material and they had withheld it until after her cross

17  examination.  So you know, damaging testimony had kind of been

18  unwittingly elicited as a result.

19       The Washington case was a reversal of a rape

20  conviction that noted the impropriety of the Prosecutor's

21  summation argument that the defendant's testimony was a lie, a

22  pile of crock and was fabricated after having had the benefit

23  of counsel and that, you know, the Jury should not be fooled by

24  it.  So summation misconduct by the trial Prosecutor.

25       The Jones case was a reversal of a robbery conviction

where the Prosecutor deliberately attempted through the direct
examination of a Detective to create the unfair impression that
the co-defendant had implicated the defendant to police.

And then the <u>Anderson</u> case was a reversal where the
Prosecutor defied the Court's Sandoval ruling and asked a
series of prejudicial questions concerning the defendant's
prior narcotics conviction.  And then committed summation
misconduct by vouching for witnesses' credibility and
denigrating the defense and mischaracterizing the defendant's
testimony.  So --

THE COURT:  At least there three of those cases have
nothing to do with Brady violations.  They are other kinds of
misconduct.  So even if there was some relevant, you know,
information about policies and practices it wouldn't have to do
with Brady, which is the specific claim in this case.  It would
just be general misconduct, which I think is, you know, way,
way, too broad.

MS. TAE:  Your Honor, we just note that our claim is
not only based on Brady violations committed by Ms. Ross, it's
also failure to correct false testimony and the summation
misconduct.  And that she failed to correct the false testimony
of the two witnesses as to the benefits that they had received
from the D.A.'s office in connection with their cooperation, as
well as summation misconduct in connection with her comments
about, you know, their lack of benefits.  And then also that

1  they had no motive to lie, or no motive other than to try to

2  get justice for their friend to testify on behalf of the

3  prosecution.

4        So I would just note that our claim is not just

5  limited to Brady violations.

6        THE COURT:  Okay.

7        MR. DePAUL:  Your Honor, I just kind of think that

8  any of the facts as plaintiff's counsel describes them, I don't

9  think they're, I still don't think those claims are in any way

10  relevant to their Monell claim.  But still, the problem is the

11  core work product, right.  These aren't the specific

12  Prosecutor's, you know, these specific cases aren't, have

13  nothing really to do with this case.  So I think any relevance

14  argument is pretty tenuous.

15        THE COURT:  Who did, who prepares these reverse

16  memorandum?

17        MR. DePAUL:  The particular appeal of the ADA?  It's

18  the ADA who handled the appeal, and then it's reviewed by their

19  supervisors and then goes to the executive level to determine

20  whether or not they should take an appeal to the Court of

21  Appeals.

22        THE COURT:  Okay.

23        MS. TAE:  I would also note the defendants already

24  have the memos, so it would be a simple matter to produce them.

25  And I would just say that they are relevant and that the, you

1 know, the factors favoring are the policy reasons underlying

2 such privilege we think are outweighed by factors favoring

3 disclosure here.

4      THE COURT:  Yes, I'm generally disinclined to allow

5 the, you know, core work product in that way to be disclosed.

6 It would probably help if I had a look at exactly what one of

7 these things looks like.  Do you think you could provide one

8 for the Court to review in camera so I have a better idea of

9 exactly what we're talking about here?

10      MR. DePAUL:  Yes, of course, Your Honor.

11      THE COURT:  Maybe get the Mackey one.  That was the

12 Brady one, right?

13      MS. TAE:  Yes, Your Honor.

14      THE COURT:  Unless you think there's a better one

15 that you want me to review.

16      MR. DePAUL:  I can, I'll take a look, Your Honor.

17 And if I think more than one will be helpful I can provide

18 that.

19      THE COURT:  All right.  Just contact --

20      MR. DePAUL:  How --

21      THE COURT:  Contact my Chambers and get an email

22 address from one of my law clerks to send to them directly.

23 It's just easier that way.

24      MR. DePAUL:  Okay.  Thank you, Your Honor.

25      THE COURT:  And all right, what's the next one?  The

next issue is the records regarding ADA Pomodore.

MS. TAE:  Yes, Your Honor, so this comes out of a high profile murder case against an individual named Petrocetti (phonetic), which was prosecuted by ADA Pomodore in 2000.  In that case the star prosecution witness Compores (phonetic) falsely testified at trial that he had been relocated because he feared for his safety but denied receiving any financial benefits from the D.A.'s office.  He falsely claimed that the D.A.'s office didn't help pay for his hotel which he had been staying at for months prior to the trial.

Ms. Pomodore at trial disclosed to the defense a one-page summary that indicated that around $18,000 had been spent on housing and meals, but it was a very, kind of vague summary with very little information.  It didn't specify whether that money was spent on housing for Compores or for his security detail.  It contained no other information.  The defense tried to confront him with that summary but Compores kept denying and Ms. Pomodore kept objecting.

And then many years later Mr. Betti (phonetic) learned through Foil (phonetic) litigation that Compores had in fact received around $20,000 in benefits which included meals, hotel fees, but also a security deposit and transportation as well.  And that disclosure included cash receipts but showed that $3,000 had been paid directly to him and that he had also declined relocation on three different locations, including

1  when Mr. Betti was returned on extradition.

2         So this undisclosed material showed that contrary to

3  testimony he knew that the D.A.'s office was paying for his

4  hotel and other benefits and also impeached his testimony that

5  he feared for his safety.  Mr. Betti then brought a 440 motion

6  in 2012 based on this evidence and the D.A.'s office opposed

7  that motion arguing that Ms. Pomodore had lacked actual

8  knowledge of the documents that she suppressed because at that

9  time the office had a practice of walling off witness security

10 records from trial Prosecutors.

11         THE COURT:  Okay.

12         MS. TAE:  And the Court there rejected the D.A.'s

13 arguments, and then reversed Mr. Betti's conviction and noted

14 that, you know, Ms. Pomodore should have corrected the false

15 testimony, that she was in a superior position than the defense

16 to know that information and, you know, she should have had the

17 cash receipts, the prosecution should have had the cash

18 receipts and declaration forms and turned them over.

19         So then we deposed Ms. Pomodore as a Monell witness

20 in connection with this lawsuit and then two other related

21 lawsuits and she testified in her deposition that she was

22 unaware through 2012 when the 440 motion was filed of any

23 policy and procedures regarding the obtaining of witness

24 security files and she also denied knowing whether, she denied

25 recollection of whether she had obtained these specific types

1  of records that she withheld in Betti and other cases.  And she

2  denied being investigated for misconduct or discipline and she

3  also, she and the D.A.'s office executives also testified that

4  there had been no investigation into whether similar Brady

5  violations had occurred in other cases.

6          So we're seeking these files from her other trials

7  because we believe the relevancy of both series of Monell claim

8  that either the D.A. was deliberately indifferent to the need

9  to train or discipline Prosecutors who committed fair trial

10 violations or that the D.A. failed to have some sort of

11 information management system that ensured that Brady

12 information was communicated to the trial Prosecutors who were

13 in the position to disclose that information to the defense.

14          THE COURT:  Tell me if I'm wrong, but this case

15 doesn't involve any kind of witness security, does it?

16          MS. TAE:  That's correct.  It doesn't involve --

17          MR. DePAUL:  No, it does not, Your Honor.

18          MS. TAE:  It doesn't involve witness security records

19 specifically, but we believe that defendant's argument that

20 it's not relevant on that basis is too narrow.  We, I mean,

21 it's impeachment evidence concerning witnesses and we believe

22 that our Brady claim is broad enough to encompass that.  So we

23 seek these records because, I mean, the records may show that

24 she had obtained or disclosed such witness security records in

25 other cases prior to 2012 that would, you know, be evidence of

1 cautious avoidance, possibly deliberate misconduct. If the

2 records show that she was --

3      THE COURT: This Prosecutor has nothing to do with

4 this case.

5      MS. TAE: That's correct, Your Honor. She wasn't the

6 same Prosecutor but, you know, we think it's relevant because

7 it's supportive of our Monell claim. The records, if the

8 records show that the, as late as 2012 the D.A.'s office still

9 had no system for ensuring that benefits concerning trial

10 witnesses remain known to the trial Prosecutor, I think that

11 also is evidence supporting our deliberate indifference claim.

12      MR. DePAUL: Your Honor, if I may be heard --

13      THE COURT: If you want to find out whether or not

14 they had a policy back then, that's one thing. But you're

15 asking for records of 37 cases where you don't even know

16 whether or not there was any violation, and they clearly have

17 nothing to do with this case. If you want to explore whether

18 or not there was a policy and practice of getting, you know,

19 WSP information to Prosecutors, you know, that's perfectly fine

20 if you want to go into the policy and practice.

21      But that's not really what this would accomplish. I

22 think this is just opening the door for a whole bunch of

23 irrelevant stuff and unnecessarily expanding the scope of

24 discovery here. You know, you want to ask witnesses about the

25 policies and practices regarding the WSP information, how it

1 was gotten to line Prosecutors and whether there's a system in

2 place, you know, that's all well and good.  But I'm not going

3 to let you get records from these 37 other cases that have no

4 other bearing on this one.  I think that's going too far.

5          MS. TAE:  Well, Your Honor, --

6          MR. DePAUL:  Your Honor, if I could add something

7 here --

8          THE COURT:  One at a time.

9          MR. DePAUL:  Your Honor, if I may be heard on this

10 point.

11          THE COURT:  Yes.

12          MR. DePAUL:  I think Your Honor is absolutely

13 correct, but I will say there has been extensive discovery on

14 this specific policy issue in the other cases, and this case,

15 and the consolidated depositions that we've taken.  Plaintiff's

16 counsel deposed the former Chief of the Witness Security

17 Division who was Chief at the time of the Betti trial.  They

18 have deposed I believe eight current or former executives at

19 the office and at each of the depositions information related

20 to the policy related to witness security was asked, there's

21 extensive testimony on that.

22          And by the way, they all testified consistently with

23 what they represented in the Betti case, that the witness

24 security files were maintained separately from the A.D.A.'s

25 trial file.  So all of that testimony is consistent and they

also produced I believe in Bellamy about 50 witness security

files were produced to plaintiff's counsel.  They have that

information.  This request is just targeting a specific

Prosecutor who has no relation to this case.

MS. TAE:  Well, Your Honor, first of all I'd like to

say, you know, the request encompasses 37 cases but, you know,

there may not have been witness protection involvement in a lot

of these so the actual number might be much smaller.  And in

many cases, you know, if there were many cases that actually,

you know, might have significant ramifications because it might

show the extent of the violations that occurred, potential

violations that might have occurred and show that the lack of

information management system as these executives conceded may

have resulted in the rights of many, many other defendants

being violated.

THE COURT:  Given the --

MS. TAE:  And you know, withstanding the deposition

of the executives -- I'm sorry.

THE COURT:  It's not your job in this case to

vindicate the rights of all of these other people who may or

may not have been affected there.

MS. TAE:  Yes, Your Honor, but, yes, but I think if

the fact, if the evidence shows that there were Brady

violations in many other cases, that shows the extent of the

deliberate indifference by the D.A.'s office for failing to

1 have a system to ensure that witness protection records were

2 conveyed to the trial Prosecutors.  And so we want to see

3 whether violations continued.

4         THE COURT:  Which would make sense if there was any

5 claim in this case that the violation here had to do with

6 witness security, which it doesn't.  I mean, you know, if you

7 want to pursue this in another case where there's a witness

8 security issue that resulted in a Brady violation, I think that

9 might be fair game.  But I think this goes way too far afield

10 of the relevant issues in this case.

11         So the last issue is the new, the most recent motion

12 which has to do with his unrelated gun charge.  Now the Brady

13 violation that you are alleging in that was there was a note

14 indicating that the gun that he pled guilty to possessing was

15 involved in another shooting?

16         MS. TAE:  Yes, Your Honor, that the D.A.'s office had

17 information that that gun had, that his co-defendant in that

18 case had used or been involved with that gun in another

19 shooting.

20         THE COURT:  Okay.

21         MS. TAE:  And the reason why we're seeking that

22 information is because defendants have indicated that they

23 intend to bring a superceding cause defense that plaintiff

24 would not be entitled to recover damages for the amount of time

25 he spent incarcerated on this gun charge.  And so we request

this information to help rebut that defense.

MR. DePAUL: Your Honor, I mean, I think it's abundantly clear that when plaintiff pleads guilty to a concurrent sentence defendants are entitled to argue that that time spent incarcerated pursuant to a knowing and voluntary plea is, he's not entitled to recover those damages. And I think it's quite telling that plaintiffs attempted to bring this claim.

This was, they sought to amend their complaint to add this specific claim and Judge Matsumoto was very, very skeptical that they could insert it because the law in our view, and it's in almost everybody's view, it's clear that it's not, it's very unsettled whether or not a plaintiff is entitled to Brady information before entering into a plea. And then he really, it's highly doubtful that you can bring a claim based on that.

And apparently plaintiff was persuaded, he decided not to bring that claim. So it doesn't seem correct to us that they would not amend the complaint to add the complaint, but still yet get the ability to obtain discovery on it.

But at the end of the day, Your Honor, this isn't a Brady violation. Just because the D.A.'s office may have had information that this gun was involved in another shooting doesn't mean that it's exculpates plaintiff of gun possession, which he pled guilty to under oath and which he admitted to

1 twice when he was arrested for it.

2       THE COURT:  Can you tell me a little bit more about

3 the circumstances of the gun possession?

4       MS. TAE:   Yes, Your Honor.

5       MR. DePAUL:  He is riding in a, go ahead, Haran.

6       MS. TAE:  Sure.  So he was a passenger in a car

7 driven by this co-defendant, Ms. Coleman.  And she was pulled

8 over I believe because she was driving under the influence, so

9 I think the reason she was pulled over was because she was

10 driving erratically.  And when they were pulled over the gun

11 was found under plaintiff's seat.  Plaintiff claimed that he

12 was sleeping, he woke up, she tossed the gun at him and then he

13 put it under the seat.  He didn't know anything about the gun

14 or where it came from.

15       When they were arrested Ms. Coleman was found to have

16 bullets matching the caliber of the gun in her pocket.  And

17 eventually they were indicted and the D.A. internal status

18 sheets note that, you know, originally the D.A. was

19 anticipating asking Mr. Taylor to cooperate with them against

20 Ms. Coleman because they had this information that it was in

21 fact her gun.  But then he ended up getting arrested on the

22 murder charge and, you know, eventually being offered the

23 concurrent time which he accepted after he had been sentenced

24 on the murder case.

25       And so, I mean, we're not contesting that defendants

1 are entitled to bring that defense, we are saying that if they

2 do bring that defense we're entitled to information related to

3 that case. And the reason why we didn't bring a separate Brady

4 claim on this case after the pre-motion hearing with Judge

5 Matsumoto was because she had indicated during that hearing

6 that, you know, she thought it would be redundant since we're

7 already claiming all of the damages for the whole period of the

8 murder and you know, there wouldn't be double recovery, so

9 what's the point. And that's why we decided not to pursue or

10 to amend the complaint to include it.

11          But I'd also note that she also opined during that

12 same hearing that she thought that defendant should turn over

13 the material.

14          THE COURT: What is it exactly that you're looking

15 for?

16          MS. TAE: So we are looking for information about

17 this case, the case file, just to try to figure out what

18 information the D.A.'s office had about her involvement with

19 this gun because, you know, it would show the extent of the

20 Brady violation that occurred.

21          MR. DePAUL: Your Honor, again, there's no claim

22 related to this. They tried to bring it, they didn't bring it,

23 there's no claim. And you know, to the extent that they're not

24 asserting the claim they shouldn't be entitled to get discovery

25 on the claim.

1          MS. TAE:  Your Honor, discovery is not limited to

2   just claims by the plaintiff, it also encompasses defenses that

3   the defendants may bring.  And they've indicated very clearly

4   that they intend to bring this as a defense, and we should be

5   entitled to evidence related to that defense, to rebut it.

6          MR. DePAUL:  I don't have anything to add,  Your

7   Honor.

8          THE COURT:  You are definitely bringing this defense,

9   correct, that because he was serving the 15 years for the gun

10  he wouldn't be entitled to damages for that period for the

11  wrongful conviction on the murder?

12         MR. DePAUL:  It would be, it would be 3-and-a-half

13  years, but yes, Your Honor.

14         THE COURT:  Yes, okay.  All right.  I mean, I think

15  they're entitled to something related to that because it is a

16  defense.  It might be a claim affirmatively on their side, but

17  it is a defense that defendants are asserting and plaintiff is

18  entitled to materials that would help them overcome that

19  defense.  So --

20         MR. DePAUL: But I think, Your Honor, I think the

21  problem that I'm having is they wouldn't be able to overcome

22  that even if they had the claim.  The law is clear that, it's

23  not as clear that plaintiff isn't entitled to Brady information

24  before his plea, and it was clearly, it was clear at the time.

25  Then I don't see the argument that he's entitled to rebut the

1  defense.  In other words if he was unable to prevail on the

2  claim on the merits then isn't allowing them to make their

3  argument just the same thing with respect to damages?

4      MS. TAE:  Your Honor, we disagree with that

5  characterization of the case law.  I think the 2nd Circuit case

6  Avellino still controls, that exculpatory Brady information is

7  required to be disclosed pre-plea.  And you know, regardless,

8  this is, whether or not we would prevail, I mean, that's a

9  trial issue.  That's not a basis for precluding discovery.

10      THE COURT:  I think ultimately this probably is not

11 going to fly, because I do think the case law is pretty clear

12 that you're not entitled to it prior to a plea.  I'll give you

13 a very small amount of leeway in terms of discovery.  I suppose

14 it would be useful to, I guess know what information, I guess,

15 the prosecution had at the time regarding the gun being used in

16 a prior shooting.  Or at least identifying what this prior

17 shooting was.

18      But you know, keeping in mind even if it was used by

19 Ms. Coleman in a prior case that doesn't necessarily prevent

20 him from being guilty of possession of it at the time that he

21 was arrested.  People share guns all the time.

22      MS. TAE:  Yes, Your Honor, but I think we're entitled

23 to explore that, and you know, constructive possession is a

24 rebuttable presumption.  If the D.A.'s office had exculpatory

25 information about that gun and didn't disclose it, I think

1  that's a Brady violation and I think --

2          MR. DePAUL:  I would also, I'm sorry, Your Honor, I'm

3  sorry, Haran, go ahead.

4          THE COURT:  Well, he also admitted to possessing, and

5  that's part of the plea, so.

6          MR. DePAUL:  And Your Honor, he admitted it at the

7  scene of his arrest.  Twice.  He said to the police officers

8  whatever is in the car is mine.  And then when his mother came

9  to the scene he said to her, mom, I did that.   And I believe

10  there was a hearing regarding whether or not those statements

11  would come in in connection with the gun case, and it was ruled

12  that they would.

13          THE COURT:  See if there's something specific

14  regarding this prior shooting, you know.  See if you can figure

15  out why they thought the same gun was used in a prior shooting,

16  whether there was like a ballistics match or something.  So you

17  can always provide that to them and they'll understand what

18  this prior shooting was.

19          MR. DePAUL:  Okay, Your Honor.

20          THE COURT:  I don't know if you can go much beyond

21  that.

22          MS. TAE:  Yes, Your Honor.  We're just trying to find

23  out what the information was that was in the D.A. office's

24  possession about, you know, what the basis for their belief

25  that she had been involved with this gun previously was.

1    THE COURT:  Yes, see if you can figure out where that

2 information is coming from.  You know, if it's something narrow

3 I think, you know, you can turn it over.  But I'm not going to

4 allow full scale discovery into a whole separate investigation.

5 But you know, if there's like a ballistics report that shows a

6 match or something simple like that.

7    MR. DePAUL:  Okay, thank you, Your Honor.

8    THE COURT:  At least explore, see what it is.  There

9 might be some limited stuff you can turn over, okay.

10    MR. DePAUL:  Okay.

11    MS. TAE:  Thank you.

12    MR. DePAUL:  Thank you, Your Honor.

13    THE COURT:  All right, I think that's everything for

14 now.

15    MS. TAE:  So Your Honor, we just request that we have

16 some sort of production schedule from the defendant.  I mean,

17 we're still waiting on a lot of material that defendants have

18 already agreed to produce, some of which we've been trying to

19 get for many years.  And so we just --

20    MR. DePAUL:  I --

21    MS. TAE:  We just believe that, you know, we need

22 some sort of schedule in order to kind of prevent undue delay.

23    MR. DePAUL:  Your Honor, I don't believe a production

24 schedule is necessary.  As we stated in our letter a lot of

25 this discovery depended on the outcome of the motion to amend.

1  Now that that's decided I'm reviewing and producing materials.

2  I've made a production of NYPD training materials next week, I

3  expect to review and produce the Snow Gang materials very soon

4  once I hear back from -- I have a data base for, I'm reviewing

5  a data base of thousands of emails obtained from the D.A.'s

6  office, and now we have, you know, information that I've been

7  ordered to  produce in connection with this motion.

8           It's not, there's been no delay, right.  The only

9  reason that the pace of production has slowed was at first the

10 pandemic.  But second, the outcome of the motion to amend.  Now

11 that that's been decided we can move forward, and I've started

12 to.  So I truly don't believe that there's, it's necessary for

13 the Court to set production deadlines.

14           THE COURT:  Look, --

15           MS. TAE:  And Your Honor, I just note that the, I'm

16 sorry.  Your Honor, we just note that the emails from the

17 D.A.'s office, I mean, Your Honor ordered those to be produced

18 in December of 2019.  I mean, we still haven't received those.

19           MR. DePAUL:  Well, I have --

20           MS. TAE:  This delay --

21           MR. DePAUL:   Haran, that's, first of all that's not

22 accurate.  We definitely produced the information related to

23 the emails for this case.  What I'm talking about and what

24 we're referring to is the Monell related emails that were

25 collected in connection with the requests that were made in

Benitez. Those are what I'm reviewing now. There was some

technical difficulties in both my office and the D.A.'s office.

Obviously everyone was short-staffed because of the pandemic,

so there was a delay.

But we have them, I'm reviewing them and I don't see

a reason why a Court should set up production deadlines for

those. We expect to produce documents, all of the documents

that we have to produce before depositions to the extent we

can, and then we should go on to depositions. But I don't see

that there's been, that there's been any prejudice. We've been

waiting for the outcome of the motion to amend, and now we've

had that.

THE COURT: All right. See what you can produce in

the next month. If you're not getting a good, you know, amount

of stuff being produced on a regular basis let me know. But I

don't want to set specific deadlines at this point given the

wide variety of different things we're talking about, some of

which may not even be in defendant's possession yet. But you

know, I'd like to move forward so let's try to get things

produced on a rolling basis as soon as you can.

MR. DePAUL: Thank you, Your Honor.

THE COURT: All right.

MS. TAE: Thank you, Your Honor.

THE COURT: Okay, have a good day. Stay safe

everyone, and --

1        MR. DePAUL:  Your Honor, we do need to set, we do

2   need to set a discovery schedule since we technically don't

3   have one, though.

4        THE COURT:  All right.  So why don't you confer and

5   come up with a realistic schedule and submit it.

6        MR. DePAUL:  Okay.  Thank you, Your Honor.

7        THE COURT:  All right.

8        MS. TAE:  Thank you, Your Honor.

9        THE COURT:  Okay, have a good day.

10       MS. TAE:  Okay.  Thank you, take care.

11       MR. DePAUL:  Thank you, Your Honor.  Bye, bye.

12       MS. TAE:  Bye bye.

13                    *  *  *  *  *

14            **C E R T I F I C A T I O N**

15       I, **PATRICIA POOLE**, court approved transcriber,

16   certify that the foregoing is a correct transcript from the

17   official electronic sound recording of the proceedings in the

18   above-entitled matter.

19

20

21   /S/ PATRICIA POOLE

22   TRACY GRIBBEN TRANSCRIPTION, LLC     DATE: May 14, 2021

23

24

25